## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

JANE DOE,                                          Case No.

                          Plaintiff,

v.

DAVID BAUM, ELIZABETH SENEY,
MARGARET GYTEKO, CHUNG
OWYANG.

                          Defendants.

---

### PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF TITLE IX OF THE EDUCATION ACT AMENDMENTS OF 1972 AND NEGLIGENCE

---

NOW COMES Plaintiff, **JANE DOE**, by and through her attorneys, The Law Office of Keith Altman, and for her Complaint against Defendants, hereby states the following:

1. This is an action seeking damages for Defendants' violations of Title IX of The Education Act Amendments of 1972. Plaintiff also brings a claim for Negligence under the law of the State of Michigan.

**COMPLAINT**

1

## **PARTIES**

1. Plaintiff Jane Doe ("Doe") is a former student of Michigan State University. Doe attended Michigan State University from Fall 2014 until Spring 2016. She was a minor child until August 2, 2015.

2. The University of Michigan ("UM") is a public research university located in the state of Michigan. As a public institution, UM receives federal funds and is therefore subject to Title IX of The Education Act Amendments of 1972.

3. On information and belief, at all times relevant to this action, Defendant DAVID BAUM was employed by UM as the lead Title IX coordinator.

4. On information and belief, at all times relevant to this action, Defendant ELIZABETH SENEY was employed by UM as the Assistant Title IX coordinator.

5. On information and belief, at all times relevant to this action, Defendant MARGARET GYTEKO was employed by UM as the Director of Faculty Affairs.

6. On information and belief, at all times relevant to this action, Defendant CHUNG OWYANG was employed by UM as the Chief of Gastroenterology.

7. On information and belief, all of these Defendants were employed by UM and worked in UM's Title IX office or were otherwise involved in Plaintiff's Title IX action.

## JURISDICTION & VENUE

8.  This action arises under the laws of the United States, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question).

9.  This action arises under the following federal statutes: Title IX of The Education Act Amendments of 1972. Pub.L. No. 92-318, 86 Stat. 373 (1972), 20 U.S.C. §§ 1681 et seq., which prohibits discrimination based on sex in educational institutions receiving federal funding.

10. In accordance with 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over Plaintiff's state law claim for negligence. This is because this state law claim is so closely related to the federal question claim that it forms the same case or controversy under Article III of the United States Constitution.

11. This Court properly exercises personal jurisdiction over each of the Defendants on the grounds that they were employees of UM at all relevant times herein and personally violated certain rights and policies, the effects of which were felt in the State of Michigan.

12. The proper venue for this case is in the United States District Court of Michigan because the events relevant to this action occurred within the State of Michigan.

COMPLAINT

## FACTUAL ALLEGATIONS

13. In or around mid-January 2013, Jane Doe (aged 19) met John Doe (aged 49) through an online website.

14. Jane Doe was a first-generation college student at Michigan State University and was interested in mentorship toward her potential goals.

15. John Doe was a board-certified gastroenterologist at the University of Michigan – Ann Arbor.

16. In late January 2013, John Doe met Jane Doe and agreed to mentor her toward her future career goals. Jane Doe was impressed by John Doe's credentials, as a board-certified gastroenterologist at the University of Michigan, as well as his achievements in research publications as an academic physician.

17. John Doe provided $250 for Jane Doe to attend this dinner meeting with him to discuss her future career aspirations as a physician and plans for college.

18. In early February 2013, John Doe met for dinner again and similarly provided $250 for her to attend this meeting. They similarly talked about her career goals as a future physician and strategized her course scheduling plans for the summer and when to take the Medical College Admission Test (MCAT) in preparation for medical school.

19. After this meeting, John Doe began to express interest in Jane Doe and put his hand on her knee, and attempted to kiss her, to which she nervously declined. During both of these dinner meetings, John Doe drove from Ann

COMPLAINT

Arbor to East Lansing to pick up and drop off Jane Doe from her dormitory. Jane doe did not have transportation of her own.

20. After this meeting, communication was in place about their mentorship relationship. John Doe offered Jane Doe $500 a month for a mentorship relationship with no intimacy, as well as $1000 a month for a mentorship relationship with intimacy.

21. John Doe also boasted that he mentored similar women in the past who provided for him included casual intimacy – although no one as young as her. The previous women, similarly, were from neighboring universities and also interested in pursuing doctoral degrees. Jane Doe 2 was a law student at Wayne State University and he purchased her a MacBook computer for her studies. Jane Doe 3 was a medical student at Wayne State University. Jane Doe felt that he was a safe individual who could be trusted given his profession and status as a doctor.

22. Jane Doe and John Doe's sexual relationship occurred from February 2013 - May 2013, although he continued to mentor her until she graduated from The University of Michigan in 2016.

