## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JANE DOE,<br>                    *Plaintiff,*<br><br>v.<br><br>UNIVERSITY OF MICHIGAN,<br>et al.<br>                    *Defendants.* | Case No. 3:2021-cv-12492<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF TITLE IX OF THE EDUCATION ACT AMENDMENTS OF 1972, 42 U.S.C.S. § 1983, AND NEGLIGENCE** |

**NOW COMES** Plaintiff, JANE DOE, by and through her attorneys, The Law Office of Keith Altman, and with her First Amended Complaint against Defendants, hereby states the following:

1. This is an action seeking injunctive relief for Defendants' violations of Title IX of The Education Act Amendments of 1972 ("Title IX"), and a 42 U.S.C.S. § 1983 claim for the violation of Title IX. Plaintiff also brings a claim for Negligence under the law of the state of Michigan.

## PARTIES

1. Plaintiff Jane Doe ("Plaintiff" or "Jane Doe") is a student at the University of Michigan and a—former student of Michigan State University. Doe attended Michigan State University from Fall 2012 until Summer 2017. Plaintiff is a student at the University of Michigan since 2021.

2. The University of Michigan ("UM") is a public research university domiciled in the state of Michigan.

3. On information and belief, at all times relevant to this action, Defendant DAVID BAUM was employed by UM as the lead Title IX coordinator.

4. On information and belief, at all times relevant to this action, Defendant ELIZABETH SENEY was employed by UM as the Assistant Title IX coordinator.

5. On information and belief, at all times relevant to this action, Defendant MARGARET GYTEKO was employed by UM as the Director of Faculty Affairs.

6. On information and belief, at all times relevant to this action, Defendant CHUNG OWYANG was employed by UM as the Chief of Gastroenterology.

7. On information and belief, all of these Defendants were employed by UM and worked in UM's Office for Institutional Equity or were otherwise involved in Plaintiff's Title IX action.

8. Defendants BAUM, SENEY, GYTEKO, and OWYANG will be jointly referred to as "Individual Defendants".

## JURISDICTION & VENUE

9. This action arises under the laws of the United States, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 (federal question).

10. This action arises under Title IX of The Education Act Amendments of 1972. Pub. L. No. 92-318, 86 Stat. 373 (1972), 20 U.S.C. §§ 1681 et seq., which prohibits discrimination based on sex in educational institutions receiving federal funding; and under 42 U.S.C.S. § 1983, which prohibits the deprivation of constitutional rights or rights secured by the laws of the United States by persons acting under the color of state law.

11. In accordance with 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over Plaintiff's state law claim for negligence. This is because this state law claim is so closely related to the federal

question claim that it forms the same case or controversy under Article III of the United States Constitution.

12.     This Court properly exercises personal jurisdiction over each of the Defendants on the grounds that they were employees of UM at all relevant times herein and personally violated certain rights and policies, the effects of which were felt in the State of Michigan.

13.     The proper venue for this case is in the United States District Court of Michigan because the events relevant to this action occurred within the State of Michigan.

## FACTUAL ALLEGATIONS

14.     In or around mid-January 2013, Plaintiff (aged 19) met John Doe (aged 49) through an online website.

15.     Plaintiff was a first-generation college student at Michigan State University and was interested in mentorship toward her potential goals.

16.     John Doe was a board-certified gastroenterologist at the University of Michigan – Ann Arbor.

17.     In late January 2013, John Doe met Plaintiff and agreed to mentor her toward her future career goals. Plaintiff was impressed by John Doe's

credentials as a board-certified gastroenterologist at the University of Michigan, as well as his achievements in research publications as an academic physician.

18.     Plaintiff felt that John Doe was a safe individual who could be trusted given his profession and status as a doctor.

19.     John Doe gave Plaintiff $250 for her to attend a dinner meeting with him to discuss her future career aspirations as a physician and future academic plans. The money was inside of an envelope embedded with the UM Health System letterhead, with John Doe's name on the left corner as a personalized return label.

20.     In early February 2013, John Doe again gave Plaintiff $250 inside of another UM envelope for her to attend a dinner meeting with him. They again talked about her career goals as a future physician and strategized her course scheduling plans for the summer, and when to take the Medical College Admission Test (MCAT) in preparation for medical school.

21.     Plaintiff was looking for a mentor and John Doe groomed Plaintiff into a sexual relationship, taking advantage of his position of power and authority and Plaintiff's young age.

