# EXHIBIT 2



Erik S. Syverson (SBN 221933)
      erik@syversonlaw.com
**THE SYVERSON LAW FIRM**
2288 Westwood Blvd., Suite 212
Los Angeles, CA  90064
Telephone: (310) 270-6000

Attorneys for Defendant and Cross-Complainant
█████████████

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

|  |  |
|---|---|
| ████████████, an individual, | Case No.: 20-CIV-3990 |
| Cross-Complainant, | |
| vs. | **CROSS-COMPLAINT FOR** |
| | **1) RAPE;** |
| DR. PHILIP SCHOENFELD, an individual, | **2) GENDER VIOLENCE;** |
| | **3) NEGLIGENCE; and** |
| Cross-Defendant. | **4) CONCEALMENT** |

Cross-Complaint
1

Defendant and Cross-Complainant ███████ ("███████") hereby alleges as follows:

## NATURE OF THE CASE

1.      For years, from 2000 to 2019, a vile and dangerous sexual predator hunted women in the community of Ann Arbor, Michigan. Ann Arbor is home to the world-renowned University of Michigan known for academic excellence and athletic success. The University is home to tens of thousands of women pursuing various academic goals.

2.      This perverse hunter of women is Plaintiff and Cross-Defendant Dr. Philip Schoenfeld (the "PREDATOR"). The PREDATOR was employed as a doctor at the University of Michigan. The PREDATOR is currently employed by Pri-Med. Pri-Med is a medical education company providing continuing education courses for medical doctors. The PREDATOR creates educational content for Pri-Med.

3.      The PREDATOR currently sits on the advisory board of Allergan, Ironwood Pharmaceuticals and Salix Pharmaceuticals. Additionally, the PREDATOR acts as a consultant to these pharmaceutical companies. Upon information and belief, at all times alleged herein, the pharmaceutical companies have been ignorant of the PREDATOR's crimes against women.

4.      The PREDATOR began his misdeeds by conducting multiple extra-marital affairs while married to Rebecca Schoenfeld with numerous local married Ann Arbor women and single University students. This caused multiple divorces, abortions and a stillborn child given the PREDATOR's fetish for unprotected sex.

5.      When the PREDATOR ran out of victims on campus, he turned his attention to the Internet for further victims. The PREDATOR's new hunting ground became www.seekingarrangements.com (also known as www.seeking.com) in or around 2013. The website URL says it all. This website provides a forum for wealthy men to prey upon young, financially disadvantaged women like ███████ The wealthy men enter various monetary "arrangements" with these disadvantaged women. ███████ was the third in a string of such "arrangements" for the PREDATOR.

6.      "Arrangement" one was Jane Doe 1, a law school student at Wayne State University. Jane Doe 1 received $1,000 per month from the PREDATOR via Paypal. "Arrangement" two was Jane

Doe 2, a medical school student at Wayne State University. Jane Doe 2 also received $1,000 per month from the PREDATOR via Paypal.

7.      The PREDATOR met ██████ at the time a student at Michigan State University, on the website in or around January 2013. ██████ was pursuing an undergraduate degree with aspirations of applying to and attending medical school. The PREDATOR expressed his desire for ██████ to become his student at the University of Michigan School of Medicine. ██████ was "arrangement" three for the PREDATOR.

8.      The PREDATOR offered to use his position and influence at the University of Michigan to gain an informal internship for ██████ at the University of Michigan hospital to boost ██████ medical school prospects.

9.      The PREDATOR also offered to pay ██████ expenses and tuition at Michigan State University. In fact, the PREDATOR paid ██████ $1,250 per month via Paypal. In return, the PREDATOR expected and demanded sex from ██████ and his other "arrangements". If ██████ did not provide sexual favors upon the PREDATOR's request, he took sexual favors by force, often at his home located at 3193 Asher Road, Ann Arbor, MI.

10.     The PREDATOR kept a dark secret from ██████ during their "arrangement". The PREDATOR was infected with the herpes virus. The PREDATOR knew this fact throughout his "arrangement" with ██████ and Jane Doe 1 and Jane Doe 2.

11.     The story gets worse and more horrifying. The PREDATOR kept another secret from ██████ and his various "arrangements". The PREDATOR was married to Rebecca Schoenfeld. During his various "arrangements", Rebecca was battling cancer. Rebecca eventually died from cancer in 2019, never knowing that the man she knew as her husband was spending thousands per month on "arrangements" while she battled for her life.

12.     The PREDATOR was able to conceal his payments to "arrangements" from his wife by paying his victims via his Paypal account pschoenf@umich.edu.

13.     In or around March 2013, the PREDATOR knowingly infected ██████ with herpes by ejaculating inside of her during sexual intercourse. ██████ never consented to this act of rape.

Nevertheless, the PREDATOR had altered ▮▮▮▮ life forever. In fact, the PREDATOR had knowingly and surreptitiously infected ▮▮▮▮ with the herpes virus.

14. ▮▮▮▮ demanded that the PREDATOR get tested for herpes. The PREDATOR denied having herpes but refused to provide medical records or submit to testing. He falsely and fraudulently stated to ▮▮▮▮ that he had tested negative for herpes. Therefore, the PREDATOR effectively reassured ▮▮▮▮ and concealed his herpes infection from ▮▮▮▮ thereby tolling the statute of limitations.

15. In 2015, the PREDATOR offered ▮▮▮▮ an internship at the University of Michigan hospital. At the same time, he entered a relationship with Dr. Linda Nguyen of Stanford University. Despite his relationship with Dr. Nguyen, the PREDATOR continued to pay ▮▮▮▮ thousands of dollars through May 2016. The PREDATOR is currently married to Dr. Nguyen. It is unknown how many "arrangements" the PREDATOR has currently engaged.

16. ▮▮▮▮ internship was nothing more than the PREDATOR's private internship used to leverage sex with ▮▮▮▮ It was never approved by the University of Michigan. In fact, the PREDATOR took steps to conceal ▮▮▮▮ identity from his co-workers and patients. The PREDATOR forced ▮▮▮▮ to wear blue nursing scrubs to avoid patient suspicions. The PREDATOR represented ▮▮▮▮ as a family friend to co-workers.

