# EXHIBIT 9

**Jane Doe**
**06/08/2023**

1               UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF MICHIGAN

3   JANE DOE,

4          Plaintiff,

5    -v-                  Case No.:  21-CV-12492

6                      Hon. Shalina D. Kumar

7   UNIVERSITY OF MICHIGAN,

8   et al.,

9          Defendants.

   _____/

10

11  PAGE 1 TO 137

12

13      The deposition of JANE DOE,

14      Taken at 1109 Geddes Avenue, Suite 2300,

15      Ann Arbor, Michigan,

16      Commencing at 2:11 p.m.,

17      Thursday, June 8, 2023,

18      Before Cheryl McDowell, CSR-2662.

19

20

21

22

23

24

25



**Jane Doe**
06/08/2023
Pages 2..5

```
1    APPEARANCES:
2    MR. KEITH ALTMAN - P81702
3    The Law Office of Keith Altman
4    33228 West Twelve Mile Road, Suite 375
5    Farmington Hills, Michigan  48334
6    (516) 456-5885
7    keithaltman@kaltmanlaw.com
8         Appearing on behalf of the Plaintiff.
9
10   MR. THOMAS L. KENT - P55863
11   MS. TARA JASTRZEMBOWSKI
12   The University of Michigan
13   1109 Geddes Avenue, Suite 2300
14   Ann Arbor, Michigan  48109
15   (734) 764-0304
16   tomkent@umich.edu
17        Appearing on behalf of the Defendants.
18
19
20
21
22
23
24
25
```

```
1    Ann Arbor, Michigan
2    Thursday, June 8, 2023
3    About 2:11 p.m.
4              JANE DOE,
5    having first been duly sworn, was examined and
6    testified on her oath as follows:
7         MR. KENT:  Let the record reflect that this
8    is the deposition of Jane Doe.
9         You can put your hand down.  It's okay.
10        Jane Doe.  Am I pronouncing that correctly?
11   THE WITNESS:  Yes.
12        MR. KENT:  Okay.  Being taken pursuant to
13   notice for any and all purposes permitted by the
14   Michigan -- excuse me -- the Federal Rules of Court
15   and Federal Rules of Evidence.
16   EXAMINATION BY MR. KENT:
17   Q.  Miss Doe, my name is Tom Kent, and I represent the
18       defendants in this case.  With me today is Tara
19       Jastrzembowski, a paralegal that works with me on this
20       case.  We have a court reporter named Cheryl who is
21       taking down my questions and your answers and any
22       input or objections that your attorney has.
23            So just a few ground rules before we get
24       going.  Have you ever taken or given a deposition
25       before?
```

```
1              TABLE OF CONTENTS
2    Witness                              Page
3    JANE DOE
4
5    EXAMINATION BY MR. KENT:                4
6    EXAMINATION BY MR. ALTMAN:            134
7
8                 EXHIBITS
9    Exhibit                              Page
10   DEPOSITION EXHIBIT NO. 1               33
11   Plaintiff's Second Amended Complaint
12   DEPOSITION EXHIBIT NO. 2               33
13   Plaintiff's Responses to Defendants'
     Limited Discovery Requests
14
     DEPOSITION EXHIBIT NO. 3               48
15
     Michigan Medicine Forms
16
17        (Exhibits attached to transcript.)
18
19
20
21
22
23
24
25
```

```
1  A.  No.
2  Q.  Okay.  So as Cheryl mentioned, try to keep your voice
3      up.
4  A.  Yes.
5  Q.  And because she's taking down everything that's said
6      in the room, it's important for us to all take turns
7      talking.
8           So when you're answering a question, I'm
9      not going to interrupt you.  I'm going to let you
10     finish before I start talking again, and I would ask
11     you to return that courtesy to me.  Just wait for the
12     question to be completed, and then you can begin your
13     answer.
14          The next one, and I'm glad you did that.
15     The next ground rule is that Cheryl can't take down
16     head shakes and nods.  So we have to be audible and we
17     have to be verbal, okay?  Yes?
18 A.  Yes.
19 Q.  Okay.  And so I can tell you're a little bit nervous,
20     so let me say this.  This is a deposition.  There's
21     no judge, there's no jury in here.  This is an
22     opportunity for me to ask you questions to help me
23     better understand your case.
24          Do you understand that?
25 A.  Yes.
```

Page 6

1 Q.  It's not an opportunity for me to make your life
2      difficult or make you sad or uncomfortable.
3           Do you understand that?
4 A.  Yes.
5 Q.  And I won't do that, okay?
6           If you need a break, and this is what you
7      asked before, we'll pick a good time.  If there's a
8      question on the table, do the best you can to answer
9      it, and then we'll take a break.
10          Does that sound fair?
11 A.  Yes.
12 Q.  All right.  Is there any reason today that you feel
13      like you can't give this deposition?
14          And the reason I ask that, and let me tell
15      you why I ask that to make it clear.  Sometimes people
16      are on medication that affects their memory or their
17      mind in some way, and they don't have the recall that
18      they would need to answer questions, or there might be
19      some other reasons why they feel like they can't give
20      a deposition.
21          Is there any reason why you think you can't
22      give a deposition today?
23 A.  I believe I can still give the deposition today to the
24      best of my ability.
25 Q.  All right.  Okay.  Could you state -- we already did

Page 7

1      that, but why don't you state again your full name for
2      the record.
3 A.  Jane Nicole Doe.
4 Q.  And what's your home address?
5           MR. ALTMAN:  Okay.  Hold on one second.  I
6      have no problem giving that to you, but can we do
7      that -- that doesn't need to be on the record.
8           Can we just go off for a second?
9           MR. KENT:  We'll do it later.
10          MR. ALTMAN:  Okay.
11 BY MR. KENT:
12 Q.  Are you married?
13 A.  No.
14 Q.  Are you in a relationship?
15 A.  No.
16 Q.  Have you ever been married?
17 A.  No.
18 Q.  Do you live alone?
19 A.  No.
20 Q.  Who do you live with?
21 A.  A roommate.
22 Q.  Okay.  What's that person's name?
23          MR. ALTMAN:  I'd rather do that off the
24      record.  We'll give it to you.  It doesn't need to be
25      on the record.

Page 8

1           MR. KENT:  Why?  That person is not
2      protected.  I'm going to ask a lot of information
3      today.
4           MR. ALTMAN:  I understand, but --
5           MR. KENT:  Friends, acquaintances.  There's
6      going to be a lot of stuff we get into.  If we start
7      taking people's names --
8           MR. ALTMAN:  I'm just trying to --
9           COURT REPORTER:  Wait.  One at a time.
10          MR. ALTMAN:  I'd give you the answer, but I
11      don't know that it needs to be in the transcript.
12          MR. KENT:  Because I want -- this is under
13      oath.  I want to know who these people are under oath.
14      I don't want you to tell me.
15          MR. ALTMAN:  I'm not going to tell you.
16          Then just mark this piece confidential, the
17      name.  That's all.
18          MR. KENT:  Okay.  Let me do it like this
19      because we might have to stop.  Are you instructing
20      her not to answer that question?
21          MR. ALTMAN:  I'm suggesting that that
22      person's confidentiality is at stake here.  They're
23      not here to defend themselves.
24          I'm perfectly happy to give you the
25      information.  If you want it under oath, just mark

Page 9

1      that answer as confidential.  Otherwise, she'll give
2      it to you, you know, not under oath, however you want
3      it.  But it's just I don't think that --
4           MR. KENT:  Okay.  That's not what I'm
5      saying.  My question is are you instructing her not to
6      answer that question?
7           MR. ALTMAN:  Yes.
8           MR. KENT:  I want to know who the roommate
9      is.
10          MR. ALTMAN:  Yes, and I'm going to tell
11      you.  We're not refusing to tell you.  We're refusing
12      to tell you in the public transcript.
13          MR. KENT:  Okay.
14          MR. ALTMAN:  So just answer --
15          MR. KENT:  We're not -- this is going to
16      keep coming up because I'm going to ask her about
17      acquaintances, I'm going to ask her about family, I'm
18      going to ask her about friends.  There's a lot of
19      questions, and every time this comes up, you're going
20      to do this and try to keep people's names out of the
21      record.
22          I have a right to know under oath things
23      that are functional about her life so I can get
24      questions, answers to questions.
25          MR. ALTMAN:  And I'm not refusing to let



Jane Doe
06/08/2023                                Pages 10..13

Page 10

1   you do that.  I'm just saying the name has to be
2   confidential.
3          MR. KENT:  It doesn't.  That person is no
4   jeopardy of anything.  They don't have to be
5   protected.  This is just a person out in the world.
6          MR. ALTMAN:  Okay.  Well, they're not here
7   to defend their right to confidentiality.
8          If you want, we'll call the judge.  That's
9   fine.
10         MR. KENT:  Why don't we do that, why don't
11  we do that.  No, let's go off the record.
12         MR. ALTMAN:  Yeah.
13         (Off the record at 2:17 p.m.)
14         (Back on the record at 2:35 p.m.)
15         MR. KENT:  Now we're back on the record.
16  BY MR. KENT:
17  Q.  Okay.  I'm going to refer to your roommate as just
18      your roommate for purposes of the deposition, okay?
19  A.  Yes.
20  Q.  All right.  Do you have any social media accounts as
21      we sit here today?
22  A.  No.
23  Q.  Any that you have that are just idle that you're not
24      using?
25  A.  Yes.

Page 11

1   Q.  What are those?
2   A.  LinkedIn.
3          MR. ALTMAN:  Hold on.  I'm going to object
4   if they were not in existence at the time that the
5   matter of this case took place.
6   BY MR. KENT:
7   Q.  Okay.  You can still answer.
8          MR. ALTMAN:  I'm going to instruct her not
9   to answer if they are not in that time period.
10         MR. KENT:  How can I know if they were in
11  that time period?
12         MR. ALTMAN:  Ask her during the time period
13  of this case did you have social media accounts.
14         MR. KENT:  I'm not confined to the time
15  period of this case.  She could have said something on
16  that account yesterday about what happened in this
17  case or about this case or about anything.  It
18  doesn't -- that doesn't have to be limited to the
19  window of that.
20         MR. ALTMAN:  So why don't you ask her have
21  you said anything in your social media accounts about
22  this case and establish that.
23  BY MR. KENT:
24  Q.  Okay.  This is the way we're going to do this from now
25      on.  I'm going to ask the question.  He's either going

Page 12

1   to tell you to answer it or not answer it, and I'm
2   just going to keep going, and then I'll file a motion
3   to compel him for sanctions.
4          MR. ALTMAN:  You should, you should
5   absolutely do that.
6          MR. KENT:  Okay.  Because this is unreal.
7   BY MR. KENT:
8   Q.  So do you have social media accounts?
9   A.  Yes.
10  Q.  Okay.  What are the names of your social media
11      accounts?
12         MR. ALTMAN:  I'm going to object to the
13  extent social media accounts did not exist during the
14  time of her relationship with the University of
15  Michigan and instruct her not to answer in accordance
16  with the judge's order.
17         MR. KENT:  That's not in accordance with
18  the judge's order.
19  BY MR. KENT:
20  Q.  But, at any rate, do any of the social media accounts
21      that you're telling me that you have that exist today
22      exist five years ago?
23  A.  No.
24  Q.  Okay.  None of them?
25  A.  None.

Page 13

1   Q.  What social media accounts did you have that existed
2       five years, from 2013 to 2019?
3   A.  I don't remember.
4   Q.  But the social media accounts you have today are not
5       with the same carriers or providers that you had in
6       2013 to 2019 such as Facebook, Twitter, Instagram,
7       things of that nature?
8   A.  No.
9   Q.  Okay.  And you don't remember any of them that you had
10      during that six-year window, correct?
11  A.  I don't remember.
12  Q.  But you do know ones that you have today but you're
13      not going to tell me because your attorney says you
14      shouldn't, is that correct?
15  A.  That's correct.
16         MR. KENT:  No, we're not going to do this.
17  Off the record.
18         (Off the record at 2:38 p.m.)
19         (Back on the record at 2:38 p.m.)
20  BY MR. KENT:
21  Q.  Do you have any family in the area?
22  A.  No.
23  Q.  No blood relatives in Michigan?
24  A.  No.  I do have blood relatives in Michigan but not in
25      this Ann Arbor area.



Page 14

1 Q.  Okay.  Who are your blood relatives in Michigan?
2         MR. ALTMAN:  Names, just we'll give you the
3   names off the record.
4 BY MR. KENT:
5 Q.  Do you talk to your blood relatives in Michigan?
**6 A.  Yes.**
7 Q.  How are they related to you?
**8 A.  I have my mom.**
9 Q.  Okay.
**10 A.  My dad.**
11 Q.  Let's start with your mom.
12         Where does she live?
**13 A.  Is this off the record?**
14 Q.  I mean what city, what area.
15         MR. ALTMAN:  That's fine.
**16         THE WITNESS:  Troy, Michigan.**
17 BY MR. KENT:
18 Q.  Okay.  So relatively close by, within an hour,
19   correct?
**20 A.  Yes.**
21 Q.  And your dad?
**22 A.  My dad.**
23 Q.  Does he also live in Troy?
**24 A.  Yes.**
25 Q.  Okay.  Who else?

Page 15

**1 A.  I have my sister, Ashley, my brother, Matthew.**
2 Q.  Where are they?
**3 A.  Troy, Michigan.**
4 Q.  Do they live with your parents?
**5 A.  Yes.**
6 Q.  Okay.
**7 A.  And my sister, Melanie.**
8 Q.  And --
9         MR. ALTMAN:  Don't use names.
10 BY MR. KENT:
11 Q.  And where is Melanie?
**12 A.  I don't want to use the name.**
13         MR. ALTMAN:  Well, it's okay.  You've
14   already used it, so it's okay.  Just answer, just
15   answer the question.
**16         THE WITNESS:  I thought the names were off**
**17 the record?**
18         MR. ALTMAN:  Okay.  But, Jane, just answer
19   his question about Melanie.
20 BY MR. KENT:
21 Q.  What area is she in?
**22 A.  Troy.**
23 Q.  Okay.
**24 A.  But I now have -- could we take a short break?**
25         MR. ALTMAN:  No.

Page 16

1         MR. KENT:  No.
2         MR. ALTMAN:  Jane, we need to go further.
3 BY MR. KENT:
4 Q.  Do they all have the same last name as you, all the
5   people that you just mentioned, your siblings and your
6   parents?
**7 A.  Yes.**
8 Q.  Have you discussed this case with any of those -- I
9   think you mentioned five people, two parents and three
10   siblings, is that correct?
**11 A.  Can you repeat your question?**
12 Q.  Yeah.  You mentioned two parents and three siblings,
13   is that correct?
**14 A.  Yes.**
15 Q.  Okay.  Tell me the ages of the siblings.
**16 A.  I would like to keep my siblings' information --**
17         MR. ALTMAN:  Jane, you've got to answer the
18   question.
19 BY MR. KENT:
20 Q.  I need to know their ages so I can know their kind
21   of -- whether they're within kind of the peer age of
22   you because I'm going to ask you about conversations
23   that you had with them.
24         Okay.  So what are their ages as best as
25   you can remember?

Page 17

**1 A.  Sibling -- I'll be sibling one.  Sibling two is**
**2   twenty-seven, sibling three is twenty-one, sibling**
**3   four is twenty.**
4 Q.  Okay.  So we've already established the names.
5         Did you say Melissa or what was the --
6         MR. KENT:  Could you read back the name of
7   her sister, the last one?
8         COURT REPORTER:  Answer:  And my sister,
9   Melanie.
10 BY MR. KENT:
11 Q.  Is Melanie twenty-seven?  Is she sibling one that you
12   just referred to?  Is Melanie twenty-seven?
**13 A.  No.**
14 Q.  Okay.  Is Melanie -- how old is Melanie?
15         MR. ALTMAN:  Jane, you've got to answer.
16   Just answer.
**17         THE WITNESS:  Twenty.**
18 BY MR. KENT:
19 Q.  Okay.  And how old are you today?
**20 A.  I'm twenty-nine.**
21 Q.  Are you the oldest?
**22 A.  Yes.**
23 Q.  Have you had conversations about either this lawsuit
24   or the underlying allegations that you've made in this
25   lawsuit with any of your siblings?



**Jane Doe**
06/08/2023                                          Pages 18..21

1  A.  I don't remember.
2  Q.  Are you closer to any particular one of your siblings?
3  A.  Yes.
4  Q.  Who are you closest to?
5  A.  Sibling three.
6  Q.  Melanie?
7  A.  No.  That's sibling four.
8         MR. ALTMAN:  Jane, just tell him which
9     sibling.  The names are there.  Just tell him which
10    sibling, please.
11        THE WITNESS:  Matthew.
12 BY MR. KENT:
13 Q.  How old is Matthew?
14 A.  Twenty-one.
15 Q.  And of all of the things that you've alleged in this
16    lawsuit in your complaint about the sexual assault,
17    the rape, the internship, mentorship all of that, you
18    don't have any recollection of ever talking about any
19    of those things with your siblings?
20        MR. ALTMAN:  Objection.  Sorry.  Objection
21    form.
22        You can answer.
23        THE WITNESS:  I don't remember.
24 BY MR. KENT:
25 Q.  Do you think that it's -- if you had to make an

1     educated guess, your best understanding, because
2     sometimes those are things that we have to do, do you
3     think that you have talked to any of your siblings
4     about this case or the allegations that are made in
5     it?
6         MR. ALTMAN:  Objection to form.  You've
7     already asked you twice.  She's given you an answer.
8     She's not going to give you a third.
9  BY MR. KENT:
10 Q.  You said you don't remember any specific.  You said
11    you don't remember, okay?  I don't remember who was in
12    my kindergarten class but I know I went to
13    kindergarten, so there's sometimes we know certain
14    things.
15        Do you think that you may have had at some
16    point conversations with your siblings that you just
17    don't remember today about this case?
18 A.  Possibly.
19 Q.  Okay.
20 A.  But with only one specific one.
21 Q.  The one you're closest with?
22 A.  The one I'm closest with, yes.
23 Q.  Same question with respect to your parents.  Have you
24    talked to them about this case or the allegations that
25    you've made in it?

1  A.  I don't remember.
2  Q.  What's your relationship like with them qualitatively
3     speaking?
4  A.  Distant.
5         So the sibling I am closest with, Matthew.
6  Q.  Yes.
7  A.  He actually -- I'm very close with him.  He's on the
8     autism spectrum disorder, and he goes to special
9     education school.
10 Q.  Okay.  Do you have close friends?
11 A.  Yes.
12 Q.  Who is your closest friend right now?
13        MR. ALTMAN:  Any names she's going to give
14    would be off the record or under confidentiality.
15        MR. KENT:  Okay.  So you're instructing her
16    not to answer that question, who her closest friends
17    are?
18        MR. ALTMAN:  No, I'm not instructing her
19    not to answer.  I'm saying as per the judge's ruling,
20    it's either going to be off the record or under
21    confidentiality.  It's your choice.
22 BY MR. KENT:
23 Q.  Okay.  So let's go off the record, and I'll get a list
24    of your closest friends, and I'll identify them as
25    friend one, friend two, friend three, and then I'll

1     ask you questions about them.
2         MR. ALTMAN:  Okay.  Fair.
3  BY MR. KENT:
4  Q.  Who they are, where they live, what you talked about,
5     and so forth, okay?
6         MR. KENT:  So we're off the record, please.
7         (Off the record at 2:46 p.m.)
8         (Back on the record at 2:47 p.m.)
9         MR. KENT:  Okay.  Back on the record.
10 BY MR. KENT:
11 Q.  Tell me friend one.
12        MR. ALTMAN:  Do you want his address now
13    before you go back on?
14        MR. KENT:  No.  I'll get that later.
15        MR. ALTMAN:  Okay.
16 BY MR. KENT:
17 Q.  Before we talk about friend one, I want to go back to
18    your roommate and ask you if she is -- let me ask it
19    this way.  How long have you known your roommate?
20 A.  Since fall 2022.
21 Q.  How did you meet?
22 A.  I live in an apartment with her.
23 Q.  Prior to living with her, how did you meet?
24 A.  I just -- I'm subleasing, so I just met her in my
25    apartment.



**Jane Doe**

06/08/2023                                         Pages 22..25

1 Q.  Did you answer some sort of ad for a subtenant that
2     she was -- was she looking for a roommate and you
3     connected through an ad?  I mean, how did it happen
4     that you met her, what was the circumstances for your
5     meeting one another?
6 **A.  Like, how I'm subleasing my apartment?**
7 Q.  Okay.  So you're subleasing to her?
8 **A.  No.  I'm subleasing from another person, and she's my**
9 **     roommate.**
10 Q.  All right.  So you first met her just by virtue of
11     moving into that space?
12 **A.  Yes.**
13 Q.  All right.  And would you consider that roommate a
14     friend?
15 **A.  No.**
16 Q.  Are you working?
17 **A.  No.**
18 Q.  And what do you do for money?
19 **A.  Scholarships.**
20 Q.  Are you a student?
21 **A.  Yes.**
22 Q.  And tell me where you're a student and how long you've
23     been a student.
24 **A.  Can it be off the record?**
25 Q.  Not really, not on that one.

1         MR. ALTMAN:  This is one you should answer.
2 **        THE WITNESS:  I'm a student at the**
3 **    University of Michigan School of Public Health, health**
4 **    behavior, health education.**
5 BY MR. KENT:
6 Q.  And when did you begin that program?
7 **A.  Fall 2021.**
8 Q.  Is that a Master's program?
9 **A.  Yes.**
10 Q.  Have you been there continuously since fall of 2021?
11 **A.  No.**
12 Q.  Tell me about any breaks that you've taken and why.
13 **A.  I took winter 2022 off and summer 2022 off.**
14 Q.  Why?
15 **A.  It's been incredibly difficult for me to be a student**
16 **    here at the University of Michigan with all that I've**
17 **    experienced.  I've experienced a hostile educational**
18 **    environment.**
19 Q.  All right.  And I'm not going to ask you questions
20     about that in today's deposition because it's a little
21     bit far afield, but we'll explore that another time.
22         But suffice it to say you've taken two
23     semesters off, is that right?
24 **A.  I guess it is winter 2022 counts as one semester.  I**
25 **    don't know if the summers count as a semester, but I**

1 **    guess we can consider it two semesters.**
2 Q.  So you went back in the fall of 2022?
3 **A.  Yes.**
4 Q.  And were continuously enrolled up until the end of
5     this last semester in the spring?
6 **A.  As of right now, yes.**
7 Q.  How much longer do you have to go in the program?
8 **A.  My anticipated graduation date is winter 2023, so in**
9 **    December 2023.**
10 Q.  Are you taking summer classes?
11 **A.  I don't think so.**
12 Q.  Because you're leaving for the summer, correct?
13 **A.  Yes.**
14 Q.  Where are you going?
15 **A.  I'm going to Dubai, United Arab Emirates.**
16 Q.  With family?
17 **A.  No.**
18 Q.  Do you have family there?
19 **A.  No.**
20 Q.  All right.  Before your deposition today, not
21     immediately before but in the days preceding it, have
22     you looked at anything, any documents to refresh your
23     memory or prepare for today?
24 **A.  I don't remember.**
25 Q.  Other than what you may have talked to your attorney

1     about, did you talk to anyone in preparation for your
2     deposition?
3 **A.  I don't remember.**
4         MR. ALTMAN:  I just want to be clear that
5     attorney means not just me.  Anybody in the firm.
6         MR. KENT:  Yes, that's correct.
7 BY MR. KENT:
8 Q.  Other than any attorneys, have you talked to any
9     non-attorneys in preparation for your deposition
10     today?
11         MR. ALTMAN:  Well, I want to be clear that
12     any of my paralegals count as part of mine, too.
13         MR. KENT:  That's true.
14         MR. ALTMAN:  Just anybody outside of my
15     firm, fair enough?
16         MR. KENT:  Fair enough.
17         MR. ALTMAN:  Okay.
18 **        THE WITNESS:  I don't remember.**
19 BY MR. KENT:
20 Q.  And you're sure that there's nothing, no sort of
21     medication or anything that's impairing your memory
22     today?  I mean, you don't recall yesterday, the day
23     before, if you talked to anyone, if you looked at
24     anything in preparation for today?
25 **A.  I am on a medication, but I don't think it impairs my**



Page 26

1   memory.
2 Q.  Have you looked at your complaint in this case?
3 **A.  Yes.**
4 Q.  The second amended complaint, have you looked at that?
5 **A.  Yes.**
6 Q.  Have you seen the discovery responses, the
7   interrogatory responses that are your responses that
8   were submitted to me?
9 **A.  Yes.**
10 Q.  Now, I don't have an attestation or signature on those
11   which is required from you, and I think at some point
12   today, we need to go through these answers to
13   determine whether you attest to the truth of them, and
14   we'll do that later, but --
15       MR. ALTMAN:  That was an error.  We'll
16   provide it to you.
17       MR. KENT:  Yeah, I sent an email a while
18   back.
19       MR. ALTMAN:  Okay.  I don't think you're
20   going to have to go through every one.  She's going to
21   attest to all of the answers.
22       MR. KENT:  Yeah.  I just don't want the
23   answers being amended in light of her deposition
24   testimony.
25       MR. ALTMAN:  Well, it can be amended anyway

Page 27

1   in light of her testimony.
2       MR. KENT:  Not if they were already signed
3   under oath before today.
4       MR. ALTMAN:  They can still be amended.
5       MR. KENT:  They can be changed.
6       MR. ALTMAN:  They can be changed.
7       My point is that there's no dispute that
8   what was submitted to you was attested to by her.  She
9   will sign whatever document, and you'll have that.  I
10   don't think you need to go through them, this
11   exercise.
12       MR. KENT:  I was going to do that anyway,
13   so it doesn't matter.
14       MR. ALTMAN:  Okay.
15 BY MR. KENT:
16 Q.  So I need to ask you some questions about treaters,
17   your health care providers, so I can get their
18   names.
19       Do you have a primary care physician?
20       MR. ALTMAN:  Bear with me a second.  I'm
21   going to object to that question as it goes beyond the
22   scope of the order issued by the court in this case
23   and instruct her not to answer.
24       MR. KENT:  Well, just in response to that
25   objection, her mental health and mental health