23. During their sexual relationship, she first began to see his need for power and control. He often instructed her on what to wear for their interactions and coerced her into unsafe sexual practices. He used his medical knowledge and provided research studies that he has a "low sperm count" and inability to impregnate women, as well as being STD-free. John Doe

**COMPLAINT**

fulfilled his fetish of ejaculating inside Jane Doe with no condom during each sexual encounter.

24. However, in a March 2013 sexual encounter, John Doe failed to disclose his visible Molloscum Contagiousum virus. Although Jane Doe saw this ulcered lesion, she did not ask what it was, and he surprisingly entered inside of her and ejaculated inside of her -- without her permission. Two weeks after this encounter, she was diagnosed with genital herpes by a physician.

25. Upon confrontation, he denied having the herpes virus and failed to show her blood results despite her request. From this moment on, John Doe acted thrilled that he had spread this incurable and lifelong disease onto her and began to use the stigma and shame of the disease to exploit her – often using channels through the University of Michigan.

26. From 2013-2016, John Doe continued to communicate with Jane Doe with mentoring goals toward medical school, since this helped keep Jane Doe more focused on the future and less on the trauma of genital herpes contraction. He often communicated with her using his @med.umich.edu email and during work hours. Officials at UM knew or should have known these things because this specific email is only used for patient care. In these emails, he frequently made sexually suggestive comments and sometimes during work hours in between patient visits.

27. In Winter 2015 and Summer 2015, John Doe gave Jane Doe an internship at the University of Michigan Taubman Center. He assured her this would

help her gain admission to the University of Michigan School of Medicine and expressed his desire for her to one day be one of his students at the Medical School.

28. During this internship, Christine Marie Brazo PA-C noticed their close contact and asked Jane Doe how they know each other. Jane Doe was instructed by John Doe to say that she is a "family friend." Notably, Jane Doe was wearing blue scrubs and not the appropriate dress attire for her internship. Jane Doe also did not have a formal background check, ID, or HIPAA compliance. However, John Doe assured her that he sought permission before the start of her internship and that she was more than welcome to observe patient procedures, such as endoscopies and colonoscopies.

29. During a colonoscopy, Jane Doe met another gastroenterologist fellow, who was also being mentored by John Doe. This gastroenterologist fellow did observe Jane Doe feeling uncomfortable, but instead trusted John Doe and his position of authority in the situation. Jane Doe exited her internship early when John Doe rejected her request for a letter of recommendation for medical school because John Doe did not "want his name on a formal document" with knowledge of a previous sexual relationship.

30. In 2016, John Doe revealed to Jane Doe the presence of other victims, which inspired Jane Doe to take her first steps toward seeking justice. Jane Doe ended the relationship completely and immediately began therapy.

**COMPLAINT**

31. In early 2018, Jane Doe contacted the University of Michigan Title IX Office. In February 2018, she met with David Baum and Elizabeth Seney who did her intake. They stated they would be unable to conduct a formal investigation, but due to the nature of the allegations, they would conduct an informal investigation toward disciplinary action.

32. Nothing happened until April 2018, Jane Doe received an email from David Baum stating that John Doe's adjunct professorship "was discontinued" and that he "was informed that I raised concerns about his behavior." Emails with David Baum continued until June 2018, which further stated that John Doe had been terminated and was the subject of disciplinary action by the University of Michigan based on her reports. David Baum suggested that Jane Doe speak to Dr. Owyang about the termination and her overall safety in the hospital.

33. Dr. Owyang offered Jane Doe a personal meeting to address her concerns. This meeting occurred on October 23, 2018. Theresa Nester was present, taking notes, as well as Brooke Noonan, Jane Doe's support person. During this meeting, Dr. Owyang emphasized her safety at the hospital and further reassured her that John Doe has been terminated since April 2018 based on her reports after the informal investigation. He stated that he personally "fired him" in April 2018 through a phone call and mentioned Jane Doe's report, investigation, and The University's concluding decision.

34. Dr. Owyang had a stack of papers on his desk which he indicated were from the Title IX office and he offered to refer to any specific email regarding the investigation that UM had conducted. Since Jane Doe received written emails directly from the Title IX Office as well as an in-person meeting with Dr. Owyang himself, Jane Doe believed this information to be true.

35. Dr. Margaret Gyetko was kept apprised of all communications between Dr. Owyang, Title IX, and Jane Doe.

36. In September 2019, Jane Doe saw through a public social media post that John Doe was interviewing at Stanford School of Medicine for both a doctor and professorship position. Jane Doe sent Stanford Title IX Office and School of Medicine Staff, information regarding John Doe's termination, as well as further evidence about the sexual assault she had experienced. Through pre-suit negotiations, documentation was revealed that there was no record of disciplinary action at UM. Furthermore, it was revealed that John Doe was never informed of Jane Doe's report to the Title IX office. Rather, John Doe chose not to renew his position at the University of Michigan when Dr. Owyang called him. Therefore, the University of Michigan had failed to even conduct an informal investigation of the matter – despite the serious allegations of sexual assault and intimate person violence – and allowed John Doe to have access to the University of Michigan's email servers, business contacts, and more students, until the end of his renewal on August 31, 2018.