22.     John Doe began to express interest in Plaintiff. John Doe put his hand on Plaintiff's knee and attempted to kiss her. Plaintiff nervously declined. For both dinner meetings, John Doe drove from Ann Arbor to East Lansing to pick up and drop off Plaintiff from her dormitory. Plaintiff did not have transportation of her own.

23.     After this meeting, John Doe offered Plaintiff $500 a month for a mentorship relationship with no intimacy, as well as $1000 a month for a mentorship relationship with intimacy. A final amount of $1250 was decided, because John Doe wanted Plaintiff to "maintain her appearance" for him on each encounter. John Doe described the funds as a personal scholarship that he was awarding Plaintiff based on her academic achievements. John Doe encouraged their mentorship relationship as increasing diversity within medicine.

24.     Plaintiff and John Doe's sexual relationship occurred from February 2013 to May 2013, although he continued to mentor her until she graduated from Michigan State University.

25.     During their first sexual encounter, John Doe purchased and gave Plaintiff alcohol even though Plaintiff was underage. Plaintiff was inebriated and did not have the ability to consent to sexual intercourse.

John Doe, 49 years old at the time, raped Plaintiff, and inebriated 19-year-old.

26.     During their sexual relationship, Plaintiff noticed John Doe's need for power and control. John Doe often instructed Plaintiff on what to wear for their interactions and coerced Plaintiff into unsafe sexual practices. John Doe used his medical knowledge and provided research studies claiming that he had a "low sperm count" and inability to impregnate women, as well as being STD-free. John Doe fulfilled his fetish of ejaculating inside Jane Doe with no condom during each sexual encounter.

27.     John Doe continued his sexual abuse of Plaintiff through encounters at his off-campus home in Ann Arbor in which he specifically requested that Plaintiff use the money he gave her to purchase Michigan Flyer public transportation bus tickets. As mentioned, Plaintiff did not have her own transportation, which kept her vulnerable during the encounters of sexual abuse.

28.     In March 2013, John Doe raped Plaintiff and infected her with herpes (Molloscum Contagisoum). During this encounter, John Doe did not disclose his genital herpes disease to Plaintiff. Plaintiff saw an

ulcered lesion on John Doe, but she did not ask what it was. Suddenly, John Doe penetrated Plaintiff's vagina without Plaintiff's consent by forcibly grabbing her body. Plaintiff froze into a state of shock. John Doe ejaculated inside of her without her permission. Two weeks after this encounter, Plaintiff was diagnosed with genital herpes by a physician.

29.    Upon confrontation, John Doe denied having the herpes virus and failed to show her blood results despite Plaintiff's request to get tested. From this moment on, John Doe acted thrilled that he had spread this incurable and lifelong disease onto Plaintiff and began to use the stigma and shame of the disease to exploit her – often using channels through the University of Michigan.

30.    From 2013-2016, John Doe continued to communicate with Plaintiff about mentoring goals toward medical school, since this helped keep Plaintiff more focused on the future and less on the trauma of the rape and genital herpes contraction. John Doe often communicated with her using his @med.umich.edu email address and during work hours. In these emails, John Doe frequently made sexually suggestive comments. John Doe would sometimes send these sometimes during work hours, in between patient visits.

31.     John Doe also gave Plaintiff access to communicate with him on his UM pager. John Doe would leave the clinic to personally meet with Plaintiff at the UM Hospital Cafeteria, then John Doe would personally bring her inside of the Gastroenterology Conference Room for Doctors to prepare for patient cases. John Doe frequently provided Plaintiff with access to UM patients' private medical information

32.     John Doe was sexually harassing Plaintiff through UM's email system using an inappropriate tone and inappropriate language. John Doe was using official UM's business to pursue and carry out sexual harassment and assault against Plaintiff.

33.     UM officials knew or should have known about John Doe's emails because that specific email address is used only for patient care.

34.     In Winter 2015 and Summer 2015, John Doe gave Plaintiff an internship at the University of Michigan Taubman Center. John Doe assured Plaintiff that the internship would help her gain admission to the University of Michigan School of Medicine and expressed his desire for her to one day be one of his students at the Medical School.

35.     During this internship, John Doe would make Plaintiff wear blue scrubs, (which were unnecessary for Plaintiff's internship) instead of

Plaintiff's normal clothes, to avoid raising suspicion. Christine Marie Brazo PA-C noticed the close contact between John Doe and Plaintiff, and asked Plaintiff how they knew each other. John Doe instructed Plaintiff to lie and say that Plaintiff was a "family friend."

36.     Plaintiff did not have a formal background check, ID, or HIPAA compliance. However, John Doe assured her that he sought permission from UM before the start of her internship and that she was more than welcome to observe patient procedures, such as endoscopies and colonoscopies.