17. The PREDATOR routinely violated HIPPA by sharing patient records with ▮▮▮▮ in addition to inviting her to observe procedures while the PREDATOR's patients were anesthetized. For example, on January 5, 2014, John Doe 1, a male patient, received an endoscopy from the PREDATOR. While John Doe 1 was anesthetized, the PREDATOR invited ▮▮▮▮ into the room to view the procedure. John Doe 1's endoscopy was performed in order to inject botox in John Doe 1's sphincter to aid with digestion. During the procedure, a nurse handed the PREDATOR the wrong amount of botox for injection. The PREDATOR proceeded to throw a tantrum during the procedure, excoriating the nurse and leaving the procedure room. ▮▮▮▮ later asked the PREDATOR what he told John Doe 1 regarding the botched procedure. The PREDATOR admitted to ▮▮▮▮ he never informed John Doe 1 of the botched procedure. To this day, John Doe 1 does not know of the negligence that occurred or that ▮▮▮▮ was in the room and witness to his medical records and

procedure. The PREDATOR committed many more HIPPA violations in a similar fashion during his
time at the University of Michigan hospital.

18.    In October 2016, ███████ terminated the "arrangement" and later reported the
PREDATOR's forementioned misdeeds to the University of Michigan after the PREDATOR followed
███████ into an Ann Arbor Walgreens and stalked her on August 9, 2017. The stalking behavior is
confirmed by Walgreen's security footage. On August 16, 2017, the PREDATOR became engaged to
Dr. Linda Nguyen.

19.    ███████ fearing for her life fled into the woman's restroom at Walgreens. The
PREDATOR remained outside the restroom. ███████ eventually managed to escape. The University
launched an inquiry into the PREDATOR's behavior. After verifying that the PREDATOR was a
danger to the community, University of Michigan and its hospital patients, and ███████ he was
promptly terminated by the University in or around April 2018.

20.    Out of work and looking for new hunting grounds, the PREDATOR turned his attention
to the Palo Alto, CA community, home to Stanford University and his new wife Dr. Linda Nguyen. Dr
Linda Nguyen seemingly gave the PREDATOR a veneer of legitimacy in much the same way
Ghislaine Maxwell provided cover to Jeffrey Epstein. In or around October 2019, the PREDATOR
applied for a job at Stanford University. Upon learning this and wishing to prevent further rapes and
the spread of the herpes virus, ███████ contacted Stanford doctors Dr. Linda Nguyen, Dr. W. Ray
Kim, Susan Lydick, and Stanford Title IX at Stanford to inform them regarding to the University of
Michigan investigation into the PREDATOR's atrocities against women.

21.    Stanford, wishing to protect its female student population, having verified the atrocities
committed by the PREDATOR, did not hire the PREDATOR. The PREDATOR, in classic "blame the
victim" tradition, filed a lawsuit in this Court against ███████ for foiling his further attempts to spread
the herpes virus in the Palo Alto community. In fact, the PREDATOR was not hired by Stanford
(despite being married to Dr. Linda Nguyen) because of his past commission of rape(s), sexual
assault(s) and improper use of influence in Ann Arbor, MI, not because of any wrongdoing by
███████

///

## GENERAL ALLEGATIONS

22.     The PREDATOR resides at 578 Seahorse lane, Redwood City, California 94065. Upon information and belief, he is currently actively hunting for further victims within California's borders. Upon information and belief, the PREDATOR has not registered as a sex offender in Redwood City.

23.     ██████ resides in Troy, Michigan.

24.     Venue is proper in this judicial district because the PREDATOR sued ██████ in this Court.

## FIRST CAUSE OF ACTION

### (RAPE/BATTERY– Against The PREDATOR)

25.     ██████ hereby re-alleges, as if fully set forth herein, the allegations of the preceding paragraphs.

26.     By clandestinely infecting ██████ with herpes without her consent, the PREDATOR raped/battered ██████

27.     ██████ was physically harmed by the PREDATOR's conduct. The PREDATOR's conduct caused ██████ to experience emotional distress.

28.     A reasonable person in ██████ situation would have been offended by the PREDATOR's conduct.

29.     The PREDATOR's conduct was willful and malicious entitling ██████ to an award of punitive damages.

## SECOND CAUSE OF ACTION

### (GENDER VIOLENCE CAL. CIV. CODE SECTION 52.4 -- Against the PREDATOR)

30.     ██████ hereby re-alleges, as if fully set forth herein, the allegations of the preceding paragraphs.

31.     Cal. Civ. Code section 52.4 prohibits commission of acts of gender violence, defined to include a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

32.     As alleged herein, ██████ was the victim of acts of gender violence.

33.    The PREDATOR created conditions of coercion and control that caused ▮▮▮ to be subjected to private, egregiously offensive sexual contact with the PREDATOR, all in furtherance of committing acts of gender violence against ▮▮▮

34.    As a direct and proximate cause of the PREDATOR's actions, ▮▮▮ has suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

35.    The forementioned conduct was willful, wanton, and malicious.  At all relevant times, the PREDATOR acted with conscious disregard of ▮▮▮ rights.  The PREDATOR acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to ▮▮▮

36.    ▮▮▮ is therefore entitled to recover her attorney's fees in addition to actual, compensatory and punitive damages.

### THIRD CAUSE OF ACTION

### (NEGLIGENCE – Against the PREDATOR)

37.    ▮▮▮ hereby re-alleges, as if fully set forth herein, the allegations of the preceding paragraphs.

38. The PREDATOR was negligent by concealing his herpes from ▮▮▮

39.    ▮▮▮ was harmed by the concealment.