Page 28

1   conditions from which Miss Doe suffers are relevant to
2   what she was thinking and what she knew and what she
3   believed about the existence of a mentorship or
4   internship or shadowing.
5       So it is relevant.  It's important.
6       MR. ALTMAN:  You've laid no foundation as
7   to health care professionals during the time in
8   question.
9       MR. KENT:  I can do that.  I mean --
10       MR. ALTMAN:  I think you need to do that.
11 BY MR. KENT:
12 Q.  Okay.  Did you have a primary care physician from 2013
13   to '18?
14 **A.  Yes.**
15 Q.  Who is that?
16 **A.  I don't remember.**
17 Q.  Do you remember any names of your health care
18   providers from 2013 to 2018?
19 **A.  How do we define health care provider?**
20 Q.  A therapist, a psychiatrist, a primary care physician,
21   anyone you saw for medical or psychological care or
22   treatment.
23 **A.  Yes.**
24 Q.  Okay.  What are their names?
25 **A.  Can we go off the record?**

Page 29

1 Q.  No.
2       MR. ALTMAN:  Those names you can give.
3 **      THE WITNESS:  Doctor Robin Billings.**
4 BY MR. KENT:
5 Q.  Can you spell Doctor -- the last name?
6 **A.  B-I-L-L-I-N-G-S.**
7 Q.  And what type of doctor is Doctor Billings?
8 **A.  A clinical psychologist.**
9 Q.  And is Robin a man or a woman?
10 **A.  A man.**
11 Q.  And where is his office?
12 **A.  Troy.**
13 Q.  Do you have an ongoing therapeutic relationship with
14   Doctor Billings?
15 **A.  Yes.**
16 Q.  Okay.  Anyone else?
17 **A.  Doctor John Allen is a gastro -- he was a**
18   **gastroenterologist or he still is here, but he's not a**
19   **primary care physician.  He's a gastroenterologist.**
20 Q.  And I'm assuming that because of the specialty, he's
21   not a mental health care provider.
22 **A.  No.**
23 Q.  He's not?
24 **A.  He's not.**
25 Q.  Okay.  And is Doctor Allen someone that you see on a

Jane Doe
06/08/2023                                       Pages 30..33

Page 30

1   regular basis for recurring physical issues?
2   **A.  Not anymore.**
3   Q.  Okay.  All right.  Any other names?
4   **A.  That's all I can remember.**
5   Q.  What type of care or treatment do you receive from
6       Doctor Billings?
7   **A.  He's a psychologist, so --**
8   Q.  Right, right.
9           So is it talk therapy, is it therapeutic,
10      is it talk therapy?
11  **A.  Yes.**
12  Q.  And how -- okay.  So from 2013 to 2018, can you give
13      me a sense for how frequently you had therapeutic
14      encounters with Doctor Billings?
15  **A.  I started seeing him in 2017.**
16  Q.  Okay.  And is this someone you saw on a weekly basis?
17  **A.  In 2017?**
18  Q.  Yeah.
19  **A.  I believe so.**
20  Q.  Was there a point in time in your therapeutic
21      relationship with Doctor Billings that the frequency
22      of your visits with him increased or decreased?
23  **A.  Increased.**
24  Q.  Okay.  And what period of time was that?
25  **A.  Within 2017.**

Page 31

1   Q.  Okay.  Since 2017 has the frequency remained
2       consistent, or has it gone down?
3   **A.  Decreased.**
4   Q.  And now how frequently do you see Doctor Billings?
5   **A.  Occasionally.**
6   Q.  On an as-needed basis?
7   **A.  Yes.**
8   Q.  And when you do, is it telemed Zoom, or do you go in
9       person or both?
10  **A.  Both.**
11  Q.  And just to make sure I've covered everything, any
12      other mental health care providers?  Do you have a
13      psychiatrist?  For instance, Doctor Billings can't
14      prescribe medicine.  Do you have a psychiatrist?
15  **A.  As of right now, no.**
16  Q.  Okay.  Have you ever?
17  **A.  Yes.**
18  Q.  And do you remember that person's name?
19  **A.  No.  I don't remember.**
20  Q.  Did that psychiatrist prescribe any drugs for you?
21  **A.  Yes.**
22  Q.  What drugs were those?
23  **A.  I don't remember.**
24  Q.  You don't remember the drugs you were taking?
25  **A.  Uh-uh.**

Page 32

1   Q.  Do you still take any drugs, medication?  Let me use
2       that term.  Do you take any medication for any mental
3       health condition?
4   **A.  Yes.**
5   Q.  What do you take?
6   **A.  Xanax as needed.**
7   Q.  But you don't know the name of the prescribing
8       physician?
9   **A.  No, I don't remember.**
10  Q.  Any other medications?
11  **A.  No.**
12  Q.  Has either the psychiatrist whose name you can't
13      recall or Doctor Billings ever given you a clinical
14      diagnosis of any mental health care condition from
15      which you suffer?
16          MR. ALTMAN:  Objection, foundation.
17          You can answer.
18          MR. KENT:  Do you want to go off the
19      record?
20          MR. ALTMAN:  No, no.  It's my diabetes
21      pump.
22          Do you remember the question?  I'm sorry
23      this interrupted you.
24  **        THE WITNESS:  I've been diagnosed with**
25  **        post-traumatic stress disorder.**

Page 33

1   BY MR. KENT:
2   Q.  Okay.  Anything else?
3   **A.  That's it.**
4   Q.  And who diagnosed you with that?
5   **A.  Doctor Robin Billings.**
6   Q.  I'm going to ask you some more specific questions, so
7       you can give me a yes or no answer.
8           Have you ever been diagnosed with any sort
9       of disorders relating to paranoia or delusion?
10  **A.  No.**
11  Q.  A mania?
12  **A.  No.**
13  Q.  Bipolar?
14  **A.  No.**
15  Q.  Psychosis?
16  **A.  No.**
17  Q.  Histrionic personality disorder?
18  **A.  No.**
19  Q.  Okay.
20          (Deposition Exhibits Nos. 1 and 2 marked
21          and attached.)
22  BY MR. KENT:
23  Q.  I'm going to put this in front of you, also, because
24      I'll refer to both of them.  Exhibit 1 is your second
25      amended complaint.  Exhibit 2 are the -- your



Page 34

1  responses to the discovery that we requested with the
2  attachments that you provided.
3        So before we start talking about your
4  answers and allegations, in various places including
5  in these documents that are marked 1 and 2 as well as
6  emails, there are three words that are kind of used in
7  various ways, the words mentorship, internship, and
8  shadowing, okay?
9        You've heard those words before, correct?
10 A. Yes.
11 Q. Okay. Can you tell me taking them one at a time what
12    each of those things means to you if they have
13    different meanings or if you think that they all mean
14    the same thing.
15        But let's start with internship. What does
16    that mean to you?
17 A. A professional and, slash, or educational opportunity.
18 Q. Okay. Mentorship.
19 A. I define mentorship as someone who helps someone else
20    towards their career.
21 Q. Okay. And shadowing.
22 A. Shadowing is a very common experience within the --
23    within premedicine. It's a clinical observation of a
24    doctor.
25 Q. Okay. Of these three things, which best describes

Page 35

1  what -- how you view your connection to
2  Doctor Schoenfeld and the university during 2015?
3  A. Mentorship.
4  Q. Do you believe you had an official internship with the
5    University of Michigan in 2015?
6  A. Yes.
7  Q. Okay. So you do -- while you think mentorship best
8    defines it, you also think that you had an internship?
9  A. Yes.
10 Q. So you think you would say that both of those words
11    fit to describe your situation at the university in
12    2015?
13 A. Yes.
14 Q. Okay. And would you say the same with shadowing?
15 A. Yes.
16 Q. So all three of these things to you, it would be valid
17    to say that Jane Doe had an internship, Jane Doe had a
18    mentorship, Jane Doe was shadowing? You think it's
19    fair to say each one of those things in that 2015
20    period?
21 A. Yes.
22 Q. Did the -- what you would characterize as a
23    mentorship, did that exist with Doctor Schoenfeld even
24    before or after the actual time at the hospital was
25    over?

Page 36

1  A. Yes.
2  Q. Okay. So the mentorship would you say is broader in
3    scope?
4  A. Yes.
5  Q. All right. And would you -- and when I say would you,
6    correct me if I'm wrong --
7  A. Okay.
8  Q. -- or if I'm not saying something that you agree with.
9    I'm not trying to put words in your mouth.
10 A. Okay. Thank you.
11 Q. So the mentorship you would say is broader in scope.
12        But would you say the internship itself was
13    limited in scope to the period of time where you were
14    actually coming on site to the hospital?
15 A. Yes.
16 Q. And would that also be true of the shadowing, you
17    wouldn't be shadowing him if it were outside of the
18    health care facilities, correct?
19 A. Yes, shadowing is a specific type of internship.
20 Q. Okay. In what way was there a mentorship relationship
21    between you and Doctor Schoenfeld outside of the
22    physical hospital environment?
23 A. I was a premedical student at Michigan State
24    University, and he said in his own words that he would
25    mentor me so I could one day gain admission to the

Page 37

1  University of Michigan Medical School.
2  Q. Okay. What did that -- looking, though, outside of
3    the internship and shadowing, what did that mentorship
4    actually look like? I mean, what actually happened?
5  A. Similar to common mentorships that premedical students
6    have, he would advise me as far as course scheduling.
7    He would advise me as far as strategy for MCAT
8    preparation and also help strategize with me as far as
9    volunteer opportunities, leadership opportunities,
10    just to help prepare my application for successful
11    medical school admission.
12 Q. Do you still intend to go to medical school?
13 A. No.
14 Q. All right. So why don't you turn to paragraph
15    eighteen of Exhibit 1. Okay. I'm going to give you a
16    second. Every time I ask you to look at a paragraph,
17    I'm going to give you a second to read it.
18        So I want you to read paragraph eighteen.
19    Okay?
20 A. Yep.
21 Q. So you met Doctor Schoenfeld in 2013 it says there, is
22    that correct?
23 A. Yes.
24 Q. Is there anything about paragraph eighteen that is not
25    true?



Jane Doe
06/08/2023
Pages 38..41

Page 38

1 A. I can say things to make sure I understand your
2    question. So to me, this paragraph is true.
3 Q. All right. How did you first know of the existence of
4    Doctor Schoenfeld who is referred to as John Doe in
5    the complaint? But how did you, how did you first
6    discover that he existed in the world?
7 A. Well, we can see paragraph fifteen, I met him through
8    an online website.
9 Q. And that online website was called
10    seekingarrangements.com?
11 A. I decline to answer due to rape shield laws. I
12    decline to answer. Like --
13 Q. You put it in --
14 A. I'm going to stick to the operative pleading, online
15    website. I will not let you attack my -- try to
16    attempt to attack my reputation, sexual history.
17    That's against rape shield laws in Michigan,
18    especially in federal court.
19 Q. This is a civil case.
20 A. Yeah. It applies in civil cases.
21 Q. And you understand that my knowledge of that website
22    does none of the things that you're suggesting. I'm
23    simply asking you how you met him, and I'm entitled to
24    know how you met him because you're alleging a
25    relationship with him that led to a relationship with

Page 39

1    the university, my client.
2        And so these are foundational questions and
3    important questions that I need to have answered, and
4    there's nothing that's attacking you about me
5    understanding how you met and where you met.
6        MR. ALTMAN: I believe that --
7        MR. KENT: That wouldn't fall under the
8    protection of a rape shield law.
9        MR. ALTMAN: I believe that the complaint
10    indicates she met on a website. I don't really see
11    what the relevance is to exactly what the website is
12    to the questions that the court has currently set
13    before at this time.
14        So I will instruct her not to answer.
15 BY MR. KENT:
16 Q. Okay. And you told RACRT investigators where you met
17    Doctor Schoenfeld because it's in the CRT notes,
18    correct? You told them it was
19    seekingarrangements.com.
20        MR. ALTMAN: Okay. We're not going to --
21    you're not going to end run around it. I've
22    instructed her not to answer about this.
23        You can note it. If you want to bring it
24    up with the judge, feel free to, but we're not going
25    to discuss it.

Page 40

1 BY MR. KENT:
2 Q. Did you tell the --
3        MR. ALTMAN: I've instructed her not to
4    answer any questions about that website or any other
5    website. It is not relevant to the issues that are
6    currently set forth by the judge.
7        MR. KENT: It is relevant because the
8    nature of that website and why they are connecting
9    people goes to the very heart of the relationship with
10    Doctor Schoenfeld of the money for sex relationship
11    that we're going to get into in a minute.
12        MR. ALTMAN: Except that's not what the
13    court said is before the issues today. It is her
14    relationship with the University of Michigan. Her
15    relationship with the doctor is not.
16        MR. KENT: Yes, it is, because that's the
17    only tie to the university. There is no other tie.
18        MR. ALTMAN: Okay. We're not going to --
19        MR. KENT: Okay. I'm going to make a
20    record here because --
21        MR. ALTMAN: Please do, please do.
22        MR. KENT: -- because there was no
23    application completed for an internship.
24        MR. ALTMAN: It does not --
25        MR. KENT: Hold on, I'm not done.

Page 41

1        COURT REPORTER: One at a time.
2        MR. KENT: I'm not done, because I'm going
3    to make a record.
4        MR. ALTMAN: Okay.
5        MR. KENT: Okay. There's no code of
6    conduct attestation, no HIPAA training, no interview,
7    no request to have her here, no attestation of any
8    kind, no application, no paperwork, no email, no
9    badge. The only connection she has to this university
10    is Doctor Schoenfeld.
11        And so if that's how you get Title IX
12    standing is the relationship to him, I'm entitled to
13    go down the road as to what that relationship is and
14    how they met.
15        MR. ALTMAN: And that will be for another
16    day. It's not for today because that's not the issues
17    that this court set before. The court said what's the
18    relationship between the university and Miss Doe.
19 BY MR. KENT:
20 Q. What's the relationship between the university and
21    you?
22 A. I was a prospective student at the University of
23    Michigan, and now I'm a current student at the
24    University of Michigan.
25 Q. In 2015 at the time that you were shadowing and you

**Jane Doe**
06/08/2023

Pages 42..45

1  say that you had an internship here, what was your
2  relationship with the University of Michigan?
3 **A.  I was a prospective student.**
4 Q.  That's it?  I mean --
5          MR. ALTMAN:  Hold on.  Let her finish.
6          MR. KENT:  Yeah, yeah.  Okay.
7          **THE WITNESS:  I was also an intern.**
8 BY MR. KENT:
9 Q.  Okay.  But why do you think you were an intern?
10 **A.  Because he had given me an internship.**
11 Q.  Who is he?
12 **A.  John Doe.**
13 Q.  Doctor Schoenfeld?
14 **A.  John Doe.**
15          MR. KENT:  Okay.  Who there's no order in
16  place protecting his name in this case.
17          MR. ALTMAN:  There are other issues at
18  stake that have to do with this where she cannot
19  discuss the name of the doctor.
20 BY MR. KENT:
21 Q.  So the only way, the only reason you believed you had
22  an internship with the University of Michigan was
23  because of your relationship with John Doe?
24          MR. ALTMAN:  Objection, form.
25          **THE WITNESS:  No, not my relationship with**

1  **John Doe.  I was in the hospital, in the facilities**
2  **interacting with patients, interacting with staff,**
3  **interacting with faculty.  So the totality of**
4  **circumstances, I did have an internship.**
5 BY MR. KENT:
6 Q.  Who told you you had an internship?
7 **A.  John Doe said I had an internship.  The employees**
8  **would also use the word internship.**
9 Q.  Okay.  So do you understand that the perception of
10  employees about why you're there doesn't per se --
11 **A.  But it's also my actions.**
12          MR. ALTMAN:  Hold on.  Let him finish.
13 BY MR. KENT:
14 Q.  Doesn't establish an internship?
15          MR. ALTMAN:  Objection.
16 BY MR. KENT:
17 Q.  Do you understand that?
18          MR. ALTMAN:  I'm sorry.
19          **THE WITNESS:  It is --**
20          MR. ALTMAN:  Hold on, hold on.  I thought
21  you were done.
22          Are you done?
23          MR. KENT:  Yes.
24          MR. ALTMAN:  Objection, foundation.
25          Now you can answer.

1          **THE WITNESS:  It is not the employees'**
2  **perceptions.  It is my actions in this internship in**
3  **the Taubman Health Care Center that make it -- that is**
4  **mentorship, internship, shadowing opportunity.**
5 BY MR. KENT:
6 Q.  Did you complete an application for an internship?
7 **A.  No.**
8 Q.  Did you complete an application for a mentorship?
9 **A.  No.**
10 Q.  Did you complete an application for job shadowing?
11 **A.  No.**
12 Q.  Did you go through any HIPAA training or compliance?
13 **A.  No.**
14 Q.  Did you sign any attestations for code of conduct?
15 **A.  Can I -- may I go back two questions?**
16          MR. ALTMAN:  No.
17          MR. KENT:  No.
18          MR. ALTMAN:  You've got to answer his
19  question.
20 BY MR. KENT:
21 Q.  Did you sign any attestations for the code of conduct?
22 **A.  I'd like to correct myself on the last question.**
23          MR. ALTMAN:  Answer his question first.
24          **THE WITNESS:  Start with this one and I can**
25  **correct the last one?**

1          MR. ALTMAN:  Just answer his question.
2 BY MR. KENT:
3 Q.  Answer the question.
4 **A.  All right.  What is --**
5 Q.  Did you complete any attestations that you had
6  received and reviewed and were complying with the code
7  of conduct that Michigan has?
8 **A.  Can you explain the word attestation?**
9 Q.  Yes.  It's a -- it's your confirmation that you
10  received certain information and that you agree to
11  comply with it.  It's an acknowledgment on your part.
12 **A.  I would say informally by Doctor Schoenfeld.**
13 Q.  Okay.
14 **A.  Could I still correct my last --**
15 Q.  Yes.  What did you want to say about that?
16 **A.  Thank you for letting me correct my answer, especially**
17  **as we go through things quickly.**
18          **So as far as HIPAA compliance, I had**
19  **previously said no, but now I'd like to say I don't**
20  **know because he had told me that he had some taking**
21  **care of the HIPAA compliance and background check.**
22  **Like, by the time of my arrival, it would have been**
23  **taken care of.**
24 Q.  But you would know if you had HIPAA training because
25  you would have done it, correct?



1  A.  No, I don't think so.

2  Q.  You wouldn't have known if you had gone through a

3     training?

4  A.  I have also shadowed other doctors, and there was no

5     formal, formal process in training for HIPAA.

6  Q.  What other doctors have you shadowed?

7  A.  Yes.  I --

8         MR. ALTMAN:  Wait.  Hold on a second.

9         THE WITNESS:  I can answer the question.

10        MR. ALTMAN:  Jane, go ahead and answer that

11    question.

12        THE WITNESS:  Doctor Anthony Emmer, D.O.

13 BY MR. KENT:

14 Q.  Where was that?

15 A.  I have to double-check the city.  I believe it may be

16    Royal Oak, so E-M-M-E-R.

17 Q.  When was that?

18 A.  2017.

19 Q.  Okay.  So let me go back to my line of questioning.

20    No application.

21        Are you familiar with any written form,

22    request form that anyone submitted to have you

23    accepted as a mentor or intern at the university?

24 A.  I believed that John Doe would have.

25 Q.  Okay.

1         MR. ALTMAN:  Hold on.  Let her finish

2     answering the --

3         MR. KENT:  I'm not asking what she

4     believed.

5         MR. ALTMAN:  It doesn't matter.  Let her

6     answer the question.

7         MR. KENT:  Okay.

8         MR. ALTMAN:  Then you can object.  But

9     you've got to let her answer.

10 BY MR. KENT:

11 Q.  Well, let me rephrase that because I'm not asking what

12    you believe.  I'm asking you are you aware of a form,

13    a piece of paper, okay, that someone completed that

14    was a request for you to be a mentor or intern at

15    Michigan Medicine.

16 A.  I was not aware of a form.  I was never, I was never

17    told there would be a form.  I was not aware of a

18    form.

19 Q.  Thank you.

20        Do you have any email or any form of

21    written documentation, a memo, letter, anything that

22    confirms that you have a mentorship, internship, or

23    shadowing opportunity at the university?

24 A.  Yeah, we can look through the evidence here.

25        Can I show you some?

1  Q.  Anything that confirms that you had an internship.

2     Let's start there.  Anything official other than an

3     email from Doctor Schoenfeld.

4  A.  So you're asking if I ever got an email from

5     University of Michigan directly?

6  Q.  Anyone other than Doctor Schoenfeld that's

7     confirmation of your status at Michigan Medicine as an

8     intern.

9  A.  No.

10        MR. KENT:  Okay.  Could you mark this whole

11    pack as 3, please?

12        (Deposition Exhibit No. 3 marked and

13        attached.)

14 BY MR. KENT:

15 Q.  Okay.  I'm going to hand you what's been marked as

16    Exhibit 3.  The first five pages of that are Michigan

17    Medicine policy on visiting observers.

18        Do you see that?

19 A.  Can you repeat your question again?

20 Q.  The first five pages is the Michigan Medicine visiting

21    observer policy.

22        Do you see that?

23 A.  Yes.

24 Q.  Have you seen that prior to today?

25 A.  No, this is my first time seeing this.

1  Q.  Okay.  Page -- the document after that which would be

2     the sixth page is the HIPAA Privacy and Security

3     Regulations.

4         Have you seen that prior to today?

5  A.  No.

6  Q.  Did you complete that as part of your alleged

7     internship or mentorship at the hospital?

8  A.  No.

9  Q.  Okay.  The document after that, University of Michigan

10    Health System Code of Conduct Attestation.

11        Did you --

12        MR. ALTMAN:  Hold on one second.  I just

13    think she's got the pages out of order.

14        MR. KENT:  No, she's right.

15        MR. ALTMAN:  No, no.  I think she put it --

16        THE WITNESS:  I'll put it like this.

17        MR. ALTMAN:  Yes, please.

18        MR. KENT:  Thanks.

19 BY MR. KENT:

20 Q.  The next document is University of Michigan Health

21    System Code of Conduct Attestation.

22        Have you ever seen that prior to today?

23 A.  No.

24 Q.  And did you complete that for purposes of your alleged

25    internship or mentorship or shadowing at the



Page 50

1  university?
**2  A.  No.**
3  Q.  Okay.  The next document is the University of Michigan
4      Hospitals and Health Centers Visiting Observer Request
5      Form.
6          Do you know whether that was filled out by
7      anyone on your behalf to seek permission for you to be
8      an observer at the hospital?
**9  A.  Based upon my belief, these forms were filled out, or**
**10     based on my belief, like, all of this was taken care**
**11     of before I came to the internship.**
12  Q.  So you believe that someone would have signed your
13      name to a HIPAA, the one that we looked at before, the
14      code of conduct, the HIPAA.  They have places for your
15      signature.
16          You think someone signed your name to
17      things?
**18  A.  Maybe they would just leave it blank.**
19  Q.  Without showing it to you, without having you
20      acknowledge that you had seen it?
21          I mean, let me ask you something because I
22      don't mean to make any suggestions here, but if you
23      have an undergraduate degree, you're in a graduate
24      program, you're obviously bright.  You've not a naive
25      person.

Page 51

1          Did you really believe that someone else
2      was taking care of all of this information?
**3  A.  I didn't know that --**
4          MR. ALTMAN:  Wait.  Hold on a second.
5      Objection, form.
6          You can answer.
7  BY MR. KENT:
8  Q.  Okay.
**9  A.  I didn't know there was even forms.  When I even did**
**10     my internship, I did another shadowing with Doctor**
**11     Anthony Emmer, there was no forms for HIPAA**
**12     compliance.  So I did not even know that there was**
**13     even -- that forms were the standard protocol for a**
**14     compliant internship.**
15  Q.  All right.  You just believed what the man who had
16      been paying you in a sexual relationship was saying,
17      you just --
18          MR. ALTMAN:  Objection.
19          MR. KENT:  Well, I'll lay a foundation for
20      it.
21  BY MR. KENT:
22  Q.  Prior to this alleged internship, you had had a sexual
23      relationship for money with Doctor Schoenfeld,
24      correct?
25          MR. ALTMAN:  Objection.