**FIRST CAUSE OF ACTION**
**Violation of Title IX of The Education Act Amendments of 1972**
**(Against All Defendants)**

37. Plaintiff Doe incorporates by reference as if fully stated herein, Paragraph Nos. 1-37 of her Complaint in their entirety.

38. Title IX of the Education Act Amendments of 1972 prohibits discrimination based on sex in educational institutions receiving federal funding. Schools receiving federal funding are required to employ at least one Title IX coordinator, a staff member responsible for Title IX compliance. 34 CFR 106.44 provides that such institutions must respond affirmatively when they receive "actual knowledge" that a student may have been discriminated against based on gender. This creates a duty for institutions to cause their Title IX coordinator to promptly investigate allegations of sex-based discrimination and provide accommodations to students that have suffered sex-based discrimination.

39. At all times herein mentioned Defendant UM was a public university that received federal financial assistance through grants and federally assisted tuition payments collected from students. Thus, Defendant UM is a recipient of Federal financial assistant for purposes of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

40. At all times herein mentioned Defendant BAUM was employed as the Lead Title IX Coordinator at UM.

**COMPLAINT**

41. The illegal actions Doe suffered at the hands of John Doe were perpetrated against Doe specifically based on Doe's gender. Doe is female. John Doe is male.

42. UM had "actual knowledge" of these illegal actions Doe suffered at the hands of John Doe when Plaintiff reported it to the Defendants. Therefore, UM was legally required under Title IX to conduct a full and thorough investigation into the illegal actions suffered by Doe.

43. Defendants violated their Title IX obligations and inflicted sex-based discrimination on Doe when:

    i. Defendant BAUM failed to initiate any meaningful Title IX investigation into John Doe's illegal actions.

    ii. Defendant UM through Defendant BAUM failed to undertake any affirmative actions to ensure that Jane Doe felt safe on UM campus.

44. As a result of Defendants' violations, Doe suffered profound disruptions to her sense of safety while enrolled at UM. This caused severe anxiety and depression, forcing Plaintiff to abandon her education and career goals for a time. Therefore, as a direct and proximate result of the Defendants' unlawful sex-based discrimination, Doe was prevented from enjoying the full benefits of her education at UM.

**SECOND CAUSE OF ACTION**
**Negligence**
**(Against Defendant BAUM and SENEY)**

**COMPLAINT**

45. Plaintiff Doe incorporates by reference as if fully stated herein, Paragraph Nos. 1-37 of her Complaint in their entirety.

46. Defendants breached their duty of reasonable care by negligently acting or omitting to act in such a way that resulted in Doe's emotional harm and withdrawal from UM. Defendants knew or should have known their actions and omissions posed a substantial risk of harm to Doe.

47. After being made aware of Doe's allegations, Defendants were negligent in performing their duties thus they failed, neglected, and/or refused to discharge their responsibilities properly and fully when:

    i.    Defendant BAUM failed to initiate any meaningful Title IX investigation into John Doe's illegal actions.

    ii.    Defendant UM through Defendant BAUM failed to undertake any affirmative actions to ensure that Jane Doe felt safe on UM campus.

    iii.    Defendants failed to undertake any correspondence with Doe regarding the status of her Title IX report.

48. By their negligent conduct, the Defendants have  inflicted extreme and severe emotional distress on Doe, who is confronted with a complete disruption of her education and career plans which forced Doe to expend financial resources to pursue her education elsewhere. Therefore, Doe has suffered direct financial losses due to the Defendants' unlawful and negligent conduct.

**COMPLAINT**

49. As a result of Defendants' conduct, Doe has also suffered from severe anxiety and depression which has affected her mental and physical wellbeing. Doe has been and continues to be treated by a therapist for these symptoms.

50. The emotional, psychological, and financial distress that the Doe has suffered and will continue to suffer was caused directly and proximately by the Defendants' unlawful and negligent conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Doe requests that this Court grant her relief as follows:

(1) Compensatory damages for monetary loss, damage to reputation, humiliation, mental anguish, and emotional distress.

(2) Punitive damages against the Defendants.

(3) Attorneys' fees.

(4) Costs of the suit.

(5) Injunctive relief; and

(6) Such other relief as the Court may deem proper.

## JURY TRIAL DEMANDED

Plaintiff Doe hereby demands a trial by jury on all issues stated in this action.

COMPLAINT

Date: October 22, 2021

Respectfully Submitted,

*/s/Keith Altman*
Keith Altman, Esq.
The Law Office of Keith Altman
33228 West 12 Mile Road - Suite 375
Farmington Hills, MI 48334
Telephone: (516) 456-5885
keithaltman@kaltmanlaw.com
*Attorney for Plaintiff Jane Doe*

**COMPLAINT**