37.     During a colonoscopy, Plaintiff met another gastroenterologist fellow, Tossapol "Tos" Kerdsirichairat, MD, who was also being mentored by John Doe. Dr. Kerdsirichairat observed Plaintiff feeling uncomfortable, but instead trusted John Doe and his position of authority in the situation.

38.     Plaintiff exited her internship early when John Doe rejected her request for a letter of recommendation for medical school because John Doe did not "want his name on a formal document" with knowledge of a previous sexual relationship.

39.     In October 2016, John Doe revealed to Plaintiff the existence of other victims. Plaintiff noticed a similar pattern of abuse from John Doe against women. This encouraged Plaintiff to take her first steps toward seeking justice. Plaintiff ended the relationship completely and immediately began therapy.

40.     John Doe is a sexual predator. John Doe boasted to Plaintiff that, in the past, he mentored similar women with whom he had casual sexual relations – although no one was as young as Plaintiff. Like Plaintiff, the previous women were students in neighboring universities and were also interested in pursuing doctoral degrees. Jane Doe 2 was a law student at Wayne State University, and he purchased her a MacBook computer for her studies. Jane Doe 3 was a medical student at Wayne State University. Moreover, a few months after John Doe sexually assaulted and infected Plaintiff with genital herpes, John Doe attempted to groom Plaintiff's roommate into a sexual relationship by offering her $250 and to purchase of alcohol in preparation for the roommate's 21st birthday, because Plaintiff's roommate was still underage.

41.     As a result of being sexually abused by John Doe, Plaintiff began to develop severe stomach pains. Plaintiff became a patient at MSU

Internal Medicine and was diagnosed with irritable bowel syndrome (IBS). In May 2017, Plaintiff was referred to UM's Gastroenterology Clinic due to the complexity of her IBS.

42.      - In August 2017, John Doe approached and stalked Plaintiff at an off-campus Walgreens. This encounter occurred on the same day Plaintiff was receiving care at UM Health System. Plaintiff reported this incident to the police.

43.      In early 2018, Plaintiff contacted the UM's Title IX Office and reported both rapes, John Doe's sexual abuse, and John Doe's predatory behavior to UM's Title IX Office. In February 2018, Plaintiff met with David Baum and Elizabeth Seney, who did Plaintiff's intake.

44.      Baum and Seney stated they would not be able to conduct a formal investigation because Plaintiff was a third party and not a student at UM, but that due to the nature of the allegations, they would conduct an informal investigation toward disciplinary action.

45.      Nothing happened until April 2018, when Plaintiff received an email from David Baum stating that John Doe's adjunct professorship "was discontinued" and that John Doe "was informed that I raised concerns about his behavior." Emails with David Baum continued until

June 2018, which further stated that John Doe had been terminated and was the subject of disciplinary action by the University of Michigan based on her reports. David Baum suggested that Plaintiff speak to Dr. Owyang about John Doe's termination and her overall safety in the hospital.

46.     Dr. Owyang offered Plaintiff a personal meeting to address her concerns. This meeting occurred on October 23, 2018. Theresa Nester was present, taking notes, as well as Brooke Noonan, Plaintiff's support person. During this meeting, Dr. Owyang emphasized Plaintiff's safety at the hospital and further reassured her that John Doe has been terminated since April 2018 based on her reports after the informal investigation. Dr. Owyang stated that he personally "fired him" in April 2018 via phone call in which Dr. Owyang mentioned Plaintiff's report, the investigation, and UM's concluding decision.

47.     Dr. Owyang had a stack of papers on his desk which he indicated were from UM's Title IX office and he offered to refer to any specific email regarding the investigation that UM had conducted. Since Plaintiff received written emails directly from the Title IX Office, as well as an in-person meeting with Dr. Owyang himself, Plaintiff believed this information to be true.

48.     Dr. Margaret Gyetko was kept apprised of all communications between Plaintiff, Dr. Owyang, and UM's Title IX Office.

49.     In September 2019, Plaintiff learned through a public social media post that John Doe was interviewing at Stanford School of Medicine for both a doctor and professorship position. Plaintiff became worried that John Doe would do to Stanford students what John Doe did to her. Plaintiff contacted Stanford School of Medicine's Title IX Office and Staff and gave them information about John Doe's termination from UM, and evidence about John Doe's sexual assault against Plaintiff.

50.     Through pre-suit negotiations, documentation revealed that there was no record of a UM disciplinary action against John Doe. Furthermore, it was revealed that John Doe was never informed of Jane Doe's report to UM's IX Office. Rather, John Doe chose not to renew his position at the University of Michigan when Dr. Owyang called him.