40. The PREDATOR's negligence was a substantial factor in causing ▮▮▮ harm.

41. As a direct and proximate cause of the PREDATOR's actions, ▮▮▮ has suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

### FOURTH CAUSE OF ACTION

### (CONCEALMENT – Against the PREDATOR)

42.    ▮▮▮ hereby re-alleges, as if fully set forth herein, the allegations of the preceding paragraphs.

43. The PREDATOR intentionally failed to disclose certain facts that were only known to him and that ▮▮▮ could not have discovered.

44.    ▮▮▮ did not know of the concealed facts.

45. The PREDATOR intended to deceive ▮▮▮ by concealing the facts.

46. Had the omitted information been disclosed, ▮▮▮ reasonably would have behaved differently.

47. The concealment was a substantial factor in ▮▮▮ harm.

48. As a direct and proximate cause of the PREDATOR's concealment, ▮▮▮ has suffered physical injury, severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

49. The forementioned conduct was willful, wanton, and malicious.  At all relevant times, the PREDATOR acted with conscious disregard ▮▮▮ rights.  The PREDATOR acted with the knowledge of or with reckless disregard for the fact that his conduct was certain to cause injury and/or humiliation to ▮▮▮

50. ▮▮▮ is therefore entitled to recover actual, compensatory and punitive damages.

## PRAYER

WHEREFORE, ▮▮▮ prays for judgment against the PREDATOR as follows:

1. General damages in an amount according to proof but no less than $1,000,000;

2. Special damages in an amount according to proof but no less than $1,500,000;

3. Punitive damages;

4. Interest in an amount according to proof;

5. Reasonable attorneys' fees and costs of suit incurred herein; and

6. Such further relief as the Court may deem just and proper.

Date: October 20, 2020                    **THE SYVERSON LAW FIRM**


By:     /s/Erik S. Syverson
        Erik S. Syverson
        Attorneys for Cross-Complainant
        ▮▮▮

## DEMAND FOR TRIAL BY JURY

Cross-Complainant ▓▓▓▓▓ hereby demands a trial by jury on all issues so triable.

Date: October 20, 2020                          THE SYVERSON LAW FIRM


                                    By:     /s/Erik S. Syverson
                                            Erik S. Syverson
                                            Attorneys for Cross-Complainant
                                            ▓▓▓▓▓▓

Complaint

1    Henry M. Burgoyne, III (SBN 203748)
2    BURGOYNE LAW GROUP
     1390 Market Street, Suite 200
3    San Francisco, CA 94102
     Telephone: (415) 795-4070
4    Fax: (415) 680-2335
     Hank@BurgoyneLawGroup.com
5
     *Attorneys for Philip Schoenfeld*
6

**Electronically FILED**
La Superior Court of California, County of San Mateo
ON    **10/13/2020**
By    **/s/ Wai Shan Lee**
        **Deputy Clerk**

7        SUPERIOR COURT OF THE STATE OF CALIFORNIA

8      FOR THE COUNTY OF SAN MATEO – UNLIMITED JURISDICTION

9

10    PHILIP SCHOENFELD,           CASE NO.: 20-CIV-03990

         Plaintiff,

11                    **FIRST AMENDED COMPLAINT FOR:**

12      v.                   **1. DEFAMATION PER SE**

13    ████████, and Does 1 through 10,    **2. INTENTIONAL INTERFERENCE WITH**
     inclusive.                      **PROSPECTIVE ECONOMIC RELATIONS**

14        Defendants.

15                        **DEMAND FOR JURY TRIAL**

16

17                     **INTRODUCTION**

18        1.      Plaintiff Dr. Philip Schoenfeld ("Plaintiff") filed this action (the "Action") in

19 response to a series of highly defamatory statements (the "Defamatory Statements") by former

20 lover ████ ("████").

21        2.      ████ whose four-month consensual physical relationship with Plaintiff ended

22 more than *seven years* ago, made the Defamatory Statements in connection with an ongoing

23 attempt to extort Plaintiff into paying a high-six- or seven-figure "settlement" of patently

24 frivolous legal claims.

25        3.      ████ made the Defamatory Statements to, amongst others, faculty and staff at

26 the Stanford University School of Medicine, where ████ knew Plaintiff to be interviewing for

27 a highly-promising job opportunity.

28        4.      ████ also made the Defamatory Statements to Plaintiff's new wife, a Stanford

1   doctor whose non-public email address        accessed by misrepresenting herself as a medical

2   student pursuing a research opportunity.

3         5.     On information and belief, as a direct and immediate consequence of the

4   Defamatory Statements, Stanford did not offer Plaintiff the position for which Plaintiff, and

5   Plaintiff alone, had been recruited by Stanford.

6         6.     Since Plaintiff filed his initial Complaint,      extortion has assumed a

7   troubling new dimension, in that      and her new counsel have threatened to file draft cross-

8   claims (the "Fraudulent Claims") accusing Plaintiff of wildly exaggerated, and entirely

9   fabricated, sexual wrongdoing against     and unidentified others.

10        7.     More troubling,      her new counsel have threatened to further distribute

11  the Fraudulent Claims and the Defamatory Statements to the news media and to others with

12  whom Plaintiff has past or prospective commercial relationships.

13        8.     The Defamatory Statements and Fraudulent Claims are of a sort that

14  knows, and must know, would and will critically injure Plaintiff in Plaintiff's business and

15  personal lives.

16        9.     As a direct result of the Defamatory Statements, Plaintiff already has suffered

17  hundreds of thousands of dollars of demonstrable damages, plus additional emotional, social, and

18  other economic and non-economic harms.

19        10.    has made more than clear that unless enjoined from making the

20  Defamatory Statements and similar false and scurrilous allegations, she will continue to do so

21  with the specific intention of critically damaging if not destroying Plaintiff's remaining career

22  and Plaintiff's personal and professional reputations and

23

                                       ident of Redwood City,

26      12.    Defendant      is an individual resident of Michigan.

27      13.    Plaintiff is not aware of the true names and capacities of the Defendants sued

28  herein as Does 1 through 10, inclusive, and therefore sues these Defendants by fictitious names.