Page 52

**1          THE WITNESS:  That is incorrect.**
2          MR. ALTMAN:  Wait.  Objection, form.
3          And I don't see the relevance between her
4      relationship between her and the University of
5      Michigan.
6          And I'm going to instruct her not to answer
7      that question based upon the judge's ruling, setting
8      scope of discovery at this time.
9          MR. KENT:  Because it goes to the
10      credibility of her believing him and why she believed
11      him when he told her that she had an internship.
**12          THE WITNESS:  I believed --**
13          MR. ALTMAN:  Hold on.
14          MR. KENT:  There's no question on the table
15      yet.  We're making objections here, okay?
16  BY MR. KENT:
17  Q.  But since you are making objections about it, so I'm
18      willing to explore the allegations in the complaint,
19      your own complaint.  These are your allegations.
**20  A.  Yes.**
21  Q.  Okay.  In the complaint on paragraph twenty-four, the
22      bottom of page six, that paragraph details the
23      financial relationship that you had with
24      Doctor Schoenfeld, does it not?
**25  A.  Yes, there's some detail.**

Page 53

1  Q.  Okay.  And that paragraph, these are not my words or
2      my speculation.  This is your complaint.  It says a
3      final amount of twelve hundred and fifty dollars was
4      decided because John Doe, Doctor Schoenfeld, wanted
5      you to maintain your appearance on each encounter.
6          Do you see that?
**7  A.  Yes.**
8  Q.  All right.  What was that twelve hundred and fifty
9      dollars for?
10          MR. ALTMAN:  Objection.  I'm not going
11      to --
**12          THE WITNESS:  I have --**
13          MR. ALTMAN:  Wait.  That goes beyond the
14      scope of the deposition as set forth by the order of
15      the court and instruct her not to answer.
**16          THE WITNESS:  I would also like to say --**
17          MR. ALTMAN:  Jane, there's no question.
**18          THE WITNESS:  Okay.**
19          MR. ALTMAN:  I've instructed you not to
20      answer.
**21          THE WITNESS:  Thank you.**
22  BY MR. KENT:
23  Q.  You made allegations of sexual assault against
24      Doctor Schoenfeld, correct?
25          MR. ALTMAN:  I'll let you answer that



Jane Doe
06/08/2023                                          Pages 54..57

Page 54

1    question.
2         THE WITNESS: Yes.
3    BY MR. KENT:
4    Q.  Rape?
5    A.  Yes.
6    Q.  Which would have been a sexual assault, rape, that
7         occurred prior to 2015, correct?
8    A.  Yes.
9    Q.  Okay.  Yet you decided to have an internship with the
10        very person that you made those allegations against,
11        is that right?
12             MR. ALTMAN:  Objection.  This goes beyond
13        the scope set forth by the court, and I'm going to
14        instruct the witness not to answer.
15             MR. KENT:  What are you talking about?  I
16        mean, my goodness, what are we doing here?  I mean --
17             MR. ALTMAN:  I didn't --
18             MR. KENT:  This man is the only connection
19        she had with the university, and I'm not even allowed
20        to explore this.  The whole purpose of the limited
21        discovery is the connection with the university, and
22        all it is is Doctor Schoenfeld and the relationship
23        that they had, and I can't even -- this is just --
24             MR. ALTMAN:  I'm sorry.  I didn't set the
25        scope of discovery.

Page 55

1              MR. KENT:  But you are, you are
2         misunderstanding what it means to explore the scope
3         that she authorized.
4              MR. ALTMAN:  Well, I don't agree.  We can
5         agree to disagree.
6              If you think I'm incorrect, call the judge,
7         make a motion.  Okay.  I believe I'm acting in
8         accordance with the judge's rulings, and I think
9         there's all kinds of questions that you can ask about
10        her relationship between her and the University of
11        Michigan.
12             MR. KENT:  There is none.  The only
13        relationship is with him.
14             MR. ALTMAN:  That's your --
15             THE WITNESS:  Because I --
16             MR. ALTMAN:  Wait.  Jane, please.  Jane,
17        there's no question pending.
18             THE WITNESS:  Thank you.
19             MR. ALTMAN:  That's your personal
20        interpretation of the situation.
21   BY MR. KENT:
22   Q.  Who gave you --
23             MR. KENT:  Back on the record.
24   BY MR. KENT:
25   Q.  Who gave you the internship at Michigan?

Page 56

1    A.  John Doe.
2    Q.  Okay.  And you knew him from your prior relationship,
3         correct?
4    A.  I always knew him in a mentorship context.
5    Q.  But you were having sex with him, correct?
6              MR. ALTMAN:  Objection.  I'm not going to
7         allow her to --
8    BY MR. KENT:
9    Q.  But that's not completely true.  The relationship
10        wasn't just a mentorship relationship, was it?
11             MR. ALTMAN:  Objection.  That goes beyond
12        the scope of the limited discovery set forth by the
13        court.
14             I'm going to instruct her not to answer.
15   BY MR. KENT:
16   Q.  Paragraph twenty-five of your complaint, we'll just do
17        it like this because you've already made the
18        allegations.  Paragraph twenty-five of your complaint
19        states:  Plaintiff and John Doe's sexual relationship
20        occurred from 2013 to May, February 2013 to May 2013.
21        Do you see that allegation?
22   A.  Yes.
23   Q.  Is it true?
24             MR. ALTMAN:  Objection.  I'm not going
25        to -- this is limited discovery.  You're entitled to

Page 57

1    explore the relationship with the University of
2    Michigan.
3    BY MR. KENT:
4    Q.  So you won't, you won't say whether an allegation in
5         the complaint is true or false?
6              MR. ALTMAN:  The entire complaint is not
7         the subject of today's deposition.  The court was very
8         specific.  You're entitled to explore the relationship
9         between the plaintiff and the University of Michigan.
10             Whatever relationship she had with the
11        doctor prior to her involvement with the University of
12        Michigan is not at stake today.  There will be a time
13        when --
14             MR. KENT:  It most certainly is.
15             MR. ALTMAN:  Okay.  We can agree to
16        disagree.
17             MR. KENT:  Are you done?  She just said
18        he's the one that gave her the internship.
19   BY MR. KENT:
20   Q.  Let me ask you this.  Let me ask you this.  Did
21        anyone, anyone in administration, a chair of any
22        department, an administrator of any department,
23        anybody tell you that you had an internship with the
24        University of Michigan?  That's a yes or no question.
25             MR. ALTMAN:  She's already answered.

**Jane Doe**
06/08/2023

1  Objection, form.
2       MR. KENT:  No, she has not answered that
3  question.
4       MR. ALTMAN:  Yes, she has.
5       MR. KENT:  She hasn't answered about a
6  chair, administrator, anyone in leadership.
7  BY MR. KENT:
8  Q.  Anyone in a position of supervisory control or
9     management, a department chair, anyone, an
10    administrator of the department, a head of an office
11    tell you that you had an internship with the
12    University of Michigan?
13 A.  As far as those specific roles?  I don't remember if
14    the word internship was used, but I remember using it.
15        The employees would use the word because I
16    did come across some of those supervisors during my
17    internship, but it was mostly the employees like the
18    nurses and staff would use the word.
19 Q.  Anyone that you believe was in a -- that you believed
20    was in a position of authority to grant or deny you an
21    internship at the university?
22       MR. ALTMAN:  Objection, foundation.
23 BY MR. KENT:
24 Q.  Okay.  But did you talk to anyone other than
25    Doctor Schoenfeld about the possibility of coming here

1  and having an internship before it started?
2  A.  No.
3  Q.  Okay.  And about how many times did you actually
4     physically come to the hospital to shadow
5     Doctor Schoenfeld?
6  A.  It was in the winter of 2015 and summer 2015, and the
7     summer of 2015 is about once a week.  In the winter it
8     was, it was -- winter break was probably a few more
9     times.  I'm going to try and make my best reasonable
10    guess.  In the summer it could be one to two times a
11    week.
12 Q.  Okay.  So when I went through the records, I found two
13    opportunities, two times you shadowed.  It was only
14    two times.  As of May 21, 2015, you had only gone
15    there twice in total according to the records that I
16    received.
17        Does that sound off to you?
18 A.  That's not correct.  I was there more frequently.  I
19    even have emails in shadowing from winter, too.
20 Q.  Okay.  Doctor Schoenfeld told you not to tell anyone about
21    the internship, didn't he?
22 A.  No, that's incorrect.
23 Q.  Well, let's look at your complaint.  Paragraph
24    thirty-six to start.  It states there that --
25       MR. ALTMAN:  Wait.  Just give me a second

1  to get to the right place, please.  Okay.
2  BY MR. KENT:
3  Q.  Okay.  It says there -- I'm not going to read the
4     whole thing, but you've had a chance to look at it.
5     John Doe instructed plaintiff to lie and say that
6     plaintiff was a family friend.
7        Do you see that?
8  A.  Yes.
9  Q.  That was -- was that specifically to Christine Brazo?
10 A.  No.
11 Q.  Okay.  He wanted you to take that position with anyone
12    who asked?
13 A.  Can I explain this sentence?
14 Q.  The last sentence?
15 A.  Yes.
16 Q.  Please.
17 A.  Okay.  So I think that the grammar of this is maybe
18    not -- I would like to -- even though this is my
19    complaint, even though it's filed and approved, I
20    think this one is maybe not worded the best, not
21    worded the best.
22        So John Doe did not instruct me to lie.  He
23    had said that if anyone asks who you are, say you are
24    a family friend, and at the time in the year 2015, to
25    me that felt like a true statement, he is a family

1  friend, because in the year 2013, he would, he would
2  instruct me to call him my uncle.
3        And this goes back to the grooming and the
4  sexual abuse I had experienced from John Doe where he
5  knew very early on that he, that he physically
6  resembles of an uncle of mine, and he would use that
7  to groom me into the sexual abuse.
8  Q.  We're not talking about -- now, you can't talk about
9     it when you want to talk about it and then not answer
10    my questions about sexual abuse.  So we're either
11    going to talk about it in light of your relationship
12    with him or we're not.
13       MR. ALTMAN:  Okay.  Let's take a break for
14    a minute.
15       THE WITNESS:  Let's take a break.
16       MR. KENT:  Thank you.
17       (Off the record at 3:35 p.m.)
18       (Back on the record at 3:36 p.m.)
19       MR. KENT:  Okay.  Back on.
20 BY MR. KENT:
21 Q.  When we broke, you were telling me how there were
22    aspects of paragraph thirty-six of your second amended
23    complaint that were inartfully worded and why.
24        Do you want to continue on with that
25    answer?



Jane Doe
06/08/2023                                    Pages 62..65

**Page 62**

1  A.  No.

2  Q.  Okay.  From what you testified to so far, you said

3      that paragraph thirty-six wasn't grammatically

4      written the best and that he didn't ask you to lie

5      essentially, is that right?  When I say he,

6      Doctor Schoenfeld.

7              MR. ALTMAN:  Objection, form.

8              You can answer.

9          **THE WITNESS:  John Doe told me to say if**

10     **anyone asked who I am, I'm a family friend, and I did**

11     **what he said to do because he was in control of me**

12     **during the internship, a supervisory authority figure.**

13 BY MR. KENT:

14  Q.  At the time he told you that, he told you it was to

15     avoid raising suspicion, correct?

16  **A.  No, that's not.**

17  Q.  He told you to wear scrubs to avoid raising suspicion?

18  **A.  No, no, it's not grammatically correct.  I had**

19     **realized to avoid raising suspicion at a later time.**

20     **He told me to wear scrubs because it would make me**

21     **look more professional, and we have some exhibits.**

22  Q.  I'm going to get to that.

23          The words to avoid raising suspicion are in

24     the complaint at paragraph thirty-six.

25          What about that mean?

**Page 63**

1  A.  **But that is not why he asked me to wear scrubs.  He**

2      **did not say to wear scrubs to avoid raising suspicion.**

3      **I think maybe it could have been better worded**

4      **because, like, in retrospect, he asked me to wear**

5      **scrubs and normal clothes to avoid raising suspicion,**

6      **but what he told me before the internship, he told me**

7      **to wear scrubs so I look more professional in the**

8      **hospital.**

9  Q.  Why do those words appear in your complaint if they're

10     not true?

11          MR. ALTMAN:  Objection, form.

12         **THE WITNESS:  It's just a grammar issue.**

13 BY MR. KENT:

14  Q.  Did you review your complaint before it was filed?

15  **A.  Yes.**

16  Q.  Why didn't you catch it and fix it?

17          MR. ALTMAN:  Objection, form.

18          You can answer.

19         **THE WITNESS:  I reviewed the complaint very**

20     **quickly, and I remember it was also a school night.**

21 BY MR. KENT:

22  Q.  So that statement's not true that he told you that to

23     avoid -- he didn't say to avoid raising suspicion?

24  **A.  Yeah, he did not say to avoid raising suspicion.  This**

25     **statement can be true with certain grammar, but, no,**

**Page 64**

1      it's not true.

2  Q.  Okay.  And did he ever ask you to lie?

3  **A.  He never told me to lie.**

4  Q.  Okay.

5  **A.  He never said those words.**

6  Q.  Okay.  So could you turn to Exhibit No. 2 which is

7      your -- Exhibit 2 is your interrogatory answers, and,

8      I'm sorry.  Page nine.  So it's not the exhibits.

9      It's way up here, page nine of your interrogatory

10     answers.

11          Okay.  Do you see that?

12  **A.  Yes.**

13          MR. ALTMAN:  Hold on, hold on.  I'm not --

14          MR. KENT:  I'm sorry.  Page nine.

15          MR. ALTMAN:  Not of the documents, of the

16     answers themselves?

17          MR. KENT:  That's right.

18          MR. ALTMAN:  Okay.

19 BY MR. KENT:

20  Q.  Okay.  So you just testified under oath in this

21     deposition that he didn't ask you, he didn't ask you

22     to lie.  Okay.

23  **A.  He never said those words.**

24  Q.  Well, did he ask you to be untruthful or lie?

25  **A.  Yeah, he never said those words.**

**Page 65**

1  Q.  Okay.

2  **A.  Yes.**

3  Q.  Well, did he ever suggest, did he ever infer, did he

4      ever anything that he wanted you to lie or be

5      untruthful?

6  **A.  He told me to say that if anyone asks who I am, I am a**

7      **family friend.**

8  Q.  Okay.  Is that a lie?

9  **A.  I don't know.**

10  Q.  You don't know if you're a family friend?

11  **A.  How I define lie is intent to deceit.**

12  Q.  Okay.  Number five, the question that I asked in

13     discovery that you also answered under oath is:  Did

14     you lie about the internship as you alleged you were

15     instructed to do in paragraph thirty-six of your

16     second amended complaint, and, if so, to whom did you

17     lie.  Your answer was yes.  Your answer under oath was

18     yes, okay, that you were instructed to lie and you did

19     lie about it.

20          Do you see that answer?  Do you see that?

21  **A.  Yes.**

22  Q.  Do you stand by that that you signed those under oath?

23  **A.  Under oath I don't think, like, the word lie, like we**

24     **talked about earlier, how do I define mentorship, how**

25     **do I define shadowing, how do I define internship.**



Jane Doe
06/08/2023                                              Pages 66..69

Page 66

1    There was still no parameters for the word lie, so I
2    guess it depends on how we define lie.
3          So did I intently deceive someone, no.
4    But, you know, but I still said what he told me to say
5    which was a family friend because he was in control of
6    the internship, and, and, you know, and he is -- and I
7    do acknowledge that he is not my family friend, but I
8    still don't consider that a lie which is why I now
9    answer I don't know.
10 Q. Okay. Which means that your answer to paragraph five
11    under oath under the penalty of perjury is not true.
12          MR. ALTMAN: Objection, form.
13 BY MR. KENT:
14 Q. You said that he asked you to lie and you lied. You
15    said yes.
16          All I'm asking you is is your answer to
17    that question that I asked true or no?
18 A.  It just depends on how you define the word lie and the
19    parameters.
20 Q. You didn't make that differentiation and distinction
21    in the answer. All you said was yes.
22          MR. ALTMAN: Can we take a break?
23          MR. KENT: Well, hold on a second.
24          MR. ALTMAN: No. There's no question
25    pending.

Page 67

1          MR. KENT: There is a question pending.
2          MR. ALTMAN: She answered it.
3          MR. KENT: There is a question pending.
4          MR. ALTMAN: No, there isn't.
5          MR. KENT: Keith, you are the most
6  unprofessional, I swear.
7          MR. ALTMAN: Listen, if you call me
8  unprofessional again, you're going to have a bar
9  complaint.
10          MR. KENT: Whatever.
11          MR. ALTMAN: There's no question pending.
12          MR. KENT: You can't take her out of here
13  when there's a question pending.
14          MR. ALTMAN: What's the question that's
15  pending?
16          MR. KENT: It was is the answer to number
17  five --
18          MR. ALTMAN: And she answered it.
19          MR. KENT: No, she didn't. She said it
20  depends how you --
21          (Off the record at 3:34 p.m.)
22          (Back on the record at 3:44 p.m.)
23          MR. ALTMAN: I think she wants to give you
24  a more complete answer.
25          Will you give him the answer, please?

Page 68

1          MR. KENT: And let's just make note that
2  counsel just took her out of the room in the middle of
3  a question, and now she's coming back ready to give an
4  answer.
5          MR. ALTMAN: There was no question pending
6  at the time.
7          MR. KENT: There was, but, anyway.
8          MR. ALTMAN: No, there wasn't.
9          MR. KENT: Well, what's she answering
10  then?
11          MR. ALTMAN: She wants to correct the
12  answer that she gave to you.
13          MR. KENT: She wants to correct an answer
14  that she just gave under oath?
15          MR. ALTMAN: That's correct.
16          THE WITNESS: Yeah.
17          MR. KENT: We've been doing that a lot
18  actually.
19 BY MR. KENT:
20 Q. But go ahead.
21 A.  Can you please repeat your question again?
22          MR. ALTMAN: There's no question pending.
23  There's no question pending.
24          THE WITNESS: No question pending. Okay.
25  Yes.

Page 69

1 BY MR. KENT:
2 Q. Hold on. I'm not giving you an opportunity to clean
3    up something you already did. I mean, the answer is
4    on the record.
5          MR. ALTMAN: So you don't want her to --
6          MR. KENT: You can ask her. You'll have an
7    opportunity to ask questions.
8          MR. ALTMAN: That's fine, that's fine. I
9    will.
10          MR. KENT: I'm not here to clean up your
11    client's false statements during this.
12          MR. ALTMAN: Okay.
13          MR. KENT: It's your job, and it's happened
14    about four times now.
15          MR. ALTMAN: Okay. That's fine.
16 BY MR. KENT:
17 Q. All right. Let's go back to the complaint which is
18    No. 1. When you went to U of M's Office of
19    Institutional Equity which has been renamed since then
20    to ECRT, did you tell anyone there that you had an
21    internship in 2015?
22 A.  I do believe to the best of my ability I did use the
23    word internship or I may have used shadowing
24    opportunity, like, synonymous words.
25 Q. But you don't have a specific recollection of telling



Page 70

1  anyone that you were an intern at Michigan Medicine in
2  2015?
3  **A.  During the 2018 ECR Title IX report?**
4  Q.  Yes.
5  **A.  I don't remember my exact terminology during that**
6  **time.**
7  Q.  Would it surprise you to learn that I searched through
8  all of the documents, three hundred that I recently
9  produced to your attorney, and did a search on them,
10  and the world internship didn't appear in any of your
11  communications with OIE.  Would that surprise you?
12      MR. ALTMAN:  Objection, foundation.
13      **THE WITNESS:  No, I don't find it**
14  **surprising because I still think internship and**
15  **clinical observation are synonymous.  Clinical**
16  **observation is a more specific type of internship or**
17  **shadowing.**
18  BY MR. KENT:
19  Q.  This shadowing that you believe that you would be
20  doing or that you alleged existed in this case, was it
21  your expectation going into this in 2015 into this
22  alleged internship that it would always be
23  Doctor Schoenfeld that you would be observing?
24  **A.  Yes, I did believe it was always Doctor Schoenfeld I**
25  **would be observing, but also, like, working with**

Page 71

1  **medical students, like, more of a collaborative**
2  **approach.**
3  Q.  Who gave you the internship, Doctor Schoenfeld or
4  Michigan Medicine?
5  **A.  John Doe, Doctor Schoenfeld.**
6  Q.  When Doctor Schoenfeld as you allege in paragraph
7  thirty-six instructed you to lie and say that you were
8  a family friend, did you have any reservations about
9  doing that?
10 **A.  Yes.**
11 Q.  What were those reservations?
12 **A.  I believed that if I did not do what he said and lie**
13  **to family friend that he would retaliate against me.**
14 Q.  In what way?
15 **A.  That he would try to impact my career as a potential**
16  **medical student at the University of Michigan Medical**
17  **School.**
18 Q.  And before we broke a while ago when you were
19  explaining some observations that you had about
20  paragraph thirty-six, you were mentioning his
21  resemblance to an uncle.
22      Can you elaborate on what you were talking
23  about there?
24 **A.  This is in my police report.**
25 Q.  With the Ann Arbor Police Department?

Page 72

1  A.  Yeah.  I've been working with the detective, yes.
2  Q.  I know.
3  **A.  So I have been -- I've communicated that to the**
4  **detective.**
5  Q.  I understand.
6  **A.  Yes.**
7  Q.  I can still ask about it, though.  That will be public
8  record when they're done with the investigation, and
9  it can be FOIA'd and I'll get it at that point.
10     But for the time being, I need to know
11  under oath.  That statement to the AAPD was not under
12  oath.  This is.  And so I need to know for purposes of
13  this deposition what you're referring to in terms of
14  this resemblance to an uncle.  You brought it up, and
15  I want to know what the relevance of it is and I want
16  you to elaborate for me.
17 **A.  The only elaboration I would want to provide is when**
18  **you FOIA the AAPD police report.**
19     MR. ALTMAN:  Jane, you need to answer the
20  question.
21     **THE WITNESS:  Can you repeat the question**
22  **one more time?**
23 BY MR. KENT:
24 Q.  Yes.  When you testified earlier, you brought up the
25  fact that there was some issue about Doctor Schoenfeld

Page 73

1  reassembling an uncle when you were talking about the
2  allegations in paragraph thirty-six, and I wanted you
3  to elaborate more about what you meant by that so I
4  can follow up with more questions.
5      MR. ALTMAN:  You know what, I have to lodge
6  an objection just to the extent that you can answer
7  that question so long as it doesn't involve anybody
8  else other than John Doe in this matter or somebody
9  associated directly with the University of Michigan.
10     If you can answer it with that regard,
11  fine.  Other than that, I'm going to instruct you not
12  to answer because it goes beyond the scope of the
13  deposition topics today.
14     **THE WITNESS:  I will not answer it.**
15 BY MR. KENT:
16 Q.  You brought it up.  You were talking about it.
17 **A.  You can learn more about it in the police report.**
18 Q.  I shouldn't have to wait for that because we have a
19  status conference next week, and I have to refile a
20  motion to dismiss your case.
21     I can't wait for their investigation to be
22  done that they've been working on for over six months
23  now.  Okay.  That could take forever if they even
24  decide to give it to the prosecutor, okay?  I don't
25  need -- I don't have to wait for that.



**Jane Doe**
06/08/2023                                         **Pages  74..77**

1     Okay.  You've already told them something
2 that you are not willing to talk about in a sworn
3 deposition in your civil suit.  That's not going to
4 fly.  I'm sorry.
5     MR. ALTMAN:  Well, I'm sorry, but this
6 judge set the scope of this deposition.
7     Whatever this has to do with a family
8 friend who is an uncle, I don't see how that has
9 anything to do with the relationship between her and
10 the University of Michigan.
11     MR. KENT:  Well, it has to do with her
12 relationship with John Doe who works for us and is the
13 only connection to this alleged internship.
14     MR. ALTMAN:  Well, I've given her an
15 instruction.  Let's move on.
16 BY MR. KENT:
17 Q.  Do you have a badge for Michigan Medicine, an ID card
18    when you claim to have had an internship?
**19 A.  No.**
20 Q.  And you are not going to answer questions about why
21    you agreed to do an internship with and for a
22    physician who you claim raped you?  You're not going
23    to answer questions about that?
24     MR. ALTMAN:  That's correct.  I'm
25 instructing her not to answer questions about that.

1 BY MR. KENT:
2 Q.  Okay.  He gave you the internship that you're alleging
3    is at the heart of this lawsuit, correct?
**4 A.  Yes.**
5 Q.  Okay.  And you won't answer any questions about your
6    relationship with him outside of the internship, is
7    that what you're saying?
**8 A.  No.**
9     MR. ALTMAN:  I've instructed her not to
10 answer such questions, that's correct.
11 BY MR. KENT:
12 Q.  And is it, and is it because you were sued by
13    Doctor Schoenfeld and lost a lawsuit that you can't or
14    just because there are other reasons?
15     MR. ALTMAN:  Objection, form, and I would
16 instruct her not to answer.
17 BY MR. KENT:
18 Q.  Okay.  You were sued by Doctor Schoenfeld, correct?
19     MR. ALTMAN:  Objection, form.
20     And I'm going to instruct her not to
21 answer.
22 BY MR. KENT:
23 Q.  And you retracted all the allegations, many of which
24    you made in this complaint --
25     MR. ALTMAN:  Objection.

1 BY MR. KENT:
2 Q.  -- that you made against him.
3     MR. KENT:  I'm not done.
4     MR. ALTMAN:  I'm sorry.
5 BY MR. KENT:
6 Q.  Is that correct?
7     MR. ALTMAN:  Objection, form.
8     I'm going to instruct her not to answer.
9 BY MR. KENT:
10 Q.  And you know that and you understand this that when we
11    come back for a much longer deposition if we have to
12    later if your case is still alive, it's going to be
13    much longer, and you're going to have to answer all of
14    these questions related to your relationship.
15     Do you understand that?
16     MR. ALTMAN:  Objection, form.
17     I'll instruct her not to answer.
18 BY MR. KENT:
19 Q.  But, no.  Do you understand what we're going to come
20    back to do later?
21     MR. ALTMAN:  Objection, foundation.
22     MR. KENT:  Foundation?
23     MR. ALTMAN:  Yeah.
24     MR. KENT:  I'm asking her what she
25 understands.  That's not a foundational objection.