51.     UM allowed John Doe to have access to the University of Michigan's email servers, business contacts, and more students, until the end of his renewal on August 31, 2018, even though UM had notice of John Doe's history of sexual violence and predatory behavior.

52.     The University of Michigan deceived Plaintiff and failed to even conduct an informal investigation of Plaintiff's Title IX report despite the serious allegations of sexual assault and harassment.

53.     Plaintiff has been a patient at UM's Gastroenterology Clinic (the same clinic in which Plaintiff did her internship) since May 2017. The result of Plaintiff's Title IX report has made Plaintiff become hypervigilant and unable to receive proper care.

## FIRST CAUSE OF ACTION
### Violation of Title IX of The Education Act Amendments of 1972
*(Against Defendant UM)*

54.     Plaintiff incorporates by reference as if fully stated herein, paragraphs 1-53 of her Complaint in their entirety.

55.     Title IX prohibits discrimination based on sex in educational institutions receiving federal funding. *20 U.S.C.* § 1681. Schools receiving federal funding are required to employ at least one Title IX coordinator, and a staff member responsible for Title IX compliance. Moreover, such institutions must respond affirmatively when they receive "actual knowledge" that a student may have been discriminated against based

on gender. This creates a duty for institutions to have their Title IX coordinator promptly investigate allegations of sex-based discrimination and provide accommodations to students that have suffered sex-based discrimination.

56.     Defendant UM is a public university that receives federal financial assistance through grants and federally assisted tuition payments collected from students. Thus, Defendant UM is a recipient of Federal financial assistant for purposes of Title IX.

57.     At all times herein mentioned, the Individual Defendants were employed by UM.

58.     The sexual harassment and assault that Plaintiff suffered at the hands of John Doe were perpetrated against Plaintiff specifically based on Doe's gender. Plaintiff is female. John Doe is male.

59.     Defendant UM had "actual knowledge" of the sexual harassment and assault that John Doe perpetrated against Plaintiff because Plaintiff reported the sexual harassment and assault to Defendant UM's Title IX Office and discussed extensively with the Individual Defendants.

60.     UM was legally required under Title IX to conduct a full and thorough investigation into the sexual harassment and assault suffered by Doe.

61.     Defendant UM violated its Title IX obligations and inflicted sex-based discrimination on Jane Doe when:

i.  Defendant Baum and Defendant Seney were deliberately indifferent when they refused to initiate any meaningful Title IX investigation into John Doe's illegal actions.

ii. Defendant UM was deliberately indifferent to Plaintiff's report of sexual assault and harassment when Defendant UM refused to take any affirmative actions to ensure that Plaintiff felt safe on UM campus and was deliberately indifferent to Plaintiff's report of sexual assault and harassment.

iii. Defendant UM was deliberately indifferent to Plaintiff's report of sexual assault and harassment when Dr. Owyang lied to Plaintiff and provided her with knowingly false information about the "termination" of John Doe.

62.     As a result of Defendant UM's violations, Plaintiff suffered profound disruptions to her sense of safety while enrolled at UM. This

caused severe anxiety and depression, forcing Plaintiff to abandon her education and career goals for a time. Therefore, as a direct and proximate result of the Defendants' unlawful sex-based discrimination, Doe was prevented from enjoying the full benefits of her education.

63.     Plaintiff seeks injunctive relief against Defendant UM, and respectfully requests this Court to issue a permanent injunction instructing Defendant UM to carry out a proper Title IX investigation of Plaintiff's report of sexual assault and sexual harassment perpetrated by John Doe, a member of Defendant UM's faculty at the time.

## SECOND CAUSE OF ACTION
### 42 U.S.C. § 1983
### Violation of Title IX of The Education Act Amendments of 1972
*(Against Defendants Baum, Seney, Gyteko, and Owyang)*

64.     Plaintiff incorporates by reference as if fully stated herein, paragraphs 1-53 of her Complaint in their entirety.

65.     42 U.S.C.S. § 1983 prohibits the deprivation of constitutional rights or rights secured by the laws of the United States by persons acting under the color of state law.

66.    Title IX prohibits discrimination based on sex in educational institutions receiving federal funding. *20 U.S.C.* § 1681. Schools receiving federal funding are required to employ at least one Title IX coordinator, and a staff member responsible for Title IX compliance. Moreover, 34 CFR 106.44 provides that such institutions must respond affirmatively when they receive "actual knowledge" that a student may have been discriminated against based on gender. This creates a duty for institutions to have their Title IX coordinator promptly investigate allegations of sex-based discrimination and provide accommodations to students that have suffered sex-based discrimination.