1   Plaintiff is informed and believes, and thereon alleges, that each of these fictitiously named

2   Defendants is responsible in some actionable manner for the damages herein alleged. Plaintiff

3   will request leave of the Court to amend the Complaint to name the Defendants specifically

4   when their identities become known.

5   14.     Plaintiff is informed and believes, and thereon alleges, that at all times mentioned herein,

6   each and every Defendant was aiding and abetting and conspiring with and otherwise acting in

7   concert and with a common intention with each of the remaining Defendants; and that each and

8   every Defendant was the agent, ostensible agent, employee, principal, proxy, guardian, surrogate,

9   alter ego or other legal representative of each of the remaining Defendants, and in doing the

10   things herein alleged, was acting within the course and scope of such capacity and with the

11   consent, permission and authorization of each of the remaining Defendants. Thus, Defendants

12   are, and each of Defendants is, directly or indirectly, in whole or in part, vicariously or otherwise

13   liable for the acts or omissions of the other Defendants, individually and collectively.

14                      **JURISDICTION AND VENUE**

15   15.     On information and belief, personal jurisdiction in the State of California is

16   proper because Plaintiff resides in this State; and because Defendants directed the Defamatory

17   Statements to persons in this State; and because Defendants specifically intended to and did

18   cause harm in this State to Plaintiff, Plaintiff's wife, and Plaintiff's professional and personal

19   prospects and reputations.

20   16.     On information and belief, venue is proper in this County in accordance with

21   California Code of Civil Procedure Section 395(a), because Plaintiff resides in this County; and

22   because Defendants directed the Defamatory Statements to multiple individuals residing and / or

23   working in this County; and because Defendants intended the Defamatory Statements to cause

24   harm in this County; and because the Defamatory Statements did cause and continue to cause

25   harm in this County, in an amount to be proved at trial.

26                      **FACTUAL BACKGROUND**

27   **Plaintiff's Distinguished Career as a Military, Government and Academic Physician.**

28   17.     Plaintiff Dr. Philip Schoenfeld is an internationally known and respected

1   gastroenterologist whose career in military, government and academic medical service spans
2   more than three decades.

3        18.   Plaintiff graduated from the University of Pennsylvania's School of Medicine in
4   1989.

5        19.   For the first eleven years of his career, Plaintiff served and practiced medicine in
6   the U.S. Navy, where he rose to a series of directorships at the U.S. Navy's National Naval
7   Medical Center. Plaintiff concluded his career with the Navy in 2000, having achieved the rank
8   of Commander.

9        20.   Subsequent to serving in the Navy, Plaintiff took a position at the University of
10   Michigan School of Medicine (the "School of Medicine"), one of the most well-funded and well-
11   respected academic medical centers in the United States.

12        21.   In his sixteen years of practice at the School of Medicine, Plaintiff was
13   consistently promoted and rose to the position of Professor of Medicine (with tenure) while
14   becoming the first Director of the Training Program in Gastrointestinal Epidemiology.

15        22.   In 2016, Plaintiff transitioned from the University of Michigan to the John D.
16   Dingell VA Medical Center (the "VA") in Detroit, MI, where Plaintiff became Chief of that
17   hospital's Gastroenterology Section.

18        23.   At the time of his transition to the VA, Plaintiff planned to complete his 30 years
19   of combined federal government service by late 2019, and then to retire from the VA to pursue
20   additional opportunities in clinical and academic medicine.

21        24.   Plaintiff has held leadership positions in the American Gastroenterological
22   Association – the most prestigious professional society for gastroenterologists – and has lectured
23   on gastroenterology and related topics throughout North America, Asia, Europe and Central
24   America.

25        25.   Plaintiff also has received multiple competitive National Institutes of Health and
26   Veterans Administration research grants, has co-authored multiple practice guidelines
27   promulgated by domestic and international gastroenterological authorities, and has been invited
28   to consult with the federal Center for Medicare and Medicaid Services.

1   **Plaintiff and ████████ Four-Month Consensual Physical Relationship.**

2       26.    In May 2005, Plaintiff separated from his wife of 12 years, with whom he had one

3 child.  The couple's divorce was finalized in January 2008.

4       27.    Lonely and saddened by a lack of intimate and romantic connection, in December

5 2012 Plaintiff searched for companionship on a website called "Seeking Arrangement," located

6 at www.seekingarrangement.com.

7       28.    At relevant times, Seeking Arrangement's promoted purpose was to facilitate

8 romantic relationships between younger adults – both men and women – and older adults of

9 financial means.

10       29.    In or around December 2012 or January 2013, Plaintiff discovered the profile that

11 ████ has voluntarily placed on Seeking Arrangement, and reached out to her through the

12 website.

13       30.    Starting shortly thereafter, and continuing for a period of approximately four

14 months, Plaintiff and ████ engaged in a consensual physical relationship.

15       31.    During those same four months, and at ████ request, Plaintiff helped pay

16 approximately $1,250 per month of ████ education-related expenses.

17       32.    Plaintiff and ████ consensual physical relationship continued until April or

18 May of 2013, at which time Plaintiff suggested, and ████ agreed, that it should end.

19   **Plaintiff's Three-Year Mentorship of ████.**

20       33.    Early in their relationship, ████ expressed to Plaintiff her desire to become a

21 physician. After Plaintiff and ████ consensual physical relationship ended, ████ asked

22 Plaintiff, and Plaintiff agreed, to mentor ████ in achieving that goal.

23       34.    ████ also asked Plaintiff, and Plaintiff again agreed, to financially support a

24 student-led public awareness organization that ████ founded, and to pay certain of ████

25 further educational expenses, to include ████ certified nursing assistant certification tuition

26 and MCAT prep courses and materials.

27       35.    On several occasions in January 2015 and July-August 2015, Plaintiff even

28 allowed ████ to accompany (or "shadow") him while he performed his duties at an outpatient

1   University of Michigan clinic (the "Clinic").

2       36.    At no time subsequent to the end of their four-month consensual physical

3   relationship did Plaintiff in any way encourage or suggest that he and ▮▮▮▮ engage in any form

4   of further physical or sexual intimacy.