1     MR. ALTMAN:  Of course it is.
2     MR. KENT:  No, it's not.
3     MR. ALTMAN:  Okay.  That's fine.  You've
4 asked her a legal question.  She's not a lawyer.
5     MR. KENT:  But I want to know if she
6 understands that you telling her not to answer these
7 today is not going to relieve her from answering them
8 in the future.
9     MR. ALTMAN:  That's wonderful that you've
10 advised her of your belief on that.
11 BY MR. KENT:
12 Q.  Okay.  Would you turn to page eight of Exhibit 2.
13    Exhibit 2.  Miss Doe, Exhibit 2.
14     Okay.  At the bottom it says:  Please
15    provide the name and titles of each and every person
16    to whom you reported at the University of Michigan.
17     Do you see that?
**18 A.  Uh-huh.**
19 Q.  You have to say yes.
**20 A.  Yes.**
21 Q.  Okay.  The answer that you gave is that:  Plaintiff's
22    specific interactions during her internship were with,
23    and you gave some names.
**24 A.  Uh-huh.**
25 Q.  My question in that discovery request was not who your

Page 78

1  specific interactions were with. The question was to
2  whom you reported.
3          To whom did you report at the university as
4  part of this alleged internship?
5  A.  I mostly reported to John Doe.
6  Q.  He would have been the one to set your schedule, to
7  tell you where to be and when in terms of patient
8  observation and things of that nature, correct?
9  A.  Yes.
10  Q.  Do you think you had a supervisor/supervisee,
11  mentor/mentee, shadower/shadowee relationship with
12  anyone else other than him?
13  A.  I believe that because he gave me this internship, he
14      was an employee at the University of Michigan.
15          My overall relationship with the University
16      of Michigan was that I was a mentee of the University
17      of Michigan and just, you know, a subordinate of the
18      University of Michigan because I was here at the
19      facilities.
20  Q.  Because he told you that he had taken care of
21  everything?
22  A.  Well, I was interacting with patients, with faculty,
23      staff, medical students. So I -- so even though he
24      was my supervisor or I -- or even though because I --
25      the mentorship, in the 2015 internship it was to me

Page 79

1      most supervisor/supervisee, but I also -- but it was
2      also in the greater context of being within the
3      University of Michigan Health System.
4  Q.  But you were only there by virtue of him, correct?
5  You said he's the one that gave you the internship,
6  right?
7  A.  Yes.
8  Q.  Okay. And I think that you testified earlier when we
9  looked at all of the documents in Exhibit 3, you had
10  never seen any of those, never even took it upon
11  yourself to go explore whether or not there were
12  things that needed to be done to make your
13  relationship more official, correct?
14  A.  I was not aware of those forms' even existence. I
15      wouldn't even know where to look to find them.
16  Q.  But you didn't try, either, did you?
17          Let me ask it in a less leading way. Did
18  you ever go online, jump online, talk to anyone, even
19  ask Doctor Schoenfeld aren't there some forms I need
20  to fill out, isn't there some training I need to do,
21  isn't there anything that needs to occur more formally
22  to memorialize this relationship that I have this
23  internship? Did you do that?
24  A.  No.
25  Q.  And it's fair to say you just took what he said at

Page 80

1  face value. When he says to you I've taken care of
2  everything, you just believed it?
3          MR. ALTMAN: Objection, form.
4  BY MR. KENT:
5  Q.  But isn't that true?
6          MR. ALTMAN: Objection, form.
7          You can answer.
8          THE WITNESS: It was a combination of what
9      he had told me but also my interactions at the
10      University of Michigan Health System with faculty,
11      staff, medical students. So it was a combination of
12      my entire experience.
13  BY MR. KENT:
14  Q.  But you believed, you believed you had an internship
15  before day one, before you even had any of those
16  interactions, correct?
17  A.  Correct.
18          MR. ALTMAN: Objection, form.
19  BY MR. KENT:
20  Q.  Okay. You did. So those interactions didn't form the
21  basis of your belief. You had already felt that way
22  based upon what he told you, correct?
23          MR. ALTMAN: Objection, form.
24  BY MR. KENT:
25  Q.  Correct? You can answer.

Page 81

1          MR. ALTMAN: Yeah.
2          THE WITNESS: Can you repeat it one more
3      time?
4  BY MR. KENT:
5  Q.  Yes. You had already believed regardless of those
6  interactions that you had later on day one that you
7  had an internship, correct?
8  A.  Yes.
9  Q.  And that was solely based on what he said, correct?
10  A.  Yes.
11  Q.  Why did it end in mid August of 2015?
12  A.  He began to make me feel uncomfortable.
13  Q.  How so?
14          MR. ALTMAN: You can answer that.
15          THE WITNESS: His behavior was
16      inappropriate.
17  BY MR. KENT:
18  Q.  How so?
19  A.  Inappropriate touch and inappropriate comments.
20  Q.  Let's start with the touch.
21          When and where and how? I guess explain to
22  me in detail what happened with inappropriate touching
23  that caused you to want to exit the alleged
24  internship.
25  A.  He specifically instructed me to always go to the



Page 82

1  cafeteria which is on the second floor and to page him
2  whenever I arrived, and then he would give me a hug,
3  and the way he would give me a hug made me feel
4  uncomfortable, and then to go up to the clinic because
5  you've been to the Taubman Center before, right?  It's
6  on the second floor, the cafeteria is on the second
7  floor, and then the GI Center is on the third floor.
8       And he would, he would take me to the third
9  floor through a private stairwell and never once took
10  the public elevators, and during the private stairwell
11  is when he began to make me feel very uncomfortable
12  over time.
13 Q.  What did he do in the private stairwell that made you
14  feel uncomfortable?
15 A.  Inappropriate touch and inappropriate comments.
16 Q.  Touch how?  What did he do?
17 A.  He caressed my arm, my lower back, in combination with
18  the very, like, long hugs where my chest would be,
19  like, pushed up against his the way he would hug me,
20  but it was more hostile in the stairwell.
21       MR. KENT:  And just so we're clear because
22  we're down this path a little bit, are you going to
23  not allow any questions about the prior sexual
24  relationship before the internship?
25       MR. ALTMAN:  That's correct.

Page 83

1  BY MR. KENT:
2  Q.  And look at page twelve of 1, I'm sorry, Exhibit 1,
3   the complaint.
4       Do you see paragraph forty-one?
5       MR. ALTMAN:  Bear with me a second.  I wish
6  the eyes worked a little better.
7       MR. KENT:  Yeah, sorry about that.
8       MR. ALTMAN:  That's all right.  Okay.
9  Thank you.
10 BY MR. KENT:
11 Q.  The first sentence reads:  John Doe is a sexual
12  predator.
13       This is your complaint, correct?
14 A.  Yes.
15 Q.  Are those your words?
16       MR. ALTMAN:  I'm not going to, well --
17       THE WITNESS:  Yes, John Doe is a sexual
18  predator.
19 BY MR. KENT:
20 Q.  Okay.  When did he boast to you that he mentored
21  similar women with whom he had casual sexual
22  relations?
23       MR. ALTMAN:  Just bear with me a second.
24  I'm going to object to form.
25       And if such a thing happened while you were

Page 84

1  an intern at the University of Michigan, I'll allow
2  you to answer.  Otherwise, I'll instruct you not to
3  answer.
4       THE WITNESS:  So I will not be answering.
5  BY MR. KENT:
6  Q.  So you think he's a sexual predator.  You state in the
7   complaint that he boasted to you of mentoring similar
8   women in the past with whom he had sexual relations,
9   but you're not going to tell me when he said that?  I
10  mean --
11 A.  No.
12       MR. ALTMAN:  I said if it took place while
13  she was an intern, then she can answer.  If it did not
14  take place while she was an intern, I'm instructing
15  her not to answer.
16 BY MR. KENT:
17 Q.  So he never said that to you while you were an intern,
18  while you were an alleged intern?
19       MR. ALTMAN:  She didn't answer the
20  question, either that or you haven't asked her --
21       MR. KENT:  She just said I'm not going to
22  answer.
23       MR. ALTMAN:  No.  Answer if it took place
24  while you were an intern.
25       THE WITNESS:  So I'll not be answering

Page 85

1  because that comment did not take place while I was an
2  intern.
3  BY MR. KENT:
4  Q.  It took place before?
5       MR. ALTMAN:  I'm going to instruct her not
6  to answer.
7  BY MR. KENT:
8  Q.  Are the allegations in paragraph forty-one true?  And
9   it goes on to a second page.
10 A.  There's quite a few details about this.
11       MR. ALTMAN:  If you can answer that
12  question based on what took place during the
13  internship, go ahead.  If not, I'm instructing her not
14  to answer.
15       MR. KENT:  So we're going to do this from
16  paragraph one because I need to develop a record for a
17  motion.
18 BY MR. KENT:
19 Q.  I am just -- this is your complaint, and I'm just
20  asking you if the allegations you make are true.  This
21  is well within the scope, so --
22       MR. ALTMAN:  I don't know that it is.
23       What does it have to do with her
24  relationship with the University of Michigan?
25       MR. KENT:  Her telling me that something in



Page 86

1  her complaint?  All she has to do is say yes, it's
2  true, and it has to do with how she exited.  It's in
3  the same discussion.  It's in the same discussion.
4        MR. ALTMAN:  I'm trying to be consistent
5  that if it's involving the internship, during the time
6  of the internship, she can answer, and if it doesn't,
7  I'm instructing her not to answer.
8        MR. KENT:  But you are -- the whole case
9  has to do with this internship.  The whole complaint
10  is about what happened during the internship.
11        MR. ALTMAN:  Okay.
12        MR. KENT:  So I'm asking her about the
13  truth or falsity of stuff in her original complaint.
14        MR. ALTMAN:  That's bootstrapping, and I'm
15  not going to allow it.  I didn't set the limitation on
16  discovery.  The court did.
17        MR. KENT:  No, but you're misinterpreting
18  what it means, and you are viewing it way too narrow.
19        And when I came into this today, I told you
20  I was going to be asking some foundational questions
21  and I may have to ask things, you know, that are, you
22  know, related but not, you know, about this window of
23  time because it matters because you have made the
24  allegations in the complaint.
25        MR. ALTMAN:  And there will be a time when

Page 87

1  you'll be able to depose her and you can ask her all
2  of these questions.
3        MR. KENT:  But these are relevant to my
4  renewed notion and you know it, and that's why you're
5  doing it.
6        MR. ALTMAN:  No, I don't agree with you.
7  I'm entitled to disagree with you.
8        MR. KENT:  But you're not entitled to make
9  relevancy objections.
10        MR. ALTMAN:  Yes, I am.  That was the point
11  of the court setting forth the scope of discovery
12  which she ratified when you called her.
13        MR. KENT:  She said give me the information
14  so I can follow up on it, and I can depose the
15  roommate which I intend to do.
16        MR. ALTMAN:  You're going to depose a
17  roommate that had nothing to do with this situation.
18  God bless.  Go ahead.
19  BY MR. KENT:
20  Q.  You went to the Title IX Office in early 2018,
21      correct?
22  A.  Yes.
23  Q.  And you made a complaint, right?
24  A.  Yes.
25  Q.  And so that was over two years later from the time

Page 88

1      that you left the alleged internship, right?
2  A.  Hold on.  Over two years, it was close to, yes.
3  Q.  Yeah.  Early 2018 January is when you made the first
4      contact with the Title IX Office, right?
5  A.  Yes.
6  Q.  Okay.  And you left in August 2015.
7  A.  Yes.
8  Q.  Okay.  Why did you wait over two years to make a
9      complaint about someone who -- at least to our office
10      to make a complaint about someone that you said was
11      sexually hostile, sexually hostile to you during your
12      alleged internship?
13  A.  I was afraid.
14  Q.  Of what?
15  A.  Of his retaliation.
16  Q.  At some point you asked him to write a recommendation
17      letter for you, right?
18  A.  Yes.
19  Q.  And he refused to do that?
20  A.  Yes.
21  Q.  Did he tell you why he refused?
22  A.  He said his evaluation of me is impacted due to the
23      knowledge of the previous sexual relationship.
24  Q.  Okay.  So there was a previous sexual relationship
25      before the internship?

Page 89

1  A.  Yes.
2  Q.  And that he didn't want his name attached to a
3      recommendation because of the potential of someone
4      discovering the existence of that relationship.
5        MR. ALTMAN:  Objection.
6  BY MR. KENT:
7  Q.  Is that what he told you?
8        MR. ALTMAN:  Objection, foundation.
9  BY MR. KENT:
10  Q.  Or words to that effect.  Did he tell you something
11      like that?
12        MR. ALTMAN:  You can answer.
13  BY MR. KENT:
14  Q.  Yes.
15  A.  He specifically said that he believed that he is
16      unable to provide a letter of evaluation because of
17      his evaluation is impacted with his knowledge of a
18      previous sexual relationship.
19        However, that was -- it was very
20      retaliatory.
21  Q.  You felt it was retaliatory --
22  A.  Yes.
23  Q.  -- to deny you a letter?
24  A.  Yes.  I put in my hours and I worked very hard at this
25      internship at the University of Michigan.



1 Q.  Did he know why you left in August of 2015?  Did you
2     share with him that you felt sexually harassed by him
3     when you left the internship?
4 A.  No.
5 Q.  Why did you tell him that you were leaving the
6     internship?
7 A.  What was your question?
8 Q.  Why did you tell him that you were leaving your
9     alleged internship?
10 A.  I told him that I needed to focus more on my MCAT
11     examination.
12 Q.  And what's the reason that you lied to him about the
13     reason for leaving the alleged internship?
14         MR. ALTMAN:  Objection, form.
15 BY MR. KENT:
16 Q.  You can answer.
17 A.  Can we define the word lie in our deposition?  Can we
18     define it first before I answer?
19 Q.  Well, we all know what the word lie is.
20         You didn't tell him the truth about why you
21     were leaving, correct?
22 A.  I can answer the question from that definition of lie,
23     or I can answer the question from intent to deceive.
24 Q.  When you told him why you were leaving, did you tell
25     him the truth?

1 A.  Me studying for the MCAT was partially true, needing
2     more time.
3 Q.  But was that the reason?  You could have studied for
4     the MCAT while you were continuing on with this
5     alleged internship.
6         When I asked you the question why you left
7     the internship, under oath you told me it was because
8     you were feeling sexually and verbally harassed.
9 A.  Yes, that was the main reason as to why I left.
10 Q.  Okay.  But you didn't tell him that, correct?
11 A.  No.
12 Q.  So you didn't tell him the truth about what the main
13     reason was for you exiting the alleged internship?
14         MR. ALTMAN:  Objection, form.
15 BY MR. KENT:
16 Q.  Correct?  Correct?
17 A.  Yes, because I was afraid of his retaliation.
18 Q.  So what I said is true, you didn't tell him the truth
19     about why you were leaving, whatever your motive was?
20 A.  Yes, because I was afraid of his retaliation.
21 Q.  I didn't ask you about what your motive was.  I just
22     asked you if you were truthful with him.  I mean, we
23     can talk about the motive in a minute.
24         MR. ALTMAN:  Objection, asked and
25     answered.

1         MR. KENT:  Okay.
2         MR. ALTMAN:  Move on.
3 BY MR. KENT:
4 Q.  Okay.  I just need you to answer my question, okay,
5     without qualifying it, okay?
6         Did you tell him the truth about what the
7     main reason was that you left the internship?
8         MR. ALTMAN:  Objection, asked and answered.
9     Please move on.
10        MR. KENT:  No, she didn't answer it.
11        MR. ALTMAN:  Yes, she did.
12        MR. KENT:  She said yes.
13        MR. ALTMAN:  She answered your question.
14    Please move on.
15        MR. KENT:  She said yes.  I don't even know
16    what that means.
17        MR. ALTMAN:  Okay.  I'm sorry that you
18    didn't understand her answer.  She gave you one.
19        MR. KENT:  Could you read back the question
20    and answer, Cheryl?  This is absurd.
21        THE COURT REPORTER:  Question:  So what I
22    said is true, you didn't tell him the truth about why
23    you were leaving, whatever your motive was?
24        Answer:  Yes, because I was afraid of his
25    retaliation.

1         MR. KENT:  So she answered yes that she
2     wasn't truthful.
3 BY MR. KENT:
4 Q.  Okay.  All right.  So let's talk about a lie.  So you
5     thought that he was going to retaliate against you,
6     and that's why you weren't truthful with him, is that
7     what you're telling me?
8 A.  Yes.
9 Q.  All right.  How would he retaliate against -- at least
10    how did you think at the time he could retaliate
11    against you?
12 A.  In many ways.  I'll give you a few examples.  He told
13    me he had sat on medical school admissions committees,
14    especially at the University of Michigan, and he's a
15    very prestigious doctor in the field of
16    gastroenterology, and that was actually one of my
17    interests as well was to be a gastroenterologist.  I
18    had considered it.  I was also really interested in
19    nutrition.
20        And I did know that with my pursuit of
21    medicine that there was going to be -- regardless of
22    what specialty I chose, I could still encounter him
23    and that he would still retaliate against me in my
24    career.
25 Q.  And that was the reason that you waited over two years



Page 94
1  to make a complaint?
2         MR. ALTMAN:  Objection, form.
3  BY MR. KENT:
4  Q.  Correct?
5  A.  Form means I can answer?
6         MR. ALTMAN:  Yes.  Unless I tell you not to
7  answer, you can answer.
8         THE WITNESS:  That was part of the reason.
9  BY MR. KENT:
10 Q.  Okay.  What else?
11 A.  During this time of early 2018, there was a shift in
12     dialogue on how we discuss sexual abuse in our
13     community, especially with the Doctor Larry Nassar
14     case.  That was around that time that had come out.
15        And for me to admire the bravery of those
16     girls on TV who bravely spoke out on what happened to
17     them to help their community is what gave me bravery
18     to report what I had experienced with Title IX.
19 Q.  Okay.  Let's talk about that because the allegations
20     in your complaint are that he raped you before the
21     internship.
22        When you were encountering this new-found
23     courage and bravery, did you file a police report or
24     report of any kind with law enforcement or anywhere
25     about what happened to you having any

Page 95
1  internship, alleged internship with the university?
2         MR. ALTMAN:  Objection.  It's outside the
3  scope set forth by the court.
4         I'm going to instruct the witness not to
5  answer.
6  BY MR. KENT:
7  Q.  You were upset about not getting a letter of
8     recommendation, right?
9  A.  Where is this?
10 Q.  No.  I'm just asking.
11 A.  I was upset that he had retaliated against me, and
12     as a form and part of retaliation was for him to
13     not provide the letter of recommendation, and he
14     retaliated against me because I had refused his sexual
15     advances.
16 Q.  The ones in the stairwell and elsewhere, the hugs and
17     so forth while the internship was -- the alleged
18     internship was going on, is that what you're talking
19     about?
20 A.  Yes.
21 Q.  So you're saying that he denied you a letter of
22     recommendation because you refused sexual advances
23     during the time that you had this alleged internship?
24 A.  Yes.
25 Q.  And eventually the Title IX Office informed you that

Page 96
1  they did not conduct an investigation, right?
2  A.  They used the word investigation when they were
3     speaking with me.
4  Q.  That's not my question.
5         Okay.  At some point the Title IX Office
6  told you that they were not going to and had not
7  completed a formal investigation, correct?
8  A.  Yes.  Formal investigation they were not going to do
9     is what they said.
10 Q.  And to your knowledge they never did, correct?  They
11     never did an investigation or make any finding on your
12     allegations, correct?
13 A.  During -- well, now, like, even though they declined a
14     formal investigation, it was my understanding and my
15     belief that they were conducting an informal
16     investigation.
17 Q.  Did they tell you that they -- that office took the
18     position that they didn't believe your allegations
19     fell within the university's sexual harassment policy?
20        MR. ALTMAN:  Hold on one second.
21        THE WITNESS:  Am I allowed?
22        MR. ALTMAN:  Wait.  Hold on.
23 BY MR. KENT:
24 Q.  This is just for my own benefit.  I'm just asking you
25     a question.

Page 97
1         MR. ALTMAN:  I understand.  I'm trying to
2  decide whether I'm going to object or not.
3         Can you ask that question one more time?
4         MR. KENT:  Yeah.
5  BY MR. KENT:
6  Q.  Did anyone from the OIE Office tell you that they
7     weren't opening an investigation because the
8     allegations that you made didn't fall within the
9     university's sexual harassment policy?
10        MR. ALTMAN:  You can answer the question.
11        THE WITNESS:  No.  They told me that they
12     were not going to conduct a formal investigation
13     because I was not a student, an active University of
14     Michigan student or University of Michigan employee at
15     the time of, at the time of my interactions with John
16     Doe.
17 BY MR. KENT:
18 Q.  Okay.  After you make the initial complaint with the
19     OIE office in January of 2018, did Doctor Schoenfeld
20     ever sexually harass you or harass you in any
21     sexual-type way after that?
22        MR. ALTMAN:  I'm going to object.  That's
23  outside the scope of the limits set forth by the court
24  in this matter, and I'll instruct her not to answer.
25 BY MR. KENT:



**Jane Doe**
06/08/2023                                                  Pages 98..101

Page 98

1  Q.  Well, did you ever have any contact with him, with
2  Doctor Schoenfeld, after January 2018?
3        MR. ALTMAN:  That goes outside the scope of
4  the limits set forth by the court in this matter and
5  instruct the witness not to answer.
6        MR. KENT:  OIE.  This is what she's saying
7  the OIE investigation was, informal investigation was
8  going on, and she's opened the door to answering
9  questions about what was happening between January
10  2018 and June 2018 when she was informed that there
11  was not going to be an investigation.  There's a
12  window there.
13        MR. ALTMAN:  But I don't agree.  That goes
14  beyond the scope of the limits set forth by the court.
15        MR. KENT:  You're cherrypicking.  You've
16  let her answer a ton of questions about the OIE
17  process, and now you're cherrypicking one particular
18  question.
19        MR. ALTMAN:  I'm not cherrypicking one
20  particular question.  The IOE process was specifically
21  discussing what took place in the 2015 time frame.
22        MR. KENT:  And you know that a defense to
23  this case is if is no post knowledge harassment, the
24  case goes away under Title IX.
25        MR. ALTMAN:  That is not true.

Page 99

1        MR. KENT:  It's true.  It is the law, and
2  that's why she denied it without prejudice.
3        MR. ALTMAN:  Okay.  That's just not true.
4        MR. KENT:  It is true, but we're not going
5  to debate that.
6        MR. ALTMAN:  That's right.  This is not a
7  debate for her, so I've instructed her not to answer.
8  Please move on.
9        MR. KENT:  There's going to be -- I'm just
10  letting you know -- off the record.
11        MR. ALTMAN:  This should be on the record.
12        MR. KENT:  No, this is off the record.
13        COURT REPORTER:  You have to agree to go
14  off the record.
15        MR. ALTMAN:  I don't want to go off the
16  record.  If you're going to make a threat --
17        MR. KENT:  I'm not going to make a threat.
18        MR. ALTMAN:  You were just about to.
19  BY MR. KENT:
20  Q.  Okay.  Take a look at page fourteen.
21        MR. ALTMAN:  Of?
22        THE WITNESS:  The complaint?
23  BY MR. KENT:
24  Q.  The complaint, paragraph forty-five.
25  A.  Uh-huh.

Page 100

1  Q.  I'm sorry.  Forty-four, excuse me, the top of the
2  page.
3        Do you see that?
4  A.  Yeah.
5  Q.  It says there in early 2018 you came to our office,
6  okay, so this is your connection with the university,
7  and it says reported both rapes.
8        What rapes are you referring to in
9  forty-four?
10        MR. ALTMAN:  No, that is not what is -- not
11  in play here.  Okay.  You're trying to use the
12  remedies that she sought claiming that has something
13  to do with her relationship with the university, and
14  that goes beyond the scope of the court's ruling, and
15  I'm going to instruct her not to answer.
16  BY MR. KENT:
17  Q.  I can ask her if the rapes that you reference in
18  paragraph forty-four are rapes that occurred during
19  your alleged internship.
20        MR. ALTMAN:  Okay.  That I'll allow.
21  BY MR. KENT:
22  Q.  Were they?
23  A.  No.
24  Q.  Okay.  So it stands to reason here because they
25  didn't, the rapes that are referenced in paragraph

Page 101

1  forty-four didn't occur during the internship, they
2  must have occurred at some other time, correct?
3        MR. ALTMAN:  You can answer.
4        THE WITNESS:  Yes.
5  BY MR. KENT:
6  Q.  Okay.  And that's what you reported to OIE according
7  to the allegations?
8  A.  Yes.
9  Q.  Okay.  All right.  Did you report any other behavior
10  to OIE?
11  A.  Yes.
12  Q.  So you gave them everything --
13  A.  Yes.
14  Q.  -- that involved Doctor Schoenfeld.  Okay.  Yes?
15  A.  Yes.
16  Q.  At the time that you agreed to this alleged
17  internship, there must have been some period of time
18  before you actually came to the hospital where you and
19  he discussed this possibility, correct, of having an
20  internship?
21  A.  Repeat your question one more time.
22  Q.  Yeah.  Before you even set foot in Michigan Medicine
23  in the spring of 2015 as an alleged intern, you and he
24  had some discussions, you would have to, correct,
25  about you doing this?