67.    Defendant UM is a public university that receives federal financial assistance through grants and federally assisted tuition payments collected from students. Thus, Defendant UM is a recipient of Federal financial assistance for purposes of Title IX.

68.    At all times herein mentioned, the Individual Defendants were employees of UM acting under the color of state law and were the officers in charge of enforcing Title IX at UM.

69.    The sexual harassment and sexual assault that Plaintiff suffered at the hands of John Doe were perpetrated against Plaintiff specifically based on Plaintiff's gender. Plaintiff is female. John Doe is male.

70.    Individual Defendants violated their Title IX obligations and inflicted sex-based discrimination on Jane Doe when:

i.   Defendants Baum and Seney failed to initiate any meaningful Title IX investigation into John Doe's illegal actions.

ii.  Individual Defendants refused to take any affirmative actions to ensure that Jane Doe felt safe on UM campus. They were deliberately indifferent to Plaintiff's report of sexual assault and harassment.

iii. Defendant Owyang was deliberately indifferent to Plaintiff's report of sexual assault and harassment when Dr. Owyang lied to Plaintiff and provided her with knowingly false information.

71.    As a result of the Individual Defendants' violations, Plaintiff suffered and continues to suffer profound disruptions to her sense of safety while enrolled at UM. This caused severe anxiety and depression, forcing Plaintiff to abandon her education and career goals for a time. Therefore, as a direct and proximate result of the Defendants' unlawful

sex-based discrimination, Doe was prevented from enjoying the full benefits of her education at UM.

## THIRD CAUSE OF ACTION
### Negligence
*(Against Defendant Baum and Seney)*

72.     Plaintiff incorporates by reference as if fully stated herein paragraphs 1-53 of her Complaint in their entirety.

73.     Defendants Baum and Seney breached their duty of reasonable care by negligently acting or omitting to act in such a way that resulted in Plaintiff's emotional harm and withdrawal from UM. Defendants knew or should have known their actions and omissions posed a substantial risk of harm to Plaintiff.

74.     After being made aware of Plaintiff's allegations, Defendants were negligent in performing their duties; thus, they failed, neglected, and/or refused to discharge their responsibilities properly and fully when:

i.   Defendant Baum failed to initiate any meaningful Title IX investigation into John Doe's illegal actions.

ii.   Defendant Baum failed to undertake any affirmative actions to ensure that Plaintiff felt safe on UM campus.

iii.   Defendant Baum and Defendant Seney failed to undertake any correspondence with Plaintiff regarding the status of her Title IX report.

75.    By their negligent conduct, Defendants Baum and Seney have inflicted extreme and severe emotional distress on Plaintiff, who is a victim of sexual assault, and is confronted with a complete disruption of her education and career plans which forced Plaintiff to expend financial resources to pursue her education elsewhere. Therefore, Plaintiff has suffered direct financial losses due to the Defendants' unlawful and negligent conduct.

76.    As a result of Defendants' conduct, Plaintiff has also suffered from severe anxiety and depression which has affected her mental and physical wellbeing. Plaintiff has been and continues to be treated by a therapist for these symptoms.

77.    The emotional and psychological distress and financial damages that  Plaintiff has and will continue to suffer, was caused directly and proximately by the Defendants' unlawful and negligent conduct.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Doe requests that this Court grant her relief as follows:

> (1) Compensatory damages for monetary loss, damage to reputation, humiliation, mental anguish, and emotional distress against Defendants Baum and Seney.
>
> (2) Punitive damages against the Defendants Baum and Seney.
>
> (3) Attorneys' fees.
>
> (4) Costs of the suit.
>
> (5) Injunctive relief; and
>
> (6) Such other relief as the Court may deem proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff Doe hereby demands a trial by jury on all issues stated in this action.

Date: January 25, 2022.          Respectfully Submitted,


Keith Altman, Esq.
The Law Office of Keith Altman
33228 West 12 Mile Road, Suite 375
Farmington Hills, Michigan 48334
Telephone: (987) 987-8929
keithaltman@kaltmanlaw.com
*Attorneys for Plaintiff*



## CERTIFICATE OF SERVICE

Undersigned hereby states that on January 25, 2022, he caused the foregoing FIRST AMENDED COMPLAINT to be filed electronically with the United States District Court and that a copy of the said document was sent to all counsel of record through the Court's CM/ECF electronic filing system.


Keith Altman, Esq.