5       37.    While the frequency of their contacts subsided, Plaintiff's mentorship of ▮▮▮▮

6   continued until her late spring 2016 graduation from college.  Upon graduating, ▮▮▮▮ sent

7   Plaintiff a "thank you" card expressing her appreciation for Plaintiff's mentorship and support.

8       38.    ▮▮▮▮ thank you card stated: "[T]he secrets to medical school are passion and

9   perseverance. ... I couldn't have developed those two attributes without your help."

10      39.    Following ▮▮▮▮ graduation, Plaintiff and ▮▮▮▮ communications tapered

11  off, although ▮▮▮▮ still occasionally reached out to Plaintiff for medical school-related advice.

12      40.    In the fall of 2016, Plaintiff transitioned to become Chief of the Gastroenterology

13  Section of the John D. Dingell VA in Detroit.  Then in May 2018, Plaintiff married a San

14  Francisco Bay Area doctor and Stanford professor whom he began dating in October 2015.

15      41.    At the time of his wedding, Plaintiff planned to retire from the VA in the fall of

16  2019 and thereafter to join his new wife and to pursue additional professional opportunities in

17  California.

18      ▮▮▮▮ **Belated (and Still Unknown) Allegations to the University of Michigan.**

19      42.    On information and belief, in or about late 2017 or early 2018, ▮▮▮▮ became a

20  patient of the Clinic at which Plaintiff had allowed ▮▮▮▮ to shadow him.

21      43.    On information and belief, at the time she became a patient, ▮▮▮▮ lived

22  between an hour and two hours' drive from the Clinic.  As such, she could have received the

23  same or similar medical care at any of a number of facilities much closer to her home.

24      44.    On information and belief, soon after becoming a Clinic patient, ▮▮▮▮ began

25  making allegations to Clinic personnel about her consensual physical relationship with Plaintiff,

26  which by that time had ended almost *five years* earlier.

27      45.    Plaintiff first learned that ▮▮▮▮ had disclosed her and Plaintiff's consensual

28  physical relationship to Clinic personnel during a late January 2018 phone call with Dr. Chung

1   Owyang, Plaintiff's mentor and the sponsor of Plaintiff's then-"adjunct" faculty appointment at

2   the School of Medicine.

3       46.   During that January 2018 call, Dr. Owyang stated that ▮▮▮ had expressed a

4   concern that Plaintiff might have access to her medical records.  As Dr. Owyang and Plaintiff

5   agreed, Plaintiff's access to ▮▮▮ records was a non-issue, given that Plaintiff no longer

6   worked at the School of Medicine.

7       47.   Plaintiff and Dr. Owyang again discussed ▮▮▮ during a September 2018 phone

8   call regarding the annual renewal of Plaintiff's University of Michigan email account.

9       48.   During that September 2018 call, Plaintiff perceived that ▮▮▮ disclosure of

10  her and Plaintiff's consensual physical relationship had embarrassed Dr. Owyang in Dr.

11  Owyang's role as Plaintiff's sponsor.  Plaintiff therefore proactively and voluntarily offered not

12  seek a further renewal of his titular "adjunct" appointment, which would otherwise expire later

13  that same month.

14      49.   Other than Plaintiff's two calls with Dr. Owyang, at no time did anyone from the

15  University of Michigan or the School of Medicine contact Plaintiff to discuss ▮▮▮

16  allegations arising from her and Plaintiff's consensual physical relationship.  To date, Plaintiff

17  remains unaware of the nature and extent of those allegations.

18      50.   At no time did anyone at the University of Michigan inform Plaintiff of any

19  supposed investigation of ▮▮▮ allegations.  University of Michigan records – to include

20  Plaintiff's personnel file – reflect that no such investigation occurred.

21      51.   Similarly, at no time did anyone at the University of Michigan inform Plaintiff

22  that Plaintiff's titular "adjunct" faculty appointment had been, or might be, terminated, whether

23  as a result of ▮▮▮ allegations or otherwise.  University of Michigan records – to include

24  Plaintiff's personnel file – reflect no such termination, or any discipline or termination of any

25  kind relating to Plaintiff.

26  **Plaintiff's Recruitment by the Stanford University School of Medicine.**

27      52.   In the spring of 2019, now *six years* after the end of Plaintiff and ▮▮▮

28  consensual physical relationship, the Stanford University School of Medicine began recruiting

1   Plaintiff as a clinical professor of medicine.

2       53.     At the time, Plaintiff had no reason to believe that ▮▮▮▮ had falsely claimed, or

3   might falsely claim, that Plaintiff had done anything that might constitute sexual misconduct of

4   any kind.

5       54.     Stanford's recruitment of Plaintiff culminated in a 2-day visit by Plaintiff to

6   Stanford starting on October 23, 2019.

7       55.     Plaintiff's recruitment visit included interviews with Stanford physician faculty

8   and administrators, nursing leadership, senior leadership in various Stanford medical school

9   departments, and a publicly-advertised lecture by Plaintiff in the field of gastroenterology.

10      56.     During Plaintiff's recruitment visit, Stanford personnel discussed with Plaintiff

11  additional specifics of the clinical professor of medicine position, to include presumed salary and

12  benefits; the proportion of Plaintiff's time that would be spent on clinical medicine versus

13  research; and possible leadership positions that Plaintiff might assume as a member of Stanford's

14  faculty.

15      57.     Based on Plaintiff's academic rank and seniority, Plaintiff was told that his base

16  annual salary would be approximately $400,000.

17      58.     Given the success of the recruitment visit, as of the afternoon of October 24,

18  2019, Plaintiff fully expected to receive a formal offer of employment from Stanford, to begin

19  following his retirement from government service.