Page 102

1  A.  Yes.
2  Q.  All right.  And those are discussions that would have
3      occurred where and how, by phone, in person?
4  A.  Fall 2014.
5  Q.  In person, by phone?  How would you guys talk about
6      the plans for this?
7  A.  This was so long ago, I don't remember.
8  Q.  Okay.  But did you have faith and trust in what he was
9      telling you at that time about the potential for some
10     alleged internship at the hospital?
11 A.  Yes.
12 Q.  Okay.  So you had faith and trust in him in the fall
13     of 2014?
14 A.  Yes.
15 Q.  And nothing that occurred prior to the fall of 2014
16     that would cause you -- that would have caused you to
17     have no faith or trust in this man?
18         MR. ALTMAN:  Hold on.  I think that
19     question goes beyond the scope of the limitations set
20     forth by the court, and I'd instruct the witness not
21     to answer.
22         MR. KENT:  Faith and trust in what she
23     believed she was getting herself into based on what
24     she was told by him is critical.  She's claiming she
25     relied on him.  He gave her the internship.  She had

Page 103

1      faith and trust in what he was telling her in the fall
2      of 2014.
3  BY MR. KENT:
4  Q.  All I'm asking is whether anything had ever happened
5      prior to that that would have destroyed or damaged any
6      faith or trust that you had in Doctor Schoenfeld.
7          MR. ALTMAN:  I'm going to instruct her not
8      to answer it.  She gave you an answer during the time
9      period that is relevant.
10         MR. KENT:  Cherrypicking.  You just let me
11     ask her without objection to her faith and trust in
12     the fall of 2014.  She hadn't even started the
13     internship.
14         Why did you let me do that?
15         MR. ALTMAN:  Because they were talking
16     about the internship.
17         MR. KENT:  Yeah, and I'm asking her whether
18     or not there's anything that would have destroyed --
19     any reason she had to believe in what this man was
20     telling her.
21         MR. ALTMAN:  She answered your question
22     that she believed him, so now you're asking her again
23     did you really believe him?
24         MR. KENT:  No, that's not what I'm asking.
25         MR. ALTMAN:  But it is effectively because

Page 104

1      you're asking her -- she said that she believed him at
2      the start of the fall of 2014 when she was talking
3      about the internship was the context.
4          MR. KENT:  Okay.  Let me ask it a different
5      way then.
6  BY MR. KENT:
7  Q.  Do you have any reason to question his faith and trust
8      that you claim to have had in him in the fall of 2014?
9  A.  No.
10 Q.  Okay.  And when you were talking about this
11     possibility of an alleged internship in 2014, whenever
12     those discussions occurred and however they occurred,
13     did you believe that he was the kind of person that
14     you wanted to work for in an internship mentorship
15     capacity at the time?
16 A.  Can you repeat it one more time?
17 Q.  Sure.
18         MR. KENT:  Cheryl, you can read it back.
19         THE COURT REPORTER:  Question:  Okay.  And
20     when you were talking about this possibility of an
21     alleged internship in 2014, whenever those discussions
22     occurred and however they occurred, did you believe
23     that he was the kind of person that you wanted to work
24     for in an internship mentorship capacity at the time?
25         THE WITNESS:  At the time he was someone I

Page 105

1      trusted, someone I really admired professionally, and
2      I did think it would be, I did think it would be, I
3      did think it would be okay for me to do this
4      internship.
5  BY MR. KENT:
6  Q.  And from those planning stages before you started and
7      talking about it and what it would look like up until
8      the time when you actually set foot into the hospital,
9      there was nothing that happened during that period of
10     time that changed your perception about having faith
11     and trust in him and wanting to do that, that
12     internship?
13 A.  So we're talking about from fall 2014?
14 Q.  Yeah, until you started in the spring.
15 A.  No.
16 Q.  Okay.  You felt the same way you did when you guys
17     were discussing the possibility back in the fall of
18     2014?
19 A.  Yes.
20 Q.  When you guys were planning this, planning, plotting,
21     however you want to call it, this alleged internship,
22     did he ask you to do anything to get ready for it, to
23     prepare for it?  For instance, did he say I need you
24     to fill out this form, I need you to go talk to this
25     person, we need to get any clearances.  Was there any

**Jane Doe**
06/08/2023                                             Pages 106..109

Page 106

1    sort of administrative processes at all that he asked
2    you to go through?
3  **A.  For me, no.**
4  Q.   Okay.  There was a form that I neglected to ask you
5    about that was in Exhibit 3 because we got pulled off
6    track, and it's a, it's a form related to vaccinations
7    and inoculations that's also required.
8            Did you fill that out?
9  **A.  No.**
10  Q.   Okay.
11           MR. ALTMAN:  Do you want to put that back?
12  **         THE WITNESS:  Okay.**
13           MR. KENT:  We'll organize it at the end.
14           MR. ALTMAN:  Okay.
15  BY MR. KENT:
16  Q.   Was there any administrative process involved in your
17    exiting this alleged internship?  In other words, was
18    there an exit interview, was there a last day of work,
19    anything that formalized you not coming anymore?
20  **A.  No.**
21  Q.   Was there any sort of celebration or party or let's
22    say good-bye to Jane Doe type of event that your
23    alleged internship culminated with?
24  **A.  No.**
25  Q.   Would you consider your leaving an abrupt exit?

Page 107

1  **A.  Yes.**
2  Q.   Have you ever gone back and counted -- or let me ask
3    it this way.  Did you keep any records of when you
4    went there?  Do you have a calendar or something on
5    your phone where you kept in your diary or calendar
6    how many times you were actually on site?
7  **A.  No.**
8  Q.   So you didn't -- how do you keep a calendar of your
9    day-to-day activities and things that you have coming
10    up?  What do you use?
11  **A.  A lot of it I just -- it depends on the task, but**
12  **   usually a journal for my everyday tasks.**
13  Q.   Were you doing that journaling in 2015?
14  **A.  During my shadowing notes.**
15  Q.   Did you keep all your shadowing notes?
16  **A.  I only have what is left which was what I have**
17  **   provided.**
18  Q.   How would some still exist and others not or why would
19    some still exist and others not?
20  **A.  Around the year, around the year 2016, I did, I did**
21  **   get rid of many of my, my items in the year 2016.**
22  Q.   Is there any way for us to go back and reconstruct
23    based upon records that you know or think might exist
24    out there for us to reconstruct when you were actually
25    here on site?

Page 108

1  **A.  Yes.**
2  Q.   How would we do that?
3  **A.  We can match my shadowing clinical observation notes I**
4  **   had provided with the actual patient records, and they**
5  **   will match precisely on the days and procedures**
6  **   performed.**
7  Q.   Okay.  So we can't access patient records for that
8    purpose, and HIPAA training might have alerted you to
9    that.
10           But with what we can access of your
11    calendar, notes, diaries, journals, is there any way
12    for you to know how many days you actually showed up
13    here?  Because you didn't have an M Card, you wouldn't
14    have buzzed in anywhere.  Is there any way for us to
15    know?
16  **A.  All I have is what I produced.  That's all I have.**
17  Q.   I talked to Doctor Schoenfeld recently, and you don't
18    have to believe this.  You can take it at face value,
19    but he thought that it was six to ten times in total
20    that you were, and that's what he is prepared to swear
21    to in an affidavit, about six to ten times or range
22    that you were actually on site.
23           Does that sound accurate to you, does it
24    sound off?
25  **A.  I believe that's lower because, like, I was there once**

Page 109

1  **   a week and I was there for the majority of the summer.**
2  **   So how many weeks of summer, once a week, and there**
3  **   was also the time in the winter break as well that I**
4  **   was there.**
5  **         So that number you gave me sounds a little**
6  **   bit lower.**
7  Q.   Do you have an estimate that's different than that?
8           MR. ALTMAN:  Objection, form.
9  BY MR. KENT:
10  Q.   You can answer.  I'm just asking you for an estimate.
11    I'm not going to hold you to any specific number.
12           MR. ALTMAN:  She gave you an answer.  She
13    told you once a week, you know.
14  **         THE WITNESS:  In the summer.**
15  BY MR. KENT:
16  Q.   So the summer has June through when you left in
17    August.  We're talking sixteen weeks there, and then
18    plus what you did up until June.
19           You think you were there over twenty times?
20  **A.  Not more than twenty times.**
21  Q.   Okay.
22  **A.  It was less than twenty times.**
23  Q.   All right.  Who is Owen Brown?
24  **A.  He was a medical student here at the University of**
25  **   Michigan and also an undergraduate student at the**



Page 110

1     University of Michigan.
2 Q.  Okay.  Did you know him?
3         Where were you an undergrad?
4 A.  Where did I go to school?
5 Q.  Yeah.
6 A.  I went to Michigan State University.
7 Q.  Did you know Owen before Michigan Medicine?
8 A.  No.
9 Q.  Have you kept in touch with him?
10 A.  No.
11 Q.  Did you have -- were you given an umich.edu email
12    address as part of your alleged internship?
13 A.  No.
14 Q.  Were you given any type of University of Michigan
15    email address?
16 A.  No.
17 Q.  Paragraph thirty-three of Exhibit 1.
18 A.  Yes.
19        MR. ALTMAN:  Hang on a second.  Okay.
20 BY MR. KENT:
21 Q.  This sexually harassing behavior that you're
22    referencing there, was that during the alleged
23    internship?
24 A.  Yes.
25 Q.  It was through emails?

Page 111

1 A.  Yes.
2 Q.  Tell me what he was doing through emails.
3 A.  I can show you the exhibit.
4 Q.  Sure.
5         And you're looking at Exhibit 2 right now?
6    There's little numbers at the bottom of the page you
7    can reference for me.
8 A.  Okay.  Well, I want to first point out, let's see,
9    0008.  So after this --
10        MR. ALTMAN:  Wait.  Just hold on one
11    second.  Okay.  No chance.
12        MR. KENT:  I can read it for the record if
13    you'd like so that --
14        MR. ALTMAN:  I don't know if you need to.
15        THE WITNESS:  I can point out certain parts
16    of it.
17 BY MR. KENT:
18 Q.  Well, I think that because we should all be on the
19    same page.
20 A.  Sure.
21 Q.  So you're saying this is a sexually harassing email
22    that occurred during your --
23        MR. ALTMAN:  Let me just make sure.  Is
24    that what you're saying because you were kind of --
25        THE WITNESS:  Yes.

Page 112

1        MR. ALTMAN:  Okay.  So I just want to be
2    sure.
3 BY MR. KENT:
4 Q.  It says hi, and it's redacted, from John Doe.
5         Is this to you?
6 A.  This is to me.
7 Q.  Okay.  It says:  That is terrific.  I'm so glad to
8    hear about your grades and hear about your study
9    abroad, too.  I'm copying Owen Brown on this email.
10    Owen was recently accepted to UM Medical School.  As
11    we discussed, he has a much better
12    understanding/perspective of the current med school
13    application process and can discuss with you what UM
14    Med School is looking for.  Owen went to UM undergrad,
15    too.  Don't be a hater since you're an MSU student.
16    Sincerely, John Doe.
17        That's the email you're referring to?
18 A.  You forgot the little emoji after the MSU student.
19 Q.  Okay.  There's a wink?
20 A.  A wink.
21 Q.  A wink emoji?
22 A.  Yes.
23 Q.  Okay.  And you don't -- you think that is sexually
24    harassing, it's not because of the MSU crack?
25 A.  No.  This is a sexually suggestive email, and then

Page 113

1    that was later confirmed.  Right after this email, I
2    did experience sexual harassment in pertaining to this
3    email.
4 Q.  How so?
5 A.  In the internship.  This is when he was making
6    inappropriate comments in the stairwell.  It was right
7    after he sent me this email.  But the inappropriate
8    comments were sexually suggestive.
9 Q.  To you they were?
10 A.  Yes.
11 Q.  Okay.  And you draw that conclusion in your mind
12    because of the emoji and nothing else?
13 A.  Not in my mind.  It was in my experience at the
14    internship right after this email.
15 Q.  But I'm just talking about the email in and of itself,
16    the content of it, is it in and of itself sexually
17    harassing?
18        MR. ALTMAN:  Objection, form.
19 BY MR. KENT:
20 Q.  You can answer.
21 A.  From my experience, yes, this is.
22 Q.  So you have experience with someone sending you a wink
23    emoji in a sexually suggestive way?
24 A.  No.  I meant with my experience from John Doe, this is
25    how I know this is sexually harassing from my



Page 114

1    experience from John Doe.
2 Q.  Okay.  All right.  And you did leave open the
3    possibility that that wink was related to the don't be
4    a hater because you're an MSU student comment?
5 A.  That is not what that wink is about.  That's not what
6    that statement is about.  Because of what -- because
7    of the physical interactions, physical, I mean, like,
8    talking about touch in the stairwell, directly
9    afterwards, right after this email, and the
10    inappropriate comments that he made.
11 Q.  All right.  Any other emails that are sexually
12    harassing?
13 A.  I guess, like, in retrospect, I do think, I do think
14    that -- it was when he told me to text him.
15 Q.  What number at the bottom of the page?
16 A.  0002.
17 Q.  Okay.  Can you read that?
18 A.  Sure.
19 Q.  Can you read it for the record?
20 A.  Yes.  Okay.  Hi, redacted.  I would be happy to have
21    you shadow me.  On Monday, January 5th, I'm performing
22    endoscopies all day.  On Thursday, January 8th, in the
23    afternoon I will be seeing patients in the office.
24    This will be at the UM Medical Center.
25        Why don't you text me (734) 474-7328, and

Page 115

1    we'll discuss details.  Sincerely, redacted.
2 Q.  Okay.  And that one was sexually harassing?
3 A.  Because -- this is sexually harassing to me because
4    when I did text him, as we can see, we were making
5    plans to talk on the phone, and just the way he had
6    spoke to me on the phone call, the way he spoke to me
7    during the phone call, like, I kind of like I brushed
8    it off.
9        I still felt that it was a safe internship
10    for me to attend, but when I actually got to the
11    internship, just his behavior began to escalate.
12 Q.  The internship started in January '15?
13 A.  Yeah, during winter break.
14 Q.  Okay.
15 A.  This is, like, one of the last days of December.
16 Q.  And you think you have a problem with this email,
17    right?
18 A.  Yes.
19 Q.  And I asked you earlier if anything happened between
20    these planning sessions in 2014 until the time you
21    started the internship in 2015 that caused you to have
22    less faith or trust in him, and you said, no, nothing
23    happened.
24 A.  That was fall of 2014.  This was December 2014.
25 Q.  Yeah, I know, but I asked you if anything happened

Page 116

1    between the fall of 2014 when you and he were
2    discussing the potential for an internship until you
3    started the internship.
4        That was the question I asked you earlier,
5    and we clarified that.  I said did anything happen in
6    that time that caused your faith or trust in him to be
7    eroded, and you said, no, nothing happened in that
8    time.
9        This is in that time.  It's a sexually
10    harassing email.
11        So something did happen within that window
12    that you felt was sexually harassing, correct?
13        MR. ALTMAN:  Objection, form.
14        THE WITNESS:  When I answered the question
15    earlier, that was my interpretation of your question
16    was only the fall of 2014, and this was the winter of
17    2014.
18 BY MR. KENT:
19 Q.  So the record will speak for itself, and I thought we
20    revisited it a couple of times and you understood what
21    I was asking.
22        But the point is is that you still were
23    okay with starting an internship with him despite the
24    fact that you felt sexually harassed by this email
25    before it started, correct?

Page 117

1 A.  I didn't feel that my educational environment at the
2    University of Michigan would be hostile which is what
3    I ended up experiencing in my internship.
4 Q.  You identify an instance of sexual harassment by him
5    before you even started your alleged internship,
6    correct?
7 A.  Yes.
8 Q.  And you did it anyway.
9 A.  I still felt it was safe for me to attend.
10 Q.  Did you bring it to anyone's attention that his -- or
11    anyone else that you felt like there was something
12    about this email that was sexually harassing to you?
13 A.  No, because I was afraid of his retaliation.
14 Q.  You were afraid of his retaliation, but you were
15    willing to go shadow him anyway?
16 A.  In the shadowing I felt that I would be protected
17    by --
18 Q.  By whom?
19 A.  By other people there.
20 Q.  So you went into the internship worried.
21 A.  No.
22        Why would you think that?  Why would you
23    think I would be --
24 Q.  Well, because you're saying that you felt sexually
25    harassed by him before you went in, but you felt like



Page 118

1  you could work for him anyway because there would be
2  protection from others around.
3  A.  It was I still felt that this would be a safe
4     environment at Michigan Medicine, but in the event
5     that something did happen, there would be people
6     there.
7  Q.  Okay. So you were thinking in your mind this would
8     still be a safe environment?
9  A.  Yes.
10  Q.  But you had reason to believe that it might not be
11     before you even went into it.
12  A.  It was still not the predominant belief. It was the
13     probability that it would be safe.
14  Q.  If you had that feeling before it started based on --
15         MR. ALTMAN:  Objection. Sorry.
16  BY MR. KENT:
17  Q.  Based upon this email that you identified as sexually
18     harassing, you just told me that you felt it was okay
19     to do it because of the protection that you would
20     likely receive from others, so you had to feel that
21     even going into it that there was some problem,
22     correct?
23         MR. ALTMAN:  Objection, form.
24  BY MR. KENT:
25  Q.  You can answer it.

Page 119

1  A.  No, no. He had always -- during this time, during
2     this time period, you know, his behavior felt very
3     normal to me, this type of behavior.
4         It was only when I began to feel
5     uncomfortable in the work space that I felt it was
6     more of a hostile environment that I needed to remove
7     myself from it.
8  Q.  But that doesn't explain the email.
9         Did this email become sexually harassing to
10     you, I mean, or was it -- I mean, did you look at it
11     when it was first sent to you and not think anything
12     of it but then six months later look back at the same
13     email and now I feel like it's a sexually harassing
14     email?
15  A.  Yes, that's correct. At the time I did not think that
16     there would be anything, anything -- I did not think
17     anything wrong with this email.
18         It was only, you know, now that I'm in my,
19     in my journey where I'm braver and stronger, I can now
20     see the totality of circumstances. But at the time,
21     no, I did not find it to be an alarming email.
22  Q.  At the time you received this, did you think it was
23     sexually harassing?
24  A.  At the time I received it, no.
25  Q.  Okay.

Page 120

1  A.  But, yes.
2  Q.  Thank you.
3         We had that interaction earlier in the
4     deposition about him asking you to lie when you looked
5     at your interrogatory answers, and I pointed out where
6     you said, yes, he asked me to lie and I lied.
7         I don't -- I know you can't read his mind.
8     I'm not asking you to do that. But did he ever give
9     you any indication, either to what he told you, did he
10     ever give you any indication of why he wouldn't want
11     others to know of your real relationship prior to the
12     alleged internship?
13  A.  Can you repeat the question again?
14  Q.  Did he ever explain to you or give you any reason to
15     help you understand why he didn't want people to know
16     about your prior relationship?
17  A.  No.
18  Q.  Do you think it was wise to covet the relationship
19     that you had prior to the start of the internship?
20         MR. ALTMAN:  Objection, form.
21  BY MR. KENT:
22  Q.  You can answer.
23  A.  So covet as in, like, to --
24  Q.  Hide.
25  A.  Hide?

Page 121

1  Q.  Yes.
2  A.  But, like, it was wise for him? Like, can you ask the
3     question?
4  Q.  Yeah. I'm just asking you, did you want -- did you
5     care if anyone knew, anyone around you, people you
6     were seeing on a day-to-day basis, people who thought
7     you were an intern, did you care if they knew or
8     didn't know about your past relationship with
9     Doctor Schoenfeld?
10  A.  At the time I did not think that would impact my
11     ability to receive the educational opportunity of the
12     internship at the time.
13  Q.  Okay. That's answering a different question.
14         My question is did you care one way or the
15     other whether they knew, whether it was public, that
16     you had a previous or whatever the nature of your
17     prior relationship was that people knew that. Did you
18     care?
19  A.  I did not think it was relevant at the time.
20  Q.  So you wouldn't want -- you wouldn't, you wouldn't
21     have wanted other people to know?
22  A.  Well, are you asking what I wish I would have done?
23  Q.  No. I'm just asking if you cared one way or the
24     other. If you all are sitting around the table in the
25     break room and Doctor Schoenfeld said, hey, let me



Page 122

1  tell everyone how I know Jane Doe, would you have
2  cared that he --
3  A.  I do wish that people would have known.  I do wish.
4  Q.  About your prior relationship?
5  A.  Yes, during the internship.
6  Q.  Okay.  But you could have told them.  That's your
7      choice to disclose that if you want to.
8            MR. ALTMAN:  Objection, form.
9  BY MR. KENT:
10  Q.  Is it not?
11  A.  I was afraid of his retaliation.
12  Q.  Okay.  So the reason you didn't tell people about your
13      prior relationship was because you feared his
14      retaliation?
15  A.  Yes.
16            MR. KENT:  Let's take a two-minute break.
17            MR. ALTMAN:  Okay.
18            (Off the record at 5:00 p.m.)
19            (Back on the record at 5:09 p.m.)
20  BY MR. KENT:
21  Q.  When we were looking at paragraph thirty-three on page
22      ten of your complaint, you were describing
23      Doctor Schoenfeld's conduct in the stairwell.
24      Actually, wrong paragraph.  You said that he was --
25      somewhere that he was engaging in sexually harassing

Page 123

1  conduct and language, also.
2  A.  What page are we on?
3  Q.  Hold on a second.  I'm trying to find it.
4            You say he was using inappropriate
5      language.  Yeah, it was paragraph thirty-three.
6  A.  Yes.
7  Q.  What language -- was it the email language or was it
8      him talking to you verbally?
9  A.  Talking to me verbally.
10  Q.  What would he say that was harassing?
11  A.  He would comment on my appearance.  He would inquire
12      about my personal life that I felt was inappropriate.
13  Q.  Okay.  Do you recall exactly what he would say about
14      your appearance?
15  A.  Yes.
16  Q.  What did he say?
17  A.  During that time of my life, I had very long hair.  My
18      hair is still long, but back then it was down here,
19      and I would put my hair in a braid and to the side,
20      and he told me that, like, I looked more attractive to
21      him when my hair is down.
22  Q.  Okay.  Anything else you can remember?
23  A.  He made inappropriate comments about the previous
24      sexual relationship that made me feel very
25      uncomfortable given that this is the workplace, and it

Page 124

1  created a hostile educational environment for me.
2  Q.  What did he say?
3  A.  It was he mentioned a very uncomfortable sexual
4      memory, but it was in regards to the prior
5      relationship.  It was his comment on it.
6  Q.  What did he say?
7  A.  It goes back to the email I was telling you about.
8            Do we need to go back to the email?
9  Q.  No.  I just want to know what he said.  You said he
10      said this to you verbally.
11  A.  Yes.  See, it was after this date, shortly afterwards.
12  Q.  Okay.  When you say this, it can't be picked up in the
13      record, so if you could read what you're referring to.
14  A.  It was after the email on May 16th, 2015.
15            MR. ALTMAN:  What's the Bates number at the
16      bottom?
17            THE WITNESS:  It's 0008.
18            MR. ALTMAN:  Okay.
19            THE WITNESS:  It says:  Owen went to UM
20      undergrad, too, dot, dot, dot, don't be a hater since
21      you're an MSU student with a wink face.
22  BY MR. KENT:
23  Q.  Yep.
24  A.  And then the next time I saw him in the stairwell, he
25      had mentioned the time that we had a mentorship

Page 125

1  outing, it is part of the, like, it's the, it's the
2  three -- you provided interrogatories for U of M, too,
3  and there's, like, the evidence is not here, but there
4  is a photo -- I'm sure you've seen it -- of John Doe
5  and I at a basketball game where I'm wearing MSU and
6  he's wearing U of M.
7  Q.  Yeah, I remember that.
8  A.  Yes.
9  Q.  Okay.
10  A.  He made a very inappropriate comment in reference to
11      the mentorship outing that we had at the U of M
12      basketball game which occurred here at the University
13      of Michigan's campus.
14  Q.  What was it?  What did he say about that membership
15      outing -- excuse me -- mentorship outing?
16  A.  It says:  Don't be a hater since you're an MSU student
17      with a wink face.  During that game it was MSU versus
18      U of M, and U of M won the game.
19  Q.  Yeah.
20  A.  And then he made a very inappropriate comment
21      connecting the mentorship outing and the winning of
22      the game to, to a very perverted comment.
23  Q.  But I keep asking you, tell me what he said.  What did
24      he say in the stairwell?
25  A.  So after this email he brought --



**Jane Doe**
06/08/2023                                      Pages 126..129

Page 126

1    MR. ALTMAN:  Jane, Jane, you have to -- let
2  me try to help you out here.
3        **THE WITNESS:  Okay.**
4    MR. ALTMAN:  He asked you specifically.
5  There's no -- what did he say to you?
6        **THE WITNESS:  He said, he said that day**
7  **U of M won the game and he won afterwards.**
8  BY MR. KENT:
9  Q.  Okay.  And you took that as sexually harassing and
10   offensive?  You took that comment as sexually
11   harassing and offensive?
12 A.  **Because I understood what he was referring to.**
13 Q.  What did you understand he was referring to?
14 A.  **After the mentorship outing, there was a hotel booked**
15   **in Ann Arbor.**
16 Q.  Okay.  And you won by having a hotel?
17 A.  **That's what he -- he said U of M won the game and he**
18   **won afterwards is what he had said.**
19 Q.  Okay.  I'm not getting it.  How did he win?
20 A.  **He meant it as a joke, but I know it was more**
21   **perverted than that.**
22 Q.  Do you think that -- are you telling me that it was
23   sexually offensive to you because he said he won
24   because you had sexual relations at the hotel
25   afterwards?

Page 127

1  A.  **Yes.**
2  Q.  Okay.  Okay.  Any other language that he used with you
3    that would fall into that category during your alleged
4    internship that you found sexually objectionable?
5        MR. ALTMAN:  For clarification, are you
6    asking written or verbal or either?
7        MR. KENT:  No.  What he said to her or
8    verbal.
9        MR. ALTMAN:  Okay.  Jane, did you hear
10   that?
11       **THE WITNESS:  Yes.**
12       MR. ALTMAN:  Okay.
13       **THE WITNESS:  Just the question is about --**
14   **that is all I can remember as of right now.**
15 BY MR. KENT:
16 Q.  Okay.  Can I ask you why you didn't -- when you went
17   to OIE in January 2018, why you didn't tell them about
18   that comment in the stairwell?
19       MR. ALTMAN:  Objection, form.
20       **THE WITNESS:  Well, I thought I did tell**
21   **them.  It's been five years.  I thought I did tell**
22   **them.**
23 BY MR. KENT:
24 Q.  Okay.  Do you feel since you've had some time to look
25   at documents, to reflect on this, to file this

Page 128

1    lawsuit, have you come to the conclusion in fact what
2    you might have thought might not have been true and
3    maybe you didn't tell them about this comment in the
4    stairwell?
5        MR. ALTMAN:  Objection, form.
6  BY MR. KENT:
7  Q.  Do you still believe today as we sit here, do you
8    still believe that that's something you shared with
9    them during any interview that you had?
10 A.  **I shared a lot of information with them during the**
11   **interview to the best of my abilities at the time, and**
12   **if I had accidentally forgotten to mention, just the**
13   **entire internship just had a lot of information of**
14   **sexual harassment, and if I, if I didn't mention it**
15   **back then, well, I hope I still have the opportunity**
16   **to mention it now to OIE.**
17       **But I know the case has been closed and the**
18   **investigation has been closed at this time, but --**
19 Q.  That's a pretty -- I mean, the way you describe it,
20   if, in fact, that happened and if he did say that,
21   that sounds like there's some sexual overtones there.
22       Would you agree that it would be something
23   that's pretty predominant in terms of the evidence of
24   sexual harassment at the time?
25       MR. ALTMAN:  Objection.  I'm sorry.