20  ▮▮▮▮▮▮▮ **First Defamatory Email and Stanford's Withdrawal from Recruiting Plaintiff.**

21      59.     On information and belief, ▮▮▮▮ learned of Stanford's recruitment of Plaintiff

22  from Plaintiff's new wife's "Twitter" feed or from Stanford's other advertising promoting

23  Plaintiff's lecture.

24      60.     On information and belief, on the evening of October 24, 2019, ▮▮▮▮ sent an

25  email (the "First Defamatory Email") to at least five Stanford personnel in the Division of

26  Gastroenterology, all of whom had interviewed Plaintiff, two of whom were long-time

27  colleagues of Plaintiff, and one of whom was Plaintiff's long-time friend.

28      61.     On information and belief, the First Defamatory email contained the following

1   Defamatory Statements, as well as other false and misleading assertions:

2         a.  the University of Michigan "conducted an internal investigation [of Plaintiff] for

3            two months on [███████] reports of sexual harassment and sexual misconduct";

4         b.  Plaintiff "was terminated at the University of Michigan … for sexual

5            misconduct";

6         c.  Plaintiff's "termination from [the University of Michigan] was the result of his

7            overall sexual misconduct";

8         d.  Plaintiff "violated the University of Michigan Standard Guide Policies" in

9            connection with his supposed misconduct as to ███████ and

10        e.  On two occasions, Plaintiff engaged in "sex without [███████] consent (rape)".

11      62.    ███████ also sent the First Defamatory Email to Plaintiff's new wife at Plaintiff's

12  wife's non-public email address.

13      63.    On information and belief, ███████ secured Plaintiff's new wife's non-public

14  email address by misrepresenting herself as a medical student pursuing a research opportunity.

15      64.    On November 2, 2019, Plaintiff's long-time friend at Stanford informed Plaintiff

16  that Stanford would not be offering Plaintiff the clinical professor of medicine position for which

17  Plaintiff, and Plaintiff alone, had been recruited.

18  ███████ **Second Defamatory Email and Plaintiff's Inability to Find Further Employment.**

19      65.    On information and belief, on or about January 6, 2020, ███████ sent a second

20  email (the "Second Defamatory Email") to the five Stanford personnel in the Division of

21  Gastroenterology who received the First Defamatory Email.

22      66.    On information and belief, the Second Defamatory Email contained the following

23  Defamatory Statements, as well as other false and misleading assertions:

24        a.  Plaintiff committed "sexual assault/rape" as to ███████ in 2013;

25        b.  if Plaintiff "disagrees with [███████] statements of sexual assault/rape … and

26           sexual misconduct … then it is because he does not completely understand the

27           legal definitions of both sexual assault/rape or sexual misconduct";

28        c.  the University of Michigan "determined that the events [███████] specifically

1                described fit the legal definitions for both sexual assault and sexual misconduct";

2         d.   Plaintiff's "termination" from the University of Michigan resulted from "findings

3             of sexual misconduct" by Plaintiff;

4         e.   Plaintiff was informed of his "termination for findings of sexual misconduct in

5             April 2018";

6         f.   Plaintiff "jeopardized patient care" at the Clinic; and

7         g.   Plaintiff "fail[ed] to disclose his termination [at the University of Michigan] when

8             interviewing at Stanford."

9     67.     Again, ▮▮▮▮ also sent the Second Defamatory Email to Plaintiff's new wife at

10  Plaintiff's new wife's non-public email address.

11     68.     Shortly after ▮▮▮▮ sent the Second Defamatory Email, all major San Francisco

12  Bay Area medical institutions announced hiring freezes relating to the COVID-19 pandemic.

13  Those freezes remain in effect.

14     69.     To Plaintiff's knowledge after inquiry, there are no advertised private practice

15  gastroenterology positions of any kind located within one hour's drive of Plaintiff's residence.

16  ▮▮▮▮ **Demands for a High-Six- or Seven-Figure "Settlement" Payment from Plaintiff.**

17     70.     In February 2020, Plaintiff, through counsel in Michigan, demanded that ▮▮▮▮

18  cease and desist from publishing the Defamatory Statements or any similar false and scurrilous

19  allegations about Plaintiff.

20     71.     Shortly thereafter, ▮▮▮▮ retained her own counsel and began posturing for a

21  settlement that would require *Plaintiff* to pay ▮▮▮▮ in consideration of "a mutual

22  nondisclosure" agreement that would, presumably, bar ▮▮▮▮ from repeating the Defamatory

23  Statements.

24     72.     As ▮▮▮▮ counsel explained in May 2020: "While it is certainly ▮▮▮▮ ▮▮▮▮

25  prerogative to publicize [the content of the Defamatory Statements] or otherwise report it, she

26  has refrained from doing so."

27     73.     Concerned about the effect on his career of the Defamatory Statements and the

28  potential for ▮▮▮▮ to make additional false and scurrilous allegations about him, Plaintiff

1    agreed to negotiate and even to mediate ▮▮▮▮ demands for financial compensation. Those

2    negotiations fell apart after ▮▮▮▮ demanded that Plaintiff pay her as much as $3 million for a

3    settlement and mutual non-disclosure agreement.

4    **Plaintiff's Initial Complaint and** ▮▮▮▮ **Threatened Fraudulent Claims.**

5      74.    In light of ▮▮▮▮ extortionate demands for payment, and fearful that ▮▮▮▮

6    would continue in her attempt to prevent Plaintiff from securing future employment, on

7    September 17, 2020 Plaintiff filed his initial Complaint against ▮▮▮▮

8      75.    Subsequent to the filing of Plaintiff's Compliant, ▮▮▮▮ retained new counsel.

9    Shortly after informing Plaintiff's counsel of his retention, ▮▮▮▮ new counsel sent Plaintiff's

10    counsel supposed draft cross-claims against Plaintiff, herein referred to as the Fraudulent Claims.

11      76.    In addition to repeating the general content of the Defamatory Statements, the

12    Fraudulent Claims accused Plaintiff of additional wildly exaggerated, and entirely fabricated,

13    sexual wrongdoing against ▮▮▮▮ and unidentified others.