Page 129

1    Objection, foundation.
2  BY MR. KENT:
3  Q.  Do you think it's a pretty big deal?
4  A.  **No.  I think there was a plethora of information as to**
5    **how this was sexual harassment.**
6  Q.  And that particular piece was just -- didn't carry any
7    greater or lesser significance than other things like
8    these emoji emails?
9  A.  **No.**
10       MR. ALTMAN:  Objection.  Hold on.
11   Objection, form.
12 BY MR. KENT:
13 Q.  Okay.
14 A.  **Now as I continue to, now as I continue to recover**
15   **from all that has happened to me, this, this encounter**
16   **was quite scary for me, and in the year 2018 was my**
17   **first time coming forward, it was very scary, too.**
18       **But now I can recognize, recognize, I can**
19   **just recognize and acknowledge it better more, more**
20   **than before.**
21 Q.  Okay.  Paragraph thirty-nine of your first amended --
22   second amended complaint, have you had a chance to
23   look at that?
24 A.  **Yep.**
25 Q.  Is that true?

**Jane Doe**
06/08/2023                                    Pages 130..133

Page 130

1        MR. ALTMAN:  Hold on one second.
2        Okay.  Thank you.
3 BY MR. KENT:
4 Q.  Is that why you exited the internship?
5        MR. ALTMAN:  Objection, form.
6        **THE WITNESS:  I exited the internship**
7   **because of his -- because him declining the letter of**
8   **recommendation was an obvious form of retaliation**
9   **against me for declining his sexual advances.**
10 BY MR. KENT:
11 Q.  Was his declining the letter of recommendation the
12   cause or a cause of you exiting the alleged
13   internship?
14 A.  **It was.**
15        MR. ALTMAN:  Objection, form.
16 BY MR. KENT:
17 Q.  Okay.
18 A.  **It was in the combination of what I had experienced**
19   **throughout the internship, just the escalating**
20   **behavior, the sexually hostile environment, him**
21   **rejecting the letter of recommendation.**
22        **And I had tried to persuade him afterwards,**
23   **I had tried to, you know, just really convince him**
24   **that I really don't understand his reasoning and**
25   **rationale as to why he was declining because I worked**

Page 131

1   **really hard, I put in all my hours, but he was**
2   **persistently declining a letter of recommendation, and**
3   **that was for me, like, the straw that broke the**
4   **camel's back.**
5 Q.  The declining of the letter?
6 A.  **Yes.  I worked really hard, put all my hours in.  I**
7   **had to redo my internship with Doctor Anthony Emmer**
8   **because letters of recommendation for medical school,**
9   **those have now actually become a requirement for some**
10   **medical schools.**
11 Q.  Did his decline to provide you with a letter result in
12   any form of argument between the two of you?
13 A.  **Yes.**
14 Q.  Tell me as best as you can recall what happened.  Was
15   it just one time that this was brought up?
16 A.  **No.  I had, I had mentioned this multiple times**
17   **throughout the internship that I've been working very**
18   **hard, I put in my hours, I'm learning a lot, I'm**
19   **scientifically inquisitive, that I, you know, earned**
20   **this letter of recommendation, and he just was**
21   **persistently declining and persistently getting more**
22   **hostile, his anger.**
23        **So as the culmination of the declining of**
24   **letter of recommendation but also being afraid of his**
25   **anger is why I had to leave abruptly.**

Page 132

1 Q.  Did the two of you ever discuss having the letter
2   written by someone else who may have been in the
3   vicinity or saw you and were able to observe some of
4   these qualities that you're describing?
5 A.  **No, he never mentioned that, but if he did, I would**
6   **not think that would be appropriate because I spent**
7   **most of my time with him, and he observed me in a**
8   **clinical setting.**
9 Q.  Did you have any sympathy or understanding for the
10   reasons that he didn't want to do it?
11 A.  **No.**
12 Q.  And you think that he didn't want to do it because he
13   didn't agree with your assessment of the quality of
14   your work or if he didn't want to do it for other
15   reasons?
16        MR. ALTMAN:  Objection, form.
17        **THE WITNESS:  He did not want to write me**
18   **a letter of recommendation as an obvious form of**
19   **retaliation because I declined his sexual advances.**
20 BY MR. KENT:
21 Q.  So he never explained to you that the reason that he
22   didn't want to write the letter was because he didn't
23   feel it was appropriate considering your past sexual
24   relationship?  Did he ever say that to you?
25 A.  **He did say that, but just given the totality of**

Page 133

1   **circumstances, I know that was not his -- I think he**
2   **was being untruthful when he had said that.**
3 Q.  Okay.
4 A.  **It was during my internship that I began to understand**
5   **that Doctor Schoenfeld has a reputation of having**
6   **anger issues, especially at work.**
7 Q.  Well, you shadowed him for twenty or so times, maybe a
8   little less.
9        Did you ever see that?
10 A.  **I saw his anger come out about the letter of**
11   **recommendation.**
12 Q.  But I'm talking about during the shadowing process.
13 A.  **Yes, I did see his anger.**
14 Q.  Other than OIE in early 2018, did you go anywhere else
15   to report all of these various things what you felt
16   was retaliation, what you felt was harassment.  In
17   that window of time, that two plus years before going
18   to OIE, did you share with any body of authority,
19   police, medical school, Dean's Office, anywhere, the
20   things that you're talking about today?
21 A.  **No.  OIE was the very first step I took towards**
22   **justice.**
23        MR. KENT:  Okay.  Thank you.  I'm all done.
24        MR. ALTMAN:  I have a few questions, and
25   I'll be very brief.



**Jane Doe**
**06/08/2023**                                                **Pages 134..137**

1 EXAMINATION BY MR. ALTMAN:
2 Q.   Jane, during the internship, you said you were exposed
3       to employees, is that correct?
**4 A.   Yes.**
5 Q.   You also said you were exposed to faculty, is that
6       correct?
**7 A.   Yes.**
8 Q.   You also said you were exposed to staff, is that
9       correct?
**10 A.   Yes.**
11 Q.   Did anybody ever ask you to show you an ID?
**12 A.   No.**
13 Q.   Did anybody ever ask you to show you a key card?
**14 A.   No.**
15 Q.   Did anybody ever question you as to what you were
16       doing there?
**17 A.   No.**
18 Q.   Did anybody ever ask you to fill out any -- if you
19       filled out any kind of forms?
**20 A.   No.**
21 Q.   The issue with respect to you talking about the --
22       John Doe telling you to tell somebody that he was an
23       uncle, did you tell that to anybody?
**24 A.   Not that he was an uncle, no.**
25 Q.   Well, that he was a family friend.  Sorry.

**1 A.   Yes.**
2 Q.   How many people?
**3 A.   One.**
4 Q.   Okay.  And who was that person?
**5 A.   Christine Marie Brazo.**
6 Q.   Now, during the internship if Doctor Schoenfeld --
7       sorry -- if John Doe told you to do something, would
8       you have done it?
**9 A.   Yes.**
10 Q.   Why?
**11 A.   Because he was in a position of power over me, and I**
**12       was afraid of his retaliation.**
13 Q.   After the internship ended, what, if any, difficulty
14       did you have talking to anybody in authority about
15       what took place?
**16 A.   Repeat your question again.**
17 Q.   After the internship ended, what, if any, difficulty
18       did you have talking about what took place with
19       anybody of authority?
**20 A.   I was afraid of retaliation.  I was also afraid of me**
**21       discussing what had occurred would affect my**
**22       application to medical school.**
23 Q.   Now, at the time you started the internship, you were
24       hoping to go -- were you hoping to go to University of
25       Michigan Medical School?

**1 A.   Yes.**
2 Q.   And did you tell that to John Doe?
**3 A.   Yes.**
4 Q.   And did you discuss it with John Doe during the time
5       that you had the internship?
**6 A.   Yes.**
7            MR. ALTMAN:  Nothing further.  Thank you.
8            MR. KENT:  All set.
**9            THE WITNESS:  Can I make some --**
10           MR. ALTMAN:  No.  What you can do is read
11 and sign.
**12           THE WITNESS:  Read and sign.  Okay.**
13
14       (Deposition concluded at 5:32 p.m.)
15
16
17
18
19
20
21
22
23
24
25

1 STATE OF MICHIGAN      )
                         )SS.
2 COUNTY OF LIVINGSTON )
3            CERTIFICATE OF NOTARY PUBLIC
4            I certify that this transcript
5 is a complete, true, and correct record of the
6 testimony of the deponent to the best of my ability
7 taken on Thursday, June 8, 2023.
8            I also certify that prior to
9 taking this deposition, the witness was duly sworn by
10 me to tell the truth.
11           I also certify that I am not a
12 relative or employee of a party, or a relative or
13 employee of an attorney for a party, have a contract
14 with a party, or am financially interested in the
15 action.
16
17
18
19
20
21
Cheryl McDowell, CSR-2662
22 Notary Public, Livingston County
State of Michigan
23 Commission Expires September 13, 2025
24
25

Jane Doe
06/08/2023

1

**0**

**0002** 114:16

**0008** 111:9 124:17

**1**

**1** 33:20,24 34:5 37:15 69:18 83:2
110:17

**15** 115:12

**16th** 124:14

**18** 28:13

**2**

**2** 33:20,25 34:5 64:6,7 77:12,13
111:5

**2013** 13:2,6 28:12,18 30:12 37:21
56:20 61:1

**2014** 102:4,13,15 103:2,12 104:2,
8,11,21 105:13,18 115:20,24
116:1,16,17

**2015** 35:2,5,12,19 41:25 54:7
59:6,7,14 60:24 69:21 70:2,21
78:25 81:11 88:6 90:1 98:21
101:23 107:13 115:21 124:14

**2016** 107:20,21

**2017** 30:15,17,25 31:1 46:18

**2018** 28:18 30:12 70:3 87:20 88:3
94:11 97:19 98:2,10 100:5
127:17 129:16 133:14

**2019** 13:2,6

**2021** 23:7,10

**2022** 21:20 23:13,24 24:2

**2023** 4:2 24:8,9

**21** 59:14

**2:11** 4:3

**2:17** 10:13

**2:35** 10:14

**2:38** 13:18,19

**2:46** 21:7

**2:47** 21:8

**3**

**3** 48:11,12,16 79:9 106:5

**3:34** 67:21

**3:35** 61:17

**3:36** 61:18

**3:44** 67:22

**5**

**5:00** 122:18

**5:09** 122:19

**5:32** 136:14

**5th** 114:21

**7**

**734 474-7328** 114:25

**8**

**8** 4:2

**8th** 114:22

**A**

**AAPD** 72:11,18

**abilities** 128:11

**ability** 6:24 69:22 121:11

**abroad** 112:9

**abrupt** 106:25

**abruptly** 131:25

**absolutely** 12:5

**absurd** 92:20

**abuse** 61:4,7,10 94:12

**accepted** 46:23 112:10

**access** 108:7,10

**accidentally** 128:12

**accordance** 12:15,17 55:8

**account** 11:16

**accounts** 10:20 11:13,21 12:8,
11,13,20 13:1,4

**accurate** 108:23

**acknowledge** 50:20 66:7 129:19

**acknowledgment** 45:11

**acquaintances** 8:5 9:17

**acting** 55:7

**actions** 43:11 44:2

**active** 97:13

**activities** 107:9

**actual** 35:24 108:4

**ad** 22:1,3

**address** 7:4 21:12 110:12,15

**administration** 57:21

**administrative** 106:1,16

**administrator** 57:22 58:6,10

**admire** 94:15

**admired** 105:1

**admission** 36:25 37:11

**admissions** 93:13

**advances** 95:15,22 130:9 132:19

**advise** 37:6,7

**advised** 77:10

**affect** 135:21

**affects** 6:16

**affidavit** 108:21

**afield** 23:21

**afraid** 88:13 91:17,20 92:24
117:13,14 122:11 131:24
135:12,20



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**afternoon** 114:23

**age** 16:21

**ages** 16:15,20,24

**agree** 36:8 45:10 55:4,5 57:15
87:6 98:13 99:13 128:22 132:13

**agreed** 74:21 101:16

**ahead** 46:10 68:20 85:13 87:18

**alarming** 119:21

**alerted** 108:8

**alive** 76:12

**allegation** 56:21 57:4

**allegations** 17:24 19:4,24 34:4
52:18,19 53:23 54:10 56:18 73:2
75:23 85:8,20 86:24 94:19
96:12,18 97:8 101:7

**allege** 71:6

**alleged** 18:15 49:6,24 51:22
65:14 70:20,22 74:13 78:4 81:23
84:18 88:1,12 90:9,13 91:5,13
95:1,17,23 100:19 101:16,23
102:10 104:11,21 105:21
106:17,23 110:12,22 117:5
120:12 127:3 130:12

**alleging** 38:24 75:2

**Allen** 29:17,25

**allowed** 54:19 96:21

**ALTMAN** 7:5,10,23 8:4,8,10,15,
21 9:7,10,14,25 10:6,12 11:3,8,
12,20 12:4,12 14:2,15 15:9,13,
18,25 16:2,17 17:15 18:8,20
19:6 20:13,18 21:2,12,15 23:1
25:4,11,14,17 26:15,19,25 27:4,
6,14,20 28:6,10 29:2 32:16,20
39:6,9,20 40:3,12,18,21,24 41:4,
15 42:5,17,24 43:12,15,18,20,24
44:16,18,23 45:1 46:8,10 47:1,5,
8 49:12,15,17 51:4,18,25 52:2,
13 53:10,13,17,19,25 54:12,17,
24 55:4,14,16,19 56:6,11,24
57:6,15,25 58:4,22 59:25 61:13
62:7 63:11,17 64:13,15,18
66:12,22,24 67:2,4,7,11,14,18,
23 68:5,8,11,15,22 69:5,8,12,15

70:12 72:19 73:5 74:5,14,24
75:9,15,19,25 76:4,7,16,21,23
77:1,3,9 80:3,6,18,23 81:1,14
82:25 83:5,8,16,23 84:12,19,23
85:5,11,22 86:4,11,14,25 87:6,
10,16 89:5,8,12 90:14 91:14,24
92:2,8,11,13,17 94:2,6 95:2
96:20,22 97:1,10,22 98:3,13,19,
25 99:3,6,11,15,18,21 100:10,20
101:3 102:18 103:7,15,21,25
106:11,14 109:8,12 110:19
111:10,14,23 112:1 113:18
116:13 118:15,23 120:20 122:8,
17 124:15,18 126:1,4 127:5,9,
12,19 128:5,25 129:10 130:1,5,
15 132:16 133:24 134:1 136:7,
10

**amended** 26:4,23,25 27:4 33:25
61:22 65:16 129:21,22

**amount** 53:3

**anger** 131:22,25 133:6,10,13

**Ann** 4:1 13:25 71:25 126:15

**answering** 5:8 47:2 68:9 77:7
84:4,25 98:8 121:13

**answers** 4:21 9:24 26:12,21,23
34:4 64:7,10,16 120:5

**Anthony** 46:12 51:11 131:7

**anticipated** 24:8

**anymore** 30:2 106:19

**anyone's** 117:10

**apartment** 21:22,25 22:6

**appearance** 53:5 123:11,14

**application** 37:10 40:23 41:8
44:6,8,10 46:20 112:13 135:22

**applies** 38:20

**approach** 71:2

**approved** 60:19

**Arab** 24:15

**Arbor** 4:1 13:25 71:25 126:15

**area** 13:21,25 14:14 15:21

**argument** 131:12

**arm** 82:17

**arrival** 45:22

**arrived** 82:2

**as-needed** 31:6

**Ashley** 15:1

**asks** 60:23 65:6

**aspects** 61:22

**assault** 18:16 53:23 54:6

**assessment** 132:13

**assuming** 29:20

**attached** 33:21 48:13 89:2

**attachments** 34:2

**attack** 38:15,16

**attacking** 39:4

**attempt** 38:16

**attend** 115:10 117:9

**attention** 117:10

**attest** 26:13,21

**attestation** 26:10 41:6,7 45:8
49:10,21

**attestations** 44:14,21 45:5

**attested** 27:8

**attorney** 4:22 13:13 24:25 25:5
70:9

**attorneys** 25:8

**attractive** 123:20

**audible** 5:16

**August** 81:11 88:6 90:1 109:17

**authority** 58:20 62:12 133:18
135:14,19

**authorized** 55:3

**autism** 20:8

**avoid** 62:15,17,19,23 63:2,5,23,
24



aware 47:12,16,17 79:14

---

**B**

**B-I-L-L-I-N-G-S** 29:6

**back** 10:14,15 13:19 17:6 21:8,9, 13,17 24:2 26:18 44:15 46:19 55:23 61:3,18,19 67:22 68:3 69:17 76:11,20 82:17 92:19 104:18 105:17 106:11 107:2,22 119:12 122:19 123:18 124:7,8 128:15 131:4

**background** 45:21

**badge** 41:9 74:17

**bar** 67:8

**based** 50:9,10 52:7 80:22 81:9 85:12 102:23 107:23 118:14,17

**basis** 30:1,16 31:6 80:21 121:6

**basketball** 125:5,12

**Bates** 124:15

**bear** 27:20 83:5,23

**began** 81:12 82:11 115:11 119:4 133:4

**begin** 5:12 23:6

**behalf** 50:7

**behavior** 23:4 81:15 101:9 110:21 115:11 119:2,3 130:20

**belief** 50:9,10 77:10 80:21 96:15 118:12

**believed** 28:3 42:21 46:24 47:4 51:15 52:10,12 58:19 71:12 80:2,14 81:5 89:15 102:23 103:22 104:1

**believing** 52:10

**benefit** 96:24

**big** 129:3

**Billings** 29:3,7,14 30:6,14,21 31:4,13 32:13 33:5

**Bipolar** 33:13

---

**bit** 5:19 23:21 82:22 109:6

**blank** 50:18

**bless** 87:18

**blood** 13:23,24 14:1,5

**boast** 83:20

**boasted** 84:7

**body** 133:18

**booked** 126:14

**bootstrapping** 86:14

**bottom** 52:22 77:14 111:6 114:15 124:16

**braid** 123:19

**bravely** 94:16

**braver** 119:19

**bravery** 94:15,17,23

**Brazo** 60:9 135:5

**break** 6:6,9 15:24 59:8 61:13,15 66:22 109:3 115:13 121:25 122:16

**breaks** 23:12

**bright** 50:24

**bring** 39:23 117:10

**broader** 36:2,11

**broke** 61:21 71:18 131:3

**brother** 15:1

**brought** 72:14,24 73:16 125:25 131:15

**Brown** 109:23 112:9

**brushed** 115:7

**buzzed** 108:14

---

**C**

**cafeteria** 82:1,6

**calendar** 107:4,5,8 108:11

**call** 10:8 55:6 61:2 67:7 105:21 115:6,7

---

**called** 38:9 87:12

**camel's** 131:4

**campus** 125:13

**capacity** 104:15,24

**card** 74:17 108:13 134:13

**care** 27:17,19 28:7,12,17,19,20, 21 29:19,21 30:5 31:12 32:14 36:18 44:3 45:21,23 50:10 51:2 78:20 80:1 121:5,7,14,18

**cared** 121:23 122:2

**career** 34:20 71:15 93:24

**caressed** 82:17

**carriers** 13:5

**carry** 129:6

**case** 4:18,20 5:23 11:5,13,15,17, 22 16:8 19:4,17,24 26:2 27:22 38:19 42:16 70:20 73:20 76:12 86:8 94:14 98:23,24 128:17

**cases** 38:20

**casual** 83:21

**catch** 63:16

**category** 127:3

**caused** 81:23 102:16 115:21 116:6

**celebration** 106:21

**Center** 44:3 82:5,7 114:24

**Centers** 50:4

**chair** 57:21 58:6,9

**chance** 60:4 111:11 129:22

**changed** 27:5,6 105:10

**characterize** 35:22

**check** 45:21

**cherrypicking** 98:15,17,19 103:10

**Cheryl** 4:20 5:2,15 92:20 104:18

**chest** 82:18


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

**choice** 20:21 122:7

**chose** 93:22

**Christine** 60:9 135:5

**circumstances** 22:4 43:4 119:20
  133:1

**city** 14:14 46:15

**civil** 38:19,20 74:3

**claim** 74:18,22 104:8

**claiming** 100:12 102:24

**clarification** 127:5

**clarified** 116:5

**class** 19:12

**classes** 24:10

**clean** 69:2,10

**clear** 6:15 25:4,11 82:21

**clearances** 105:25

**client** 39:1

**client's** 69:11

**clinic** 82:4

**clinical** 29:8 32:13 34:23 70:15
  108:3 132:8

**close** 14:18 20:7,10 88:2

**closed** 128:17,18

**closer** 18:2

**closest** 18:4 19:21,22 20:5,12,
  16,24

**clothes** 63:5

**code** 41:5 44:14,21 45:6 49:10,
  21 50:14

**collaborative** 71:1

**combination** 80:8,11 82:17
  130:18

**comment** 85:1 114:4 123:11
  124:5 125:10,20,22 126:10
  127:18 128:3

**comments** 81:19 82:15 113:6,8
  114:10 123:23

**committees** 93:13

**common** 34:22 37:5

**communicated** 72:3

**communications** 70:11

**community** 94:13,17

**compel** 12:3

**complaint** 18:16 26:2,4 33:25
  38:5 39:9 52:18,19,21 53:2
  56:16,18 57:5,6 59:23 60:19
  61:23 62:24 63:9,14,19 65:16
  67:9 69:17 75:24 83:3,13 84:7
  85:19 86:1,9,13,24 87:23 88:9,
  10 94:1,20 97:18 99:22,24
  122:22 129:22

**complete** 44:6,8,10 45:5 49:6,24
  67:24

**completed** 5:12 40:23 47:13 96:7

**completely** 56:9

**compliance** 44:12 45:18,21
  51:12

**compliant** 51:14

**comply** 45:11

**complying** 45:6

**concluded** 136:14

**conclusion** 113:11 128:1

**condition** 32:3,14

**conditions** 28:1

**conduct** 41:6 44:14,21 45:7
  49:10,21 50:14 96:1 97:12
  122:23 123:1

**conducting** 96:15

**conference** 73:19

**confidential** 8:16 9:1 10:2

**confidentiality** 8:22 10:7 20:14,
  21

**confined** 11:14

**confirmation** 45:9 48:7

**confirmed** 113:1

**confirms** 47:22 48:1

**connected** 22:3

**connecting** 40:8 125:21

**connection** 35:1 41:9 54:18,21
  74:13 100:6

**considered** 93:18

**consistent** 31:2 86:4

**contact** 88:4 98:1

**content** 113:16

**context** 56:4 79:2 104:3

**continue** 61:24 129:14

**continuing** 91:4

**continuously** 23:10 24:4

**control** 58:8 62:11 66:5

**conversations** 16:22 17:23
  19:16

**convince** 130:23

**copying** 112:9

**correct** 13:10,14,15 14:19 16:10,
  13 24:12 25:6 34:9 36:6,18
  37:22 39:18 44:22,25 45:14,16,
  25 51:24 53:24 54:7 56:3,5
  59:18 62:15,18 68:11,13,15
  74:24 75:3,10,18 76:6 78:8 79:4,
  13 80:16,17,22,25 81:7,9 82:25
  83:13 87:21 90:21 91:10,16 94:4
  96:7,10,12 101:2,19,24 116:12,
  25 117:6 118:22 119:15 134:3,6,
  9