14      77.    More specifically, the Fraudulent Claims falsely and scurrilously alleged that:

15        a.    Plaintiff is "a vile and dangerous sexual predator [who] hunted women in the

16          community of Ann Arbor, Michigan";

17        b.    Plaintiff "knowingly and surreptitiously infected ▮▮▮▮ with the herpes virus";

18        c.    Plaintiff sought employment with Stanford with the specific intention of

19          "spread[ing] the herpes virus in the Palo Alto community";

20        d.    Plaintiff "offered to use his position and influence at the University of Michigan

21          to gain employment for ▮▮▮▮ at the University of Michigan hospital"; and

22        e.    "Stanford, wishing to protect its female student population[,] verified the [sexual]

23          crimes committed by" Plaintiff and then refused to hire him.

24      78.    The Fraudulent Claims conceded that Plaintiff "was not hired by Stanford" as a

25    direct result of ▮▮▮▮ false and scurrilous allegations regarding Plaintiff's supposed "past

26    commission of rape(s), sexual assault(s) and improper use of influence in Ann Arbor, MI."

27      79.    As ▮▮▮▮ and her new counsel must know, the Fraudulent Claims – one styled

28    "Rape" – were and are factually and legally groundless to a point beyond frivolity.

80.     As ███ and her new counsel also must know, if further publicized, the Defamatory Statements and Fraudulent Claims would all but certainly end Plaintiff's career and do incalculable, and irreparable, damage to Plaintiff's personal and professional reputations, personal and professional relationships, and emotional well-being.

███ **Stated Intention to Publicize the Defamatory Statements and Fraudulent Claims.**

81.     Notwithstanding the obvious falsity and frivolity of the Fraudulent Claims, and the unquestionable harm that would result from them, ███ and her new counsel have threatened to file them, and to further publish them and the Defamatory Statements, unless Plaintiff agrees to pay ███ hundreds of thousands of dollars.

82.     In particular, ███ new counsel has threatened – directly or through clear implication – to:

  a.  Publish the Defamatory Statements and Fraudulent Claims to entities with whom ███ believes Plaintiff to have ongoing commercial relationships, to the end that those entities "fire" Plaintiff;

  b.  Provide the Defamatory Statements and Fraudulent Claims to the news media. (Plaintiff's new counsel stated: "I'm not saying the New York Times or the San Francisco Chronicle's going to be interested in it. But you never know.");

  c.  Inform Plaintiff's prospective employers – to the extent ███ hasn't already informed them – of the Defamatory Statements and Fraudulent Claims, to the end that Plaintiff "remains unemployed due to negative publicity surrounding the case"; and

  d.  Inform Plaintiff's new wife about the details of Plaintiff and ███ consensual physical relationship.

83.     ███ new counsel even suggested that Plaintiff's pursuit of his claims against ███ could cost Plaintiff his medical license.

84.     ███ new counsel described this Action as a "suicide mission" for Plaintiff. "It's gonna be real brutal litigation. … It's the kind of case that's just gonna be real destructive to Dr. Schoenberger [sic.]," he stated.

85.    ▮ new counsel further stated that he is unconcerned with obvious choice-of-law and statute of limitations issues affecting the Fraudulent Claims, or with the fact that there is no civil cause of action for "Rape."

86.    ▮ new counsel explained that in crafting the Fraudulent Claims, he was more interested in "story and facts, leverage points and strategy. ... I can always find a legal claim. I've never had a problem doing it."

87.    As to ▮ case specifically, ▮ new counsel added: "I've got a lot of, I think, leverage vectors. ... Right or wrong, I don't get into it morally."

88.    In effect, ▮ new counsel isn't offering to settle legitimate claims against Plaintiff. He's offering to spare Plaintiff from the gamut of unlawful, unethical and abusive litigation tactics that he and ▮ otherwise would inflict in the course of the Action.

89.    ▮ new counsel summarized his and ▮ strategy: "[I] think the concept is to give your client certain value immediately for something that, in my estimation, would cost him 500k over the next few years, open up his private life, jeopardize his career and leave him with much stress and uncertainty. [I]n practical, realistic business terms, why not spend that 500k to get the judgment he desires now?"

### ▮ Threats and Plaintiff's Need for Injunctive Relief.

90.    To this day, Plaintiff does not know who all received the First Defamatory Email and Second Defamatory email.

91.    Also to this day, Plaintiff does not know to whom ▮ made, or might have made, the Defamatory Statements or other similar false and scurrilous statements about Plaintiff.

92.    On information and belief, ▮ already has made further false and scurrilous statements about Plaintiff to some or all of Plaintiff's former colleagues at the University of Michigan School of Medicine.

93.    The Second Defamatory Email stated ▮ belief that Plaintiff must "disclose[] the truth of his termination at the University of Michigan when interviewing at future academic institutions."

94.    In light of that statement and ▮ additional threats, Plaintiff is concerned

1  that ▉▉▉ may make further false and scurrilous statements about him to other of his

2  prospective employers, thus undermining or destroying his chances of securing further

3  employment and causing irreparable harm to his personal and professional reputations.

### FIRST CAUSE OF ACTION
### DEFAMATION PER SE
### (Against All Defendants)

6  95.    Plaintiff hereby incorporates the previous paragraphs and re-alleges them as

7  though fully set forth herein.

8  96.    On information and belief, Defendants made the Defamatory Statements to, at a

9  minimum, five Stanford personnel, as well as to Plaintiff's new wife and perhaps others.

10  97.    On information and belief, the Defamatory Statements identified Plaintiff by

11  name, and all recipients reasonably understood those statements to refer to Plaintiff.