**correctly** 4:10

**counsel** 68:2

**count** 23:25 25:12

**counted** 107:2

**counts** 23:24

**couple** 116:20

**courage** 94:23

**court** 4:14,20 8:9 17:8 27:22
  38:18 39:12 40:13 41:1,17 53:15
  54:13 56:13 57:7 86:16 87:11



92:21 95:3 97:23 98:4,14 99:13
102:20 104:19

court's 100:14

courtesy 5:11

covered 31:11

covet 120:18,23

crack 112:24

created 124:1

credibility 52:10

critical 102:24

CRT 39:17

culminated 106:23

culmination 131:23

current 41:23 112:12

### D

D.O. 46:12

dad 14:10,21,22

damaged 103:5

date 24:8 124:11

day 25:22 36:25 41:16 80:15 81:6
106:18 114:22 126:6

day-to-day 107:9 121:6

days 24:21 108:5,12 115:15

deal 129:3

Dean's 133:19

debate 99:5,7

deceit 65:11

deceive 66:3 90:23

December 24:9 115:15,24

decide 73:24 97:2

decided 53:4 54:9

decline 38:11,12 131:11

declined 96:13 132:19

declining 130:7,9,11,25 131:2,5,

21,23

decreased 30:22 31:3

defend 8:23 10:7

defendants 4:18

defense 98:22

define 28:19 34:19 65:11,24,25
66:2,18 90:17,18

defines 35:8

definition 90:22

degree 50:23

delusion 33:9

denied 95:21 99:2

deny 58:20 89:23

department 57:22 58:9,10 71:25

depends 66:2,18 67:20 107:11

depose 87:1,14,16

deposition 4:8,24 5:20 6:13,20,
22,23 10:18 23:20 24:20 25:2,9
26:23 33:20 48:12 53:14 57:7
64:21 72:13 73:13 74:3,6 76:11
90:17 120:4 136:14

describe 35:11 128:19

describes 34:25

describing 122:22 132:4

destroyed 103:5,18

detail 52:25 81:22

details 52:22 85:10 115:1

detective 72:1,4

determine 26:13

develop 85:16

diabetes 32:20

diagnosed 32:24 33:4,8

diagnosis 32:14

dialogue 94:12

diaries 108:11

diary 107:5

differentiation 66:20

difficult 6:2 23:15

difficulty 135:13,17

directly 48:5 73:9 114:8

disagree 55:5 57:16 87:7

disclose 122:7

discover 38:6

discovering 89:4

discovery 26:6 34:1 52:8 54:21,
25 56:12,25 65:13 77:25 86:16
87:11

discuss 39:25 42:19 94:12
112:13 115:1 132:1 136:4

discussed 16:8 101:19 112:11

discussing 98:21 105:17 116:2
135:21

discussion 86:3

discussions 101:24 102:2
104:12,21

dismiss 73:20

disorder 20:8 32:25 33:17

disorders 33:9

dispute 27:7

Distant 20:4

distinction 66:20

doctor 29:3,5,7,14,17,25 30:6,14,
21 31:4,13 32:13 33:5 34:24
35:2,23 36:21 37:21 38:4 39:17
40:10,15 41:10 42:13,19 45:12
46:12 48:3,6 51:10,23 52:24
53:4,24 54:22 57:11 58:25 59:5,
20 62:6 70:23,24 71:3,5,6 72:25
75:13,18 79:19 93:15 94:13
97:19 98:2 101:14 103:6 108:17
121:9,25 122:23 131:7 133:5
135:6

doctors 46:4,6

document 27:9 49:1,9,20 50:3

documentation 47:21



Jane Doe
06/08/2023

6

documents 24:22 34:5 64:15
70:8 79:9 127:25

Doe 4:4,8,10,17 7:3 28:1 35:17,
18 38:4 41:18 42:12,14,23 43:1,
7 46:24 53:4 56:1 60:5,22 61:4
62:9 71:5 73:8 74:12 77:13 78:5
83:11,17 97:16 106:22 112:4,16
113:24 114:1 122:1 125:4
134:22 135:7 136:2,4

Doe's 56:19

dollars 53:3,9

door 98:8

dot 124:20

double-check 46:15

draw 113:11

drugs 31:20,22,24 32:1

Dubai 24:15

due 38:11 88:22

duly 4:5

---

**E**

E-M-M-E-R 46:16

earlier 65:24 72:24 79:8 115:19
116:4,15 120:3

early 61:5 87:20 88:3 94:11
100:5 133:14

earned 131:19

ECR 70:3

ECRT 69:20

educated 19:1

education 20:9 23:4

educational 23:17 34:17 117:1
121:11 124:1

effect 89:10

effectively 103:25

eighteen 37:15,18,24

elaborate 71:22 72:16 73:3

elaboration 72:17

elevators 82:10

email 26:17 41:8 47:20 48:3,4
110:11,15 111:21 112:9,17,25
113:1,3,7,14,15 114:9 115:16
116:10,24 117:12 118:17 119:8,
9,13,14,17,21 123:7 124:7,8,14
125:25

emails 34:6 59:19 110:25 111:2
114:11 129:8

Emirates 24:15

Emmer 46:12 51:11 131:7

emoji 112:18,21 113:12,23 129:8

employee 78:14 97:14

employees 43:7,10 58:15,17
134:3

employees' 44:1

encounter 53:5 93:22 129:15

encountering 94:22

encounters 30:14

end 24:4 39:21 81:11 106:13

ended 117:3 135:13,17

endoscopies 114:22

enforcement 94:24

engaging 122:25

enrolled 24:4

entire 57:6 80:12 128:13

entitled 38:23 41:12 56:25 57:8
87:7,8

environment 23:18 36:22 117:1
118:4,8 119:6 124:1 130:20

Equity 69:19

eroded 116:7

error 26:15

escalate 115:11

escalating 130:19

essentially 62:5

establish 11:22 43:14

established 17:4

estimate 109:7,10

evaluation 88:22 89:16,17

event 106:22 118:4

eventually 95:25

everyday 107:12

evidence 4:15 47:24 125:3
128:23

exact 70:5

examination 4:16 90:11 134:1

examined 4:5

examples 93:12

excuse 4:14 100:1 125:15

exercise 27:11

exhibit 33:24,25 37:15 48:12,16
64:6,7 77:12,13 79:9 83:2 106:5
110:17 111:3,5

exhibits 33:20 62:21 64:8

exist 12:13,21,22 35:23 107:18,
19,23

existed 13:1 38:6 70:20

existence 11:4 28:3 38:3 79:14
89:4

exit 81:23 106:18,25

exited 86:2 130:4,6

exiting 91:13 106:17 130:12

expectation 70:21

experience 34:22 80:12 113:2,
13,21,22,24 114:1

experienced 23:17 61:4 94:18
130:18

experiencing 117:3

explain 45:8 60:13 81:21 119:8
120:14

explained 132:21


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

explaining 71:19

explore 23:21 52:18 54:20 55:2
57:1,8 79:11

exposed 134:2,5,8

extent 12:13 73:6

eyes 83:6

### F

face 80:1 108:18 124:21 125:17

Facebook 13:6

facilities 36:18 43:1 78:19

fact 72:25 116:24 128:1,20

faculty 43:3 78:22 80:10 134:5

fair 6:10 21:2 25:15,16 35:19
79:25

faith 102:8,12,17,22 103:1,6,11
104:7 105:10 115:22 116:6

fall 21:20 23:7,10 24:2 39:7 97:8
102:4,12,15 103:1,12 104:2,8
105:13,17 115:24 116:1,16
127:3

false 57:5 69:11

falsity 86:13

familiar 46:21

family 9:17 13:21 24:16,18 60:6,
24,25 62:10 65:7,10 66:5,7 71:8,
13 74:7 134:25

feared 122:13

February 56:20

federal 4:14,15 38:18

feel 6:12,19 39:24 81:12 82:3,11,
14 117:1 118:20 119:4,13
123:24 127:24 132:23

feeling 91:8 118:14

fell 96:19

felt 60:25 80:21 89:21 90:2
105:16 115:9 116:12,24 117:9,
11,16,24,25 118:3,18 119:2,5

123:12 133:15,16

field 93:15

fifteen 38:7

fifty 53:3,8

figure 62:12

file 12:2 94:23 127:25

filed 60:19 63:14

fill 79:20 105:24 106:8 134:18

filled 50:6,9 134:19

final 53:3

financial 52:23

find 70:13 79:15 119:21 123:3

finding 96:11

fine 10:9 14:15 69:8,15 73:11
77:3

finish 5:10 42:5 43:12 47:1

firm 25:5,15

fit 35:11

fix 63:16

floor 82:1,6,7,9

fly 74:4

focus 90:10

FOIA 72:18

FOIA'D 72:9

follow 73:4 87:14

foot 101:22 105:8

forever 73:23

forgot 112:18

forgotten 128:12

form 18:21 19:6 42:24 46:21,22
47:12,16,17,18,20 50:5 51:5
52:2 58:1 62:7 63:11,17 66:12
75:15,19 76:7,16 80:3,6,18,20,
23 83:24 90:14 91:14 94:2,5
95:12 105:24 106:4,6 109:8
113:18 116:13 118:23 120:20
122:8 127:19 128:5 129:11

130:5,8,15 131:12 132:16,18

formal 46:5 96:7,8,14 97:12

formalized 106:19

formally 79:21

forms 50:9 51:9,11,13 79:19
134:19

forms' 79:14

forty-five 99:24

forty-four 100:1,9,18 101:1

forty-one 83:4 85:8

forward 129:17

found 59:12 127:4

foundation 28:6 32:16 43:24
51:19 58:22 70:12 76:21,22 89:8
129:1

foundational 39:2 76:25 86:20

fourteen 99:20

frame 98:21

free 39:24

frequency 30:21 31:1

frequently 30:13 31:4 59:18

friend 20:12,25 21:11,17 22:14
60:6,24 61:1 62:10 65:7,10 66:5,
7 71:8,13 74:8 134:25

friends 8:5 9:18 20:10,16,24

front 33:23

full 7:1

functional 9:23

future 77:8

### G

gain 36:25

game 125:5,12,17,18,22 126:7,
17

gastro 29:17

gastroenterologist 29:18,19


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

Jane Doe
06/08/2023
8

93:17

gastroenterology 93:16

gave 55:22,25 57:18 68:12,14
71:3 75:2 77:21,23 78:13 79:5
92:18 94:17 101:12 102:25
103:8 109:5,12

GI 82:7

girls 94:16

give 6:13,19,22,23 7:24 8:10,24
9:1 14:2 19:8 20:13 29:2 30:12
33:7 37:15,17 59:25 67:23,25
68:3 73:24 82:2,3 87:13 93:12
120:8,10,14

giving 7:6 69:2

glad 5:14 112:7

God 87:18

good 6:7

good-bye 106:22

goodness 54:16

grades 112:8

graduate 50:23

graduation 24:8

grammar 60:17 63:12,25

grammatically 62:3,18

grant 58:20

greater 79:2 129:7

groom 61:7

grooming 61:3

ground 4:23 5:15

guess 19:1 23:24 24:1 59:10
66:2 81:21 114:13

guys 102:5 105:16,20

**H**

hair 123:17,18,19,21

hand 4:9 48:15

Hang 110:19

happen 22:3 116:5,11 118:5

happened 11:16 37:4 69:13
81:22 83:25 86:10 94:16,25
103:4 105:9 115:19,23,25 116:7
128:20 129:15 131:14

happening 98:9

happy 8:24 114:20

harass 97:20

harassed 90:2 91:8 116:24
117:25

harassing 110:21 111:21 112:24
113:17,25 114:12 115:2,3
116:10,12 117:12 118:18 119:9,
13,23 122:25 123:10 126:9,11

harassment 96:19 97:9 98:23
113:2 117:4 128:14,24 129:5
133:16

hard 89:24 131:1,6,18

hater 112:15 114:4 124:20
125:16

head 5:16 58:10

health 23:3,4 27:17,25 28:7,17,
19 29:21 31:12 32:3,14 36:18
44:3 49:10,20 50:4 79:3 80:10

hear 112:8 127:9

heard 34:9

heart 40:9 75:3

helps 34:19

hey 121:25

Hide 120:24,25

HIPAA 41:6 44:12 45:18,21,24
46:5 49:2 50:13,14 51:11 108:8

history 38:16

Histrionic 33:17

hold 7:5 11:3 40:25 42:5 43:12,
20 46:8 47:1 49:12 51:4 52:13
64:13 66:23 69:2 88:2 96:20,22
102:18 109:11 111:10 123:3
129:10 130:1

home 7:4

hope 128:15

hoping 135:24

hospital 35:24 36:14,22 43:1
49:7 50:8 59:4 63:8 101:18
102:10 105:8

Hospitals 50:4

hostile 23:17 82:20 88:11 117:2
119:6 124:1 130:20 131:22

hotel 126:14,16,24

hour 14:18

hours 89:24 131:1,6,18

hug 82:2,3,19

hugs 82:18 95:16

hundred 53:3,8 70:8

**I**

ID 74:17 134:11

identified 118:17

identify 20:24 117:4

idle 10:23

immediately 24:21

impact 71:15 121:10

impacted 88:22 89:17

impairing 25:21

impairs 25:25

important 5:6 28:5 39:3

inappropriate 81:16,19,22 82:15
113:6,7 114:10 123:4,12,23
125:10,20

inartfully 61:23

including 34:4

incorrect 52:1 55:6 59:22

increased 30:22,23

incredibly 23:15

indication 120:9,10



infer  65:3

informal  96:15 98:7

informally  45:12

information  8:2,25 16:16 45:10
  51:2 87:13 128:10,13 129:4

informed  95:25 98:10

initial  97:18

inoculations  106:7

input  4:22

inquire  123:11

inquisitive  131:19

Instagram  13:6

instance  31:13 105:23 117:4

Institutional  69:19

instruct  11:8 12:15 27:23 39:14
  52:6 53:15 54:14 56:14 60:22
  61:2 73:11 75:16,20 76:8,17
  84:2 85:5 95:4 97:24 98:5
  100:15 102:20 103:7

instructed  39:22 40:3 53:19 60:5
  65:15,18 71:7 75:9 81:25 99:7

instructing  8:19 9:5 20:15,18
  74:25 84:14 85:13 86:7

instruction  74:15

intend  37:12 87:15

intent  65:11 90:23

intently  66:3

interacting  43:2,3 78:22

interaction  120:3

interactions  77:22 78:1 80:9,16,
  20 81:6 97:15 114:7

interested  93:18

interests  93:17

intern  42:7,9 46:23 47:14 48:8
  70:1 84:1,13,14,17,18,24 85:2
  101:23 121:7

internship  18:17 28:4 34:7,15
  35:4,8,17 36:12,19 37:3 40:23

42:1,10,22 43:4,6,7,8,14 44:2,4,
6 47:22 48:1 49:7,25 50:11
51:10,14,22 52:11 54:9 55:25
57:18,23 58:11,14,17,21 59:1,21
62:12 63:6 65:14,25 66:6 69:21,
23 70:10,14,16,22 71:3 74:13,
18,21 75:2,6 77:22 78:4,13,25
79:5,23 80:14 81:7,24 82:24
85:13 86:5,6,9,10 88:1,12,25
89:25 90:3,6,9,13 91:5,7,13 92:7
94:21 95:1,17,18,23 100:19
101:1,17,20 102:10,25 103:13,
16 104:3,11,14,21,24 105:4,12,
21 106:17,23 110:12,23 113:5,
14 115:9,11,12,21 116:2,3,23
117:3,5,20 120:12,19 121:12
122:5 127:4 128:13 130:4,6,13,
19 131:7,17 133:4 134:2 135:6,
13,17,23 136:5

interpretation  55:20 116:15

interrogatories  125:2

interrogatory  26:7 64:7,9 120:5

interrupt  5:9

interrupted  32:23

interview  41:6 106:18 128:9,11

investigation  72:8 73:21 96:1,2,
7,8,11,14,16 97:7,12 98:7,11
128:18

investigators  39:16

involve  73:7

involved  101:14 106:16

involvement  57:11

involving  86:5

IOE  98:20

issue  63:12 72:25 134:21

issued  27:22

issues  30:1 40:5,13 41:16 42:17
133:6

items  107:21

IX  41:11 70:3 87:20 88:4 94:18
95:25 96:5 98:24

## J

Jane  4:4,8,10 7:3 15:18 16:2,17
  17:15 18:8 35:17,18 46:10 53:17
  55:16 72:19 106:22 122:1 126:1
  127:9 134:2

January  88:3 97:19 98:2,9
  114:21,22 115:12 127:17

Jastrzembowski  4:19

jeopardy  10:4

job  44:10 69:13

John  29:17 38:4 42:12,14,23
  43:1,7 46:24 53:4 56:1,19 60:5,
  22 61:4 62:9 71:5 73:8 74:12
  78:5 83:11,17 97:15 112:4,16
  113:24 114:1 125:4 134:22
  135:7 136:2,4

joke  126:20

journal  107:12

journaling  107:13

journals  108:11

journey  119:19

judge  5:21 10:8 39:24 40:6 55:6
  74:6

judge's  12:16,18 20:19 52:7 55:8

jump  79:18

June  4:2 98:10 109:16,18

jury  5:21

justice  133:22

## K

Keith  67:5

Kent  4:7,12,16,17 7:9,11 8:1,5,
  12,18 9:4,8,13,15 10:3,10,15,16
  11:6,10,14,23 12:6,7,17,19
  13:16,20 14:4,17 15:10,20 16:1,
  3,19 17:6,10,18 18:12,24 19:9
  20:15,22 21:3,6,9,10,14,16 23:5
  25:6,7,13,16,19 26:17,22 27:2,5,
  12,15,24 28:9,11 29:4 32:18



33:1,22 39:7,15 40:1,7,16,19,22, 25 41:2,5,19 42:6,8,15,20 43:5, 13,16,23 44:5,17,20 45:2 46:13 47:3,7,10 48:10,14 49:14,18,19 51:7,19,21 52:9,14,16 53:22 54:3,15,18 55:1,12,21,23,24 56:8,15 57:3,14,17,19 58:2,5,7, 23 60:2 61:16,19,20 62:13 63:13,21 64:14,17,19 66:13,23 67:1,3,5,10,12,16,19 68:1,7,9, 13,17,19 69:1,6,10,13,16 70:18 72:23 73:15 74:11,16 75:1,11, 17,22 76:1,3,5,9,18,22,24 77:2, 5,11 80:4,13,19,24 81:4,17 82:21 83:1,7,10,19 84:5,16,21 85:3,7,15,18,25 86:8,12,17 87:3, 8,13,19 89:6,9,13 90:15 91:15 92:1,3,10,12,15,19 93:1,3 94:3,9 95:6 96:23 97:4,5,17,25 98:6,15, 22 99:1,4,9,12,17,19,23 100:16, 21 101:5 102:22 103:3,10,17,24 104:4,6,18 105:5 106:13,15 109:9,15 110:20 111:12,17 112:3 113:19 116:18 118:16,24 120:21 122:9,16,20 124:22 126:8 127:7,15,23 128:6 129:2, 12 130:3,10,16 132:20 133:23 136:8

**key** 134:13

**kind** 16:20,21 34:6 41:8 94:24 104:13,23 111:24 115:7 134:19

**kindergarten** 19:12,13

**kinds** 55:9

**knew** 28:2 56:2,4 61:5 121:5,7, 15,17

**knowledge** 38:21 88:23 89:17 96:10 98:23

**L**

**laid** 28:6

**language** 123:1,5,7 127:2

**Larry** 94:13

**law** 39:8 94:24 99:1

**laws** 38:11,17

**lawsuit** 17:23,25 18:16 75:3,13 128:1

**lawyer** 77:4

**lay** 51:19

**leadership** 37:9 58:6

**leading** 79:17

**learn** 70:7 73:17

**learning** 131:18

**leave** 50:18 114:2 131:25

**leaving** 24:12 90:5,8,13,21,24 91:19 92:23 106:25

**led** 38:25

**left** 88:1,6 90:1,3 91:6,9 92:7 107:16 109:16

**legal** 77:4

**lesser** 129:7

**letter** 47:21 88:17 89:16,23 95:7, 13,21 130:7,11,21 131:2,5,11, 20,24 132:1,18,22 133:10

**letters** 131:8

**letting** 45:16 99:10

**lie** 60:5,22 62:4 64:2,3,22,24 65:4,8,11,14,17,18,19,23 66:1,2, 8,14,18 71:7,12 90:17,19,22 93:4 120:4,6

**lied** 66:14 90:12 120:6

**life** 6:1 9:23 123:12,17

**light** 26:23 27:1 61:11

**limitation** 86:15

**limitations** 102:19

**limited** 11:18 36:13 54:20 56:12, 25

**limits** 97:23 98:4,14

**Linkedin** 11:2

**list** 20:23

**Listen** 67:7

**live** 7:18,20 14:12,23 15:4 21:4, 22

**living** 21:23

**lodge** 73:5

**long** 21:19 22:22 73:7 82:18 102:7 123:17,18

**longer** 24:7 76:11,13

**looked** 24:22 25:23 26:2,4 50:13 79:9 120:4 123:20

**lost** 75:13

**lot** 8:2,6 9:18 68:17 107:11 128:10,13 131:18

**lower** 82:17 108:25 109:6

**M**

**M's** 69:18

**made** 17:24 19:4,25 53:23 54:10 56:17 75:24 76:2 82:3,13 86:23 87:23 88:3 97:8 114:10 123:23, 24 125:10,20

**main** 91:9,12 92:7

**maintain** 53:5

**majority** 109:1

**make** 6:1,2,15 18:25 31:11 38:1 40:19 41:3 44:3 50:22 55:7 59:9 62:20 66:20 68:1 79:12 81:12 82:11 85:20 87:8 88:8,10 94:1 96:11 97:18 99:16,17 111:23 136:9

**making** 52:15,17 113:5 115:4

**man** 29:9,10 51:15 54:18 102:17 103:19

**management** 58:9

**mania** 33:11

**Marie** 135:5

**mark** 8:16,25 48:10

**marked** 33:20 34:5 48:12,15

**married** 7:12,16

**Master's** 23:8

match 108:3,5

matter 11:5 27:13 47:5 73:8
97:24 98:4

matters 86:23

Matthew 15:1 18:11,13 20:5

MCAT 37:7 90:10 91:1,4

meanings 34:13

means 25:5 34:12 55:2 66:10
86:18 92:16 94:5

meant 73:3 113:24 126:20

med 112:12,14

media 10:20 11:13,21 12:8,10,
13,20 13:1,4

medical 28:21 37:1,11,12 71:1,
16 78:23 80:11 93:13 109:24
112:10 114:24 131:8,10 133:19
135:22,25

medication 6:16 25:21,25 32:1,2

medications 32:10

medicine 31:14 47:15 48:7,17,20
70:1 71:4 74:17 93:21 101:22
110:7 118:4

meet 21:21,23

meeting 22:5

Melanie 15:7,11,19 17:9,11,12,14
18:6

Melissa 17:5

membership 125:14

memo 47:21

memorialize 79:22

memory 6:16 24:23 25:21 26:1
124:4

mental 27:25 29:21 31:12 32:2,
14

mentee 78:16

mention 128:12,14,16

mentioned 5:2 16:5,9,12 124:3,
25 131:16 132:5

mentioning 71:20

mentor 36:25 46:23 47:14

mentor/mentee 78:11

mentored 83:20

mentoring 84:7

mentorship 18:17 28:3 34:7,18,
19 35:3,7,18,23 36:2,11,20 37:3
44:4,8 47:22 49:7,25 56:4,10
65:24 78:25 104:14,24 124:25
125:11,15,21 126:14

mentorships 37:5

met 21:24 22:4,10 37:21 38:7,23,
24 39:5,10,16 41:14

Michigan 4:1,14 12:15 13:23,24
14:1,5,16 15:3 23:3,16 35:5
36:23 37:1 38:17 40:14 41:23,24
42:2,22 45:7 47:15 48:5,7,16,20
49:9,20 50:3 52:5 55:11,25 57:2,
9,12,24 58:12 70:1 71:4,16 73:9
74:10,17 77:16 78:14,16,17,18
79:3 80:10 84:1 85:24 89:25
93:14 97:14 101:22 109:25
110:1,6,7,14 117:2 118:4 135:25

Michigan's 125:13

mid 81:11

middle 68:2

mind 6:17 113:11,13 118:7 120:7

mine 25:12 61:6

minute 40:11 61:14 91:23

misinterpreting 86:17

misunderstanding 55:2

mom 14:8,11

Monday 114:21

money 22:18 40:10 51:23

months 73:22 119:12

motion 12:2 55:7 73:20 85:17

motive 91:19,21,23 92:23

mouth 36:9

move 74:15 92:2,9,14 99:8

moving 22:11

MSU 112:15,18,24 114:4 124:21
125:5,16,17

multiple 131:16

---

### N

naive 50:24

named 4:20

names 8:7 9:20 12:10 14:2,3
15:9,16 17:4 18:9 20:13 27:18
28:17,24 29:2 30:3 77:23

narrow 86:18

Nassar 94:13

nature 13:7 40:8 78:8 121:16

needed 32:6 79:12 90:10 119:6

needing 91:1

neglected 106:4

nervous 5:19

new-found 94:22

Nicole 7:3

night 63:20

nods 5:16

non-attorneys 25:9

normal 63:5 119:3

Nos 33:20

note 39:23 68:1

notes 39:17 107:14,15 108:3,11

notice 4:13

notion 87:4

number 65:12 67:16 109:5,11
114:15 124:15

numbers 111:6

nurses 58:18

nutrition 93:19



Jane Doe
06/08/2023

12

## O

**Oak** 46:16

**oath** 4:6 8:13,25 9:2,22 27:3 64:20 65:13,17,22,23 66:11 68:14 72:11,12 91:7

**object** 11:3 12:12 27:21 47:8 83:24 97:2,22

**objection** 18:20 19:6 27:25 32:16 42:24 43:15,24 51:5,18,25 52:2 53:10 54:12 56:6,11,24 58:1,22 62:7 63:11,17 66:12 70:12 73:6 75:15,19,25 76:7,16,21,25 80:3, 6,18,23 89:5,8 90:14 91:14,24 92:8 94:2 95:2 103:11 109:8 113:18 116:13 118:15,23 120:20 122:8 127:19 128:5,25 129:1,10, 11 130:5,15 132:16

**objectionable** 127:4

**objections** 4:22 52:15,17 87:9

**observation** 34:23 70:15,16 78:8 108:3

**observations** 71:19

**observe** 132:3

**observed** 132:7

**observer** 48:21 50:4,8

**observers** 48:17

**observing** 70:23,25

**obvious** 130:8 132:18

**Occasionally** 31:5

**occur** 79:21 101:1

**occurred** 54:7 56:20 100:18 101:2 102:3,15 104:12,22 111:22 125:12 135:21

**offensive** 126:10,11,23

**office** 29:11 58:10 69:18 87:20 88:4,9 95:25 96:5,17 97:6,19 100:5 114:23 133:19

**official** 35:4 48:2 79:13

**OIE** 70:11 97:6,19 98:6,7,16 101:6,10 127:17 128:16 133:14, 18,21

**oldest** 17:21

**ongoing** 29:13

**online** 38:8,9,14 79:18

**open** 114:2

**opened** 98:8

**opening** 97:7

**operative** 38:14

**opportunities** 37:9 59:13

**opportunity** 5:22 6:1 34:17 44:4 47:23 69:2,7,24 121:11 128:15

**order** 12:16,18 27:22 42:15 49:13 53:14

**organize** 106:13

**original** 86:13

**outing** 125:1,11,15,21 126:14

**overtones** 128:21

**Owen** 109:23 110:7 112:9,10,14 124:19

## P

**p.m.** 4:3 10:13,14 13:18,19 21:7, 8 61:17,18 67:21,22 122:18,19 136:14

**pack** 48:11

**pages** 48:16,20 49:13

**paper** 47:13

**paperwork** 41:8

**paragraph** 37:14,16,18,24 38:2,7 52:21,22 53:1 56:16,18 59:23 61:22 62:3,24 65:15 66:10 71:6, 20 73:2 83:4 85:8,16 99:24 100:18,25 110:17 122:21,24 123:5 129:21