12  98.    The recipients of the Defamatory Statements understood those statements to mean

13  that: Plaintiff committed sexual assault and/or rape as to ▉▉▉ the University of Michigan

14  conducted a two-month investigation of ▉▉▉ claims of sexual assault and sexual misconduct

15  by Plaintiff; the University of Michigan determined that Plaintiff had committed unlawful

16  "sexual assault and sexual misconduct" as to ▉▉▉ as a result of those findings and

17  "[Plaintiff's] overall sexual misconduct," the University of Michigan terminated Plaintiff's

18  faculty position and informed Plaintiff of that termination; Plaintiff violated University of

19  Michigan policies and rules relating to sexual harassment and sexual misconduct;  Plaintiff

20  "jeopardized patient care" at the University of Michigan; and Plaintiff lied to Stanford during the

21  recruiting process by failing to disclose his supposed termination from the University of

22  Michigan and the alleged reasons therefor.

23  99.    The Defamatory Statements are damaging on their face without further

24  explanation, in that they falsely accuse Plaintiff of criminal and unethical behavior, and of being

25  unfit to practice in Plaintiff's business and profession.

26  100.    The Defamatory Statements were, and are, false.

27  101.    On information and belief, Defendants made the Defamatory Statements with the

28  intention and purpose of scuttling Plaintiff's job prospects with Stanford and other prospective

1   employers, and of ruining Plaintiff's personal and business reputations and career.

2        102.    On information and belief, Defendants failed to use reasonable care to determine

3   the truth or falsity of the Defamatory Statements, or acted in reckless disregard of the truth, or

4   acted with knowledge that the Defamatory Statements were false.

5        103.    On information and belief, as a direct, proximate and substantial result of the

6   Defamatory Statements, Plaintiff was not offered a clinical professor of medicine position for

7   which he, and he alone, had been recruited by Stanford, resulting in lost wages and other

8   economic damages.

9        104.    The Defamatory Statements also have directly, proximately and substantially

10  caused harm to Plaintiff in his profession by handicapping Plaintiff's job search and overall

11  professional prospects, and by damaging Plaintiff's professional reputation, and by requiring

12  Plaintiff to engage services providers in an attempt to address the impact of the Defamatory

13  Statements.

14       105.    Additionally, the Defamatory Statements have directly, proximately and

15  substantially caused harm to Plaintiff's and Plaintiff's new wife's personal reputations, and have

16  caused Plaintiff and Plaintiff's new wife social and emotional harms of a sort that would

17  naturally result from similar false and scurrilous public statements.

18       106.    On information and belief, in making the Defamatory Statements, Defendants

19  acted with malice, oppression and / or fraud, thus entitling Plaintiff to an award of exemplary

20  damages.

21       107.    On information and belief, Defendants plan, and have threatened, to re-publish the

22  Defamatory Statements in an ongoing effort to destroy Plaintiff's reputation and professional

23  prospects.  Because financial damages would be inadequate to compensate Plaintiff for all those

24  future harms, an award of injunctive relief is warranted.

25                      **SECOND CAUSE OF ACTION**

26  **INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS**
                        **(Against All Defendants)**

27       108.    Plaintiff hereby incorporates the previous paragraphs and re-alleges them as

28  though fully set forth herein.

1      109.   Immediately prior to the First Defamatory Email, Plaintiff and Stanford

2   University were in an economic relationship that was likely to result, and probably would have

3   resulted, in an economic benefit to Plaintiff in the form of a clinical professor of medicine

4   position for which Stanford was recruiting him.

5      110.   On information and belief, had Stanford offered Plaintiff the position for which

6   Plaintiff, and Plaintiff alone, had been recruited, Plaintiff's annual salary would have been

7   approximately $400,000, plus additional monetary and non-monetary benefits.

8      111.   On information and belief, prior to disseminating the Defamatory Statements,

9   Defendants knew of Plaintiff and Stanford's economic relationship.

10     112.   Following the second day of Plaintiff's two-day recruitment visit to Stanford,

11   Defendants published the Defamatory Statements, each and all of which are defamatory *per se*.

12     113.   On information and belief, at the time Defendants published the Defamatory

13   Statements, they intended those statements to disrupt Plaintiff and Stanford's economic

14   relationship, in that they intended Stanford to rely on those statements, and thought it was

15   substantially likely that Stanford would rely on them, in declining to offer Plaintiff a clinical

16   professor of medicine position.

17     114.   On information and belief, as a direct, proximate and substantial result of the

18   Defamatory Statements, Plaintiff and Stanford's economic relationship was disrupted, in that

19   Plaintiff was not offered a clinical professor of medicine position.

20     115.   On information and belief, as a direct, proximate and substantial result of the

21   Defamatory Statements and the disruption of Plaintiff and Stanford's economic relationship,

22   Plaintiff suffered lost wages, impaired economic opportunities, and other economic damages in

23   amounts to be proved at trial.

24     116.   On information and belief, as a direct, proximate and substantial result of the

25   Defamatory Statements and the disruption of Plaintiff and Stanford's economic relationship,

26   Plaintiff has suffered further harms in the form of reduced professional prospects and damage to

27   his professional reputation.

28     117.   On information and belief, in making the Defamatory Statements, Defendants

1  | acted with malice, oppression and / or fraud, thus entitling Plaintiff to an award of exemplary

2  | damages.

3  | ### PRAYER FOR RELIEF

4  | **WHEREFORE**, Plaintiff seeks relief from this Court as follows:

5  | 1.      For general and special damages according to proof;

6  | 2.      For exemplary damages according to proof;

7  | 3.      For injunctive relief barring Plaintiff from further publishing the Defamatory

8  | Statements;

9  | 4.      For Plaintiff's attorneys' fees and costs of suit; and

10 | 5.      For such other relief as the Court may deem just and proper.

11 |

12 | Dated: October 13, 2020                                   BURGOYNE LAW GROUP

13 |

14 | By: _____
   |                                       Henry M. Burgoyne III
15 |                                 *Attorney for Plaintiff Philip Schoenfeld*

1

## JURY TRIAL DEMAND

2       Plaintiff hereby demands trial by jury for the cause of action, claim or issue in this Action

3  which is triable as a matter of right to a jury.

4  Dated: October 13, 2020

BURGOYNE LAW GROUP

5

6                    By: _____

7                          Henry M. Burgoyne, III
                         *Attorney for Plaintiff Philip Schoenfeld*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28