**paralegal** 4:19

**paralegals** 25:12

**parameters** 66:1,19

**paranoia** 33:9

**parents** 15:4 16:6,9,12 19:23

**part** 25:12 45:11 49:6 78:4 94:8 95:12 110:12 125:1

**partially** 91:1

**parts** 111:15

**party** 106:21

**past** 84:8 121:8 132:23

**path** 82:22

**patient** 78:7 108:4,7

**patients** 43:2 78:22 114:23

**paying** 51:16

**peer** 16:21

**penalty** 66:11

**pending** 55:17 66:25 67:1,3,11, 13,15 68:5,22,23,24

**people** 6:15 8:13 16:5,9 40:9 117:19 118:5 120:15 121:5,6,17, 21 122:3,12 135:2

**people's** 8:7 9:20

**perception** 43:9 105:10

**perceptions** 44:2

**perfectly** 8:24

**performed** 108:6

**performing** 114:21

**period** 11:9,11,12,15 30:24 35:20 36:13 101:17 103:9 105:9 119:2

**perjury** 66:11

**permission** 50:7

**permitted** 4:13

**persistently** 131:2,21

**person** 8:1 10:3,5 22:8 31:9 50:25 54:10 77:15 102:3,5 104:13,23 105:25 135:4

**person's** 7:22 8:22 31:18



personal 55:19 123:12

personality 33:17

persuade 130:22

pertaining 113:2

perverted 125:22 126:21

phone 102:3,5 107:5 115:5,6,7

photo 125:4

physical 30:1 36:22 114:7

physically 59:4 61:5

physician 27:19 28:12,20 29:19 32:8 74:22

pick 6:7

picked 124:12

piece 8:16 47:13 129:6

place 11:5 42:16 60:1 84:12,14, 23 85:1,4,12 98:21 135:15,18

places 34:4 50:14

plaintiff 56:19 57:9 60:5,6

Plaintiff's 77:21

planning 105:6,20 115:20

plans 102:6 115:5

play 100:11

pleading 38:14

plethora 129:4

plotting 105:20

point 19:16 26:11 27:7 30:20 72:9 87:10 88:16 96:5 111:8,15 116:22

pointed 120:5

police 71:24,25 72:18 73:17 94:23 133:19

policy 48:17,21 96:19 97:9

position 58:8,20 60:11 96:18 135:11

possibility 58:25 101:19 104:11, 20 105:17 114:3

Possibly 19:18

post 98:23

post-traumatic 32:25

potential 71:15 89:3 102:9 116:2

power 135:11

preceding 24:21

precisely 108:5

predator 83:12,18 84:6

predominant 118:12 128:23

prejudice 99:2

premedical 36:23 37:5

premedicine 34:23

preparation 25:1,9,24 37:8

prepare 24:23 37:10 105:23

prepared 108:20

prescribe 31:14,20

prescribing 32:7

prestigious 93:15

pretty 128:19,23 129:3

previous 88:23,24 89:18 121:16 123:23

previously 45:19

primary 27:19 28:12,20 29:19

prior 21:23 48:24 49:4,22 51:22 54:7 56:2 57:11 82:23 94:25 102:15 103:5 120:11,16,19 121:17 122:4,13 124:4

Privacy 49:2

private 82:9,10,13

probability 118:13

problem 7:6 115:16 118:21

procedures 108:5

process 46:5 98:17,20 106:16 112:13 133:12

processes 106:1

produced 70:9 108:16

professional 34:17 62:21 63:7

professionally 105:1

professionals 28:7

program 23:6,8 24:7 50:24

pronouncing 4:10

prosecutor 73:24

prospective 41:22 42:3

protected 8:2 10:5 117:16

protecting 42:16

protection 39:8 118:2,19

protocol 51:13

provide 26:16 72:17 77:15 89:16 95:13 131:11

provided 34:2 107:17 108:4 125:2

provider 28:19 29:21

providers 13:5 27:17 28:18 31:12

psychiatrist 28:20 31:13,14,20 32:12

psychological 28:21

psychologist 29:8 30:7

Psychosis 33:15

public 9:12 23:3 72:7 82:10 121:15

pulled 106:5

pump 32:21

purpose 54:20 108:8

purposes 4:13 10:18 49:24 72:12

pursuant 4:12

pursuit 93:20

pushed 82:19

put 4:9 33:23 36:9 38:13 49:15, 16 89:24 106:11 123:19 131:1,6, 18



HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100

## Q

qualifying 92:5

qualitatively 20:2

qualities 132:4

quality 132:13

question 5:8,12 6:8 8:20 9:5,6 11:25 15:15,19 16:11,18 19:23 20:16 27:21 28:8 32:22 38:2 44:19,22,23 45:1,3 46:9,11 47:6 48:19 52:7,14 53:17 54:1 55:17 57:24 58:3 65:12 66:17,24 67:1, 3,11,13,14 68:3,5,21,22,23,24 72:20,21 73:7 77:4,25 78:1 84:20 85:12 90:7,22,23 91:6 92:4,13,19,21 96:4,25 97:3,10 98:18,20 101:21 102:19 103:21 104:7,19 116:4,14,15 120:13 121:3,13,14 127:13 134:15 135:16

questioning 46:19

questions 4:21 5:22 6:18 9:19,24 21:1 23:19 27:16 33:6 39:2,3,12 40:4 44:15 55:9 61:10 69:7 73:4 74:20,23,25 75:5,10 76:14 82:23 86:20 87:2 98:9,16 133:24

quickly 45:17 63:20

## R

RACRT 39:16

raising 62:15,17,19,23 63:2,5,23, 24

range 108:21

rape 18:17 38:11,17 39:8 54:4,6

raped 74:22 94:20

rapes 100:7,8,17,18,25

rate 12:20

ratified 87:12

rationale 130:25

read 17:6 37:17,18 60:3 92:19

104:18 111:12 114:17,19 120:7 124:13 136:10,12

reads 83:11

ready 68:3 105:22

real 120:11

realized 62:19

reason 6:12,14,21 42:21 90:12, 13 91:3,9,13 92:7 93:25 94:8 100:24 103:19 104:7 118:10 120:14 122:12 132:21

reasonable 59:9

reasoning 130:24

reasons 6:19 75:14 132:10,15

reassembling 73:1

recall 6:17 25:22 32:13 123:13 131:14

receive 30:5 118:20 121:11

received 45:6,10 59:16 119:22, 24

recently 70:8 108:17 112:10

recognize 129:18,19

recollection 18:18 69:25

recommendation 88:16 89:3 95:8,13,22 130:8,11,21 131:2,8, 20,24 132:18 133:11

reconstruct 107:22,24

record 4:7 7:2,7,24,25 9:21 10:11,13,14,15 13:17,18,19 14:3,13 15:17 20:14,20,23 21:6, 7,8,9 22:24 28:25 32:19 40:20 41:3 55:23 61:17,18 67:21,22 69:4 72:8 85:16 99:10,11,12,14, 16 111:12 114:19 116:19 122:18,19 124:13

records 59:12,15 107:3,23 108:4, 7

recover 129:14

recurring 30:1

redacted 112:4 114:20 115:1

redo 131:7

refer 10:17 33:24

reference 100:17 111:7 125:10

referenced 100:25

referencing 110:22

referred 17:12 38:4

referring 72:13 100:8 112:17 124:13 126:12,13

refile 73:19

reflect 4:7 127:25

refresh 24:22

refused 88:19,21 95:14,22

refusing 9:11,25

regard 73:10

regular 30:1

Regulations 49:3

rejecting 130:21

related 14:7 76:14 86:22 106:6 114:3

relating 33:9

relations 83:22 84:8 126:24

relationship 7:14 12:14 20:2 29:13 30:21 36:20 38:25 40:9, 10,14,15 41:12,13,18,20 42:2, 23,25 51:16,23 52:4,23 54:22 55:10,13 56:2,9,10,19 57:1,8,10 61:11 74:9,12 75:6 76:14 78:11, 15 79:13,22 82:24 85:24 88:23, 24 89:4,18 100:13 120:11,16,18 121:8,17 122:4,13 123:24 124:5 132:24

relatives 13:23,24 14:1,5

relevance 39:11 52:3 72:15

relevancy 87:9

relevant 28:1,5 40:5,7 87:3 103:9 121:19

relied 102:25

relieve 77:7



remained 31:1

remedies 100:12

remember 13:3,9,11 16:25 18:1,
23 19:10,11,17 20:1 24:24 25:3,
18 28:16,17 30:4 31:18,19,23,24
32:9,22 58:13,14 63:20 70:5
102:7 123:22 125:7 127:14

remove 119:6

renamed 69:19

renewed 87:4

repeat 16:11 48:19 68:21 72:21
81:2 101:21 104:16 120:13
135:16

rephrase 47:11

report 70:3 71:24 72:18 73:17
78:3 94:18,23,24 101:9 133:15

reported 77:16 78:2,5 100:7
101:6

reporter 4:20 8:9 17:8 41:1 92:21
99:13 104:19

represent 4:17

reputation 38:16 133:5

request 41:7 46:22 47:14 50:4
77:25

requested 34:1

required 26:11 106:7

requirement 131:9

resemblance 71:21 72:14

resembles 61:6

reservations 71:8,11

respect 19:23 134:21

response 27:24

responses 26:6,7 34:1

result 131:11

retaliate 71:13 93:5,9,10,23

retaliated 95:11,14

retaliation 88:15 91:17,20 92:25
95:12 117:13,14 122:11,14

130:8 132:19 133:16 135:12,20

retaliatory 89:20,21

retracted 75:23

retrospect 63:4 114:13

return 5:11

review 63:14

reviewed 45:6 63:19

revisited 116:20

rid 107:21

road 41:13

Robin 29:3,9 33:5

roles 58:13

room 5:6 68:2 121:25

roommate 7:21 9:8 10:17,18
21:18,19 22:2,9,13 87:15,17

Royal 46:16

rule 5:15

rules 4:14,15,23

ruling 20:19 52:7 100:14

rulings 55:8

run 39:21

---

## S

sad 6:2

safe 115:9 117:9 118:3,8,13

sanctions 12:3

sat 93:13

scary 129:16,17

schedule 78:6

scheduling 37:6

Schoenfeld 35:2,23 36:21 37:21
38:4 39:17 40:10 41:10 42:13
45:12 48:3,6 51:23 52:24 53:4,
24 54:22 58:25 59:5,20 62:6
70:23,24 71:3,5,6 72:25 75:13,
18 79:19 97:19 98:2 101:14

103:6 108:17 121:9,25 133:5
135:6

Schoenfeld's 122:23

Scholarships 22:19

school 20:9 23:3 37:1,11,12
63:20 71:17 93:13 110:4 112:10,
12,14 131:8 133:19 135:22,25

schools 131:10

scientifically 131:19

scope 27:22 36:3,11,13 52:8
53:14 54:13,25 55:2 56:12 73:12
74:6 85:21 87:11 95:3 97:23
98:3,14 100:14 102:19

scrubs 62:17,20 63:1,2,5,7

search 70:9

searched 70:7

Security 49:2

seek 50:7

seekingarrangements.com
38:10

seekingarrangements.com.
39:19

semester 23:24,25 24:5

semesters 23:23 24:1

sending 113:22

sense 30:13

sentence 60:13,14 83:11

sessions 115:20

set 39:12 40:6 41:17 53:14 54:13,
24 56:12 74:6 78:6 86:15 95:3
97:23 98:4,14 101:22 102:19
105:8 136:8

setting 52:7 87:11 132:8

sex 40:10 56:5

sexual 18:16 38:16 51:16,22
53:23 54:6 56:19 61:4,7,10
82:23 83:11,17,21 84:6,8 88:23,
24 89:18 94:12 95:14,22 96:19
97:9 113:2 117:4 123:24 124:3



126:24 128:14,21,24 129:5
130:9 132:19,23

**sexual-type**  97:21

**sexually**  88:11 90:2 91:8 97:20
110:21 111:21 112:23,25 113:8,
16,23,25 114:11 115:2,3 116:9,
12,24 117:12,24 118:17 119:9,
13,23 122:25 126:9,10,23 127:4
130:20

**shadow**  59:4 114:21 117:15

**shadowed**  46:4,6 59:13 133:7

**shadower/shadowee**  78:11

**shadowing**  28:4 34:8,21,22
35:14,18 36:16,17,19 37:3 41:25
44:4,10 47:23 49:25 51:10 59:19
65:25 69:23 70:17,19 107:14,15
108:3 117:16 133:12

**shakes**  5:16

**share**  90:2 133:18

**shared**  128:8,10

**she'll**  9:1

**shield**  38:11,17 39:8

**shift**  94:11

**short**  15:24

**shortly**  124:11

**show**  47:25 111:3 134:11,13

**showed**  108:12

**showing**  50:19

**sibling**  17:1,2,11 18:5,7,9,10
20:5

**siblings**  16:5,10,12,15 17:25
18:2,19 19:3,16

**siblings'**  16:16

**side**  123:19

**sign**  27:9 44:14,21 136:11,12

**signature**  26:10 50:15

**signed**  27:2 50:12,16 65:22

**significance**  129:7

**similar**  37:5 83:21 84:7

**simply**  38:23

**Sincerely**  112:16 115:1

**sister**  15:1,7 17:7,8

**sit**  10:21 128:7

**site**  36:14 107:6,25 108:22

**sitting**  121:24

**situation**  35:11 55:20 87:17

**six-year**  13:10

**sixteen**  109:17

**sixth**  49:2

**slash**  34:17

**social**  10:20 11:13,21 12:8,10,13,
20 13:1,4

**solely**  81:9

**sort**  22:1 25:20 33:8 106:1,21

**sought**  100:12

**sound**  6:10 59:17 108:23,24

**sounds**  109:5 128:21

**space**  22:11 119:5

**speak**  116:19

**speaking**  20:3 96:3

**special**  20:8

**specialty**  29:20 93:22

**specific**  19:10,20 33:6 36:19
57:8 58:13 69:25 70:16 77:22
78:1 109:11

**specifically**  60:9 81:25 89:15
98:20 126:4

**spectrum**  20:8

**speculation**  53:2

**spell**  29:5

**spent**  132:6

**spoke**  94:16 115:6

**spring**  24:5 101:23 105:14

**staff**  43:2 58:18 78:23 80:11
134:8

**stages**  105:6

**stairwell**  82:9,10,13,20 95:16
113:6 114:8 122:23 124:24
125:24 127:18 128:4

**stake**  8:22 42:18 57:12

**stand**  65:22

**standard**  51:13

**standing**  41:12

**stands**  100:24

**start**  5:10 8:6 14:11 34:3,15
44:24 48:2 59:24 81:20 104:2
120:19

**started**  30:15 59:1 103:12 105:6,
14 115:12,21 116:3,25 117:5
118:14 135:23

**starting**  116:23

**state**  6:25 7:1 36:23 84:6 110:6

**statement**  60:25 63:25 72:11
114:6

**statement's**  63:22

**statements**  69:11

**states**  56:19 59:24

**status**  48:7 73:19

**step**  133:21

**stick**  38:14

**stop**  8:19

**strategize**  37:8

**strategy**  37:7

**straw**  131:3

**stress**  32:25

**stronger**  119:19

**student**  22:20,22,23 23:2,15
36:23 41:22,23 42:3 71:16
97:13,14 109:24,25 112:15,18
114:4 124:21 125:16



**students** 37:5 71:1 78:23 80:11

**studied** 91:3

**study** 112:8

**studying** 91:1

**stuff** 8:6 86:13

**subject** 57:7

**subleasing** 21:24 22:6,7,8

**submitted** 26:8 27:8 46:22

**subordinate** 78:17

**subtenant** 22:1

**successful** 37:10

**sued** 75:12,18

**suffer** 32:15

**suffers** 28:1

**suffice** 23:22

**suggest** 65:3

**suggesting** 8:21 38:22

**suggestions** 50:22

**suggestive** 112:25 113:8,23

**suit** 74:3

**summer** 23:13 24:10,12 59:6,7,
10 109:1,2,14,16

**summers** 23:25

**supervisor** 78:24

**supervisor/supervisee** 78:10
79:1

**supervisors** 58:16

**supervisory** 58:8 62:12

**surprise** 70:7,11

**surprising** 70:14

**suspicion** 62:15,17,19,23 63:2,5,
23,24

**swear** 67:6 108:20

**sworn** 4:5 74:2

**sympathy** 132:9

**synonymous** 69:24 70:15

**System** 49:10,21 79:3 80:10

---

**T**

**table** 6:8 52:14 121:24

**taking** 4:21 5:5 8:7 24:10 31:24
34:11 45:20 51:2

**talk** 14:5 21:17 25:1 30:9,10
58:24 61:8,9,11 74:2 79:18
91:23 93:4 94:19 102:5 105:24
115:5

**talked** 19:3,24 21:4 24:25 25:8,
23 65:24 108:17

**talking** 5:7,10 18:18 34:3 54:15
61:8 71:22 73:1,16 95:18 103:15
104:2,10,20 105:7,13 109:17
113:15 114:8 123:8,9 133:12,20
134:21 135:14,18

**Tara** 4:18

**task** 107:11

**tasks** 107:12

**Taubman** 44:3 82:5

**telemed** 31:8

**telling** 12:21 61:21 69:25 77:6
85:25 93:7 102:9 103:1,20 124:7
126:22 134:22

**ten** 108:19,21 122:22

**term** 32:2

**terminology** 70:5

**terms** 72:13 78:7 128:23

**terrific** 112:7

**testified** 4:6 62:2 64:20 72:24
79:8

**testimony** 26:24 27:1

**text** 114:14,25 115:4

**therapeutic** 29:13 30:9,13,20

**therapist** 28:20

**therapy** 30:9,10

**thing** 34:14 60:4 83:25

**things** 9:22 13:7 18:15,19 19:2,
14 34:12,25 35:16,19 38:1,22
45:17 50:17 78:8 79:12 86:21
107:9 129:7 133:15,20

**thinking** 28:2 118:7

**thirty-nine** 129:21

**thirty-six** 59:24 61:22 62:3,24
65:15 71:7,20 73:2

**thirty-three** 110:17 122:21 123:5

**thought** 15:16 43:20 93:5 108:19
116:19 121:6 127:20,21 128:2

**threat** 99:16,17

**Thursday** 4:2 114:22

**tie** 40:17

**time** 6:7 8:9 9:19 11:4,9,11,12,14
12:14 23:21 28:7 30:20,24 34:11
35:24 36:13 37:16 39:13 41:1,25
45:22 48:25 52:8 57:12 60:24
62:14,19 68:6 70:6 72:10,22
81:3 82:12 86:5,23,25 87:25
91:2 93:10 94:11,14 95:23 97:3,
15 98:21 101:2,16,17,21 102:9
103:8 104:15,16,24,25 105:8,10
109:3 115:20 116:6,8,9 119:1,2,
15,20,22,24 121:10,12,19
123:17 124:24,25 127:24
128:11,18,24 129:17 131:15
132:7 133:17 135:23 136:4

**times** 59:3,9,10,13,14 69:14
107:6 108:19,21 109:19,20,22
116:20 131:16 133:7

**Title** 41:11 70:3 87:20 88:4 94:18
95:25 96:5 98:24

**titles** 77:15

**today** 4:18 6:12,22,23 8:3 10:21
12:21 13:4,12 17:19 19:17
24:20,23 25:10,22,24 26:12 27:3
40:13 41:16 48:24 49:4,22 57:12
73:13 77:7 86:19 128:7 133:20

**today's** 23:20 57:7

**told** 39:16,18 43:6 45:20 47:17
52:11 59:20 62:9,14,17,20 63:6,

Jane Doe
06/08/2023

22 64:3 65:6 66:4 74:1 78:20
80:9,22 86:19 89:7 90:10,24
91:7 93:12 96:6 97:11 102:24
109:13 114:14 118:18 120:9
122:6 123:20 135:7

**Tom** 4:17

**ton** 98:16

**top** 100:1

**topics** 73:13

**total** 59:15 108:19

**totality** 43:3 119:20 132:25

**touch** 81:19,20 82:15,16 110:9
114:8

**touching** 81:22

**track** 106:6

**training** 41:6 44:12 45:24 46:3,5
79:20 108:8

**transcript** 8:11 9:12

**treaters** 27:16

**treatment** 28:22 30:5

**Troy** 14:16,23 15:3,22 29:12

**true** 25:13 36:16 37:25 38:2 56:9,
23 57:5 60:25 63:10,22,25 64:1
66:11,17 80:5 85:8,20 86:2 91:1,
18 92:22 98:25 99:1,3,4 128:2
129:25

**trust** 102:8,12,17,22 103:1,6,11
104:7 105:11 115:22 116:6

**trusted** 105:1

**truth** 26:13 86:13 90:20,25 91:12,
18 92:6,22

**truthful** 91:22 93:2,6

**turn** 37:14 64:6 77:12

**turns** 5:6

**TV** 94:16

**twelve** 53:3,8 83:2

**twenty** 17:3,17 109:19,20,22
133:7

**twenty-five** 56:16,18

**twenty-four** 52:21

**twenty-nine** 17:20

**twenty-one** 17:2 18:14

**twenty-seven** 17:2,11,12

**Twitter** 13:6

**two-minute** 122:16

**type** 29:7 30:5 36:19 70:16
106:22 110:14 119:3

---

**U**

**Uh-huh** 77:18,24 99:25

**Uh-uh** 31:25

**umich.edu** 110:11

**unable** 89:16

**uncle** 61:2,6 71:21 72:14 73:1
74:8 134:23,24

**uncomfortable** 6:2 81:12 82:4,
11,14 119:5 123:25 124:3

**undergrad** 110:3 112:14 124:20

**undergraduate** 50:23 109:25

**underlying** 17:24

**understand** 5:23,24 6:3 8:4 38:1,
21 43:9,17 72:5 76:10,15,19
92:18 97:1 120:15 126:13
130:24 133:4

**understanding** 19:1 39:5 96:14
132:9

**understanding/perspective**
112:12

**understands** 76:25 77:6

**understood** 116:20 126:12

**United** 24:15

**university** 12:14 23:3,16 35:2,5,
11 36:24 37:1 39:1 40:14,17
41:9,18,20,22,24 42:2,22 46:23
47:23 48:5 49:9,20 50:1,3 52:4
54:19,21 55:10 57:1,9,11,24

58:12,21 71:16 73:9 74:10 77:16
78:3,14,15,16,18 79:3 80:10
84:1 85:24 89:25 93:14 95:1
97:13,14 100:6,13 109:24 110:1,
6,14 117:2 125:12 135:24

**university's** 96:19 97:9

**unprofessional** 67:6,8

**unreal** 12:6

**untruthful** 64:24 65:5 133:2

**upset** 95:7,11

---

**V**

**vaccinations** 106:6

**valid** 35:16

**verbal** 5:17 127:6,8

**verbally** 91:8 123:8,9 124:10

**versus** 125:17

**vicinity** 132:3

**view** 35:1

**viewing** 86:18

**virtue** 22:10 79:4

**visiting** 48:17,20 50:4

**visits** 30:22

**voice** 5:2

**volunteer** 37:9

---

**W**

**wait** 5:11 8:9 46:8 51:4 52:2
53:13 55:16 59:25 73:18,21,25
88:8 96:22 111:10

**waited** 93:25

**wanted** 53:4 60:11 65:4 73:2
104:14,23 121:21

**wanting** 105:11

**ways** 34:7 93:12

**wear** 62:17,20 63:1,2,4,7



wearing  125:5,6

website  38:8,9,15,21 39:10,11
40:4,5,8

week  59:7,11 73:19 109:1,2,13

weekly  30:16

weeks  109:2,17

win  126:19

window  11:19 13:10 86:22 98:12
116:11 133:17

wink  112:19,20,21 113:22 114:3,
5 124:21 125:17

winning  125:21

winter  23:13,24 24:8 59:6,7,8,19
109:3 115:13 116:16

wise  120:18 121:2

woman  29:9

women  83:21 84:8

won  125:18 126:7,16,17,18,23

wonderful  77:9

word  43:8 45:8 58:14,15,18
65:23 66:1,18 69:23 90:17,19
96:2

worded  60:20,21 61:23 63:3

words  34:6,7,9 35:10 36:9,24
53:1 62:23 63:9 64:5,23,25
69:24 83:15 89:10 106:17

work  104:14,23 106:18 118:1
119:5 132:14 133:6

worked  83:6 89:24 130:25 131:6

working  22:16 70:25 72:1 73:22
131:17

workplace  123:25

works  4:19 74:12

world  10:5 38:6 70:10

worried  117:20

write  88:16 132:17,22

written  46:21 47:21 62:4 127:6
132:2

wrong  36:6 119:17 122:24

---

**X**

---

Xanax  32:6

---

**Y**

---

year  60:24 61:1 107:20,21
129:16

years  12:22 13:2 87:25 88:2,8
93:25 127:21 133:17

yesterday  11:16 25:22

---

**Z**

---

Zoom  31:8


HANSON RENAISSANCE
COURT REPORTERS & VIDEO
hansonreporting.com
313.567